IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

RICHARD LEE BROWN, ET AL.,   :
                            :     CIVIL ACTION NO.:
                            :     1:20-cv-3702-WMR
                            :
             Plaintiffs,    :
                            :
        v.                 :
                            :
SEC. ALEX AZAR, ET AL.,    :
                            :
           Defendants.   :

## PLAINTIFFS' BRIEF IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION

Pursuant to Rule 65 of the Federal Rules of Civil Procedure, Plaintiffs Richard Lee (Rick) Brown, Jeffrey Rondeau, David Krausz, Sonya Jones and the National Apartment Association (NAA) move for a preliminary injunction against Defendants, Secretary Alex Azar, U.S. Department of Health and Human Services, Acting Chief of Staff Nina B. Witkofsky, and U.S. Centers for Disease Control and Prevention (collectively "CDC") vacating their September 1, 2020 Order, which suspended lawful residential evictions as applied to Plaintiffs.

Plaintiffs have faithfully upheld their end of the landlord/tenant contract. Plaintiffs had a right to expect that if their tenants did not pay rent the law and the

courts would be open to them. The livelihoods of NAA members across the country depend on this understanding.

Plaintiffs upheld their end of the bargain. They provided habitable homes to their tenants and continue to pay for maintenance, utilities and other expenses. Upon breach of lease Plaintiffs should have been able to follow the lawful process laid down by state law for retaking possession of their homes.

Plaintiffs failed to anticipate, however, that CDC, a federal agency without any authority over housing, would issue a sweeping order suspending *state* law under the flimsy premise that doing so was "necessary" to control the COVID-19 pandemic. CDC's actions are not authorized by statute or regulation. They are unprecedented in our history and unconstitutionally deny property owners across the country to access the courts. CDC's effort to seize control of state law on such an insupportable basis is causing irreparable harm and must be rejected. This Court should therefore issue a preliminary injunction.

## I. FACTS

Mr. Brown owns a residential property in Winchester, VA. (Brown Decl. at ¶ 3.) He has a mortgage on the property and makes monthly payments of approximately $400 for the mortgage principal, interest and taxes. (Brown Decl. at ¶ 4.) On April 1, 2017, Mr. Brown leased the property to a tenant, who agreed to pay monthly rent of $925, and the lease is currently in effect. (Brown Decl. at ¶ 5.)

2

Mr. Brown's tenant has fallen behind on rent and asserted to Mr. Brown that she is unable to pay because of economic stress arising from the COVID-19 pandemic, has used best efforts to obtain available government assistance and otherwise pay rent, has no other home to go to, and is making less than $99,000 annually. (Brown Decl. at ¶ 6.) To date, the tenant owes $8,092 in unpaid rent and has made no payments at all to Mr. Brown for several months. (Brown Decl. at ¶ 6.)

Mr. Rondeau owns a residential property in Vale, NC, where he intends to live once he retires. (Rondeau Decl. at ¶ 3.) Starting on May 1, 2019, he rented the property for a monthly rent of $1,000, and the lease was renewed in May 2020 and is currently in effect. (Rondeau Decl. at ¶ 5.)

Mr. Rondeau's tenant had a spotty payment history and has not paid any rent since July 6, 2020. (Rondeau Decl. at ¶ 7.) The tenant now owes more than $2,100 in rent and fees. (Rondeau Decl. at ¶ 7.) On August 17, 2020, Mr. Rondeau filed for a summary ejectment in North Carolina state court. (Rondeau Decl. at ¶ 8.) A state judge granted ejectment on August 24, 2020 and ordered a sheriff to serve a writ of possession removing the tenants from the property. (Rondeau Decl. at ¶ 8.) The eviction was set to take place on September 21, 2020. (Rondeau Decl. at ¶ 9.)

Mr. Krausz owns a residential property in Columbia SC, which he leased to a tenant for a monthly rent of $700. (Krausz Decl. at ¶ 3.) He has a currently effective lease agreement with the tenant. (Krausz Decl. at ¶ 3.) Mr. Krausz's tenant fell

3

behind on rent in July 2020, and now owes approximately $2265 in unpaid rent. (Krausz Decl. at ¶ 4.)

On July 7, 2020, Mr. Krausz filed an application for ejectment to initiate the legal eviction process under South Carolina law. (Krausz Decl. at ¶ 5.) Mr. Krausz's tenant requested a hearing, which was held on July 30, 2020. (Krausz Decl. at ¶ 6.) At the hearing Mr. Krausz and his tenant entered into a consent agreement where the tenant would have 4 days to pay $700 towards past due rent, and then was required to pay an additional $2265 in unpaid rent by August 31, 2020. (Krausz Decl. at ¶ 7.) The tenant agreed to waive their right to an additional hearing. (Krausz Decl. at ¶ 7.) If the tenant breached the agreement, which was accepted by the court, then Mr. Krausz was entitled to request the court issue a writ of ejectment immediately without any further hearings on the matter. (Krausz Decl. at ¶ 7.) Mr. Krausz's tenant paid $700 for July's rent as agreed but failed to pay any portion of the outstanding $2265. (Krausz Decl. at ¶ 8.)

On September 11, 2020 Mr. Krausz requested service of a writ of ejectment from the magistrate court, which is a process by which a sheriff evicts a tenant under South Carolina law. (Krausz Decl. at ¶ 9.) The writ was granted, and the Richland County South Carolina Sheriff's Department scheduled an eviction of Mr. Krausz's tenant for September 21, 2020. (Krausz Decl. at ¶ 10.)

4

Ms. Jones owns a residential property in Jesup, GA, which she leased to a tenant for a monthly rent of $450. (Jones Decl. at ¶ 3.) Ms. Jones has a currently effective lease agreement with her tenant. (Jones Decl. at ¶ 3.) Ms. Jones' tenant has fallen behind on rent and now owes more than $1800 in unpaid rent, plus late fees. (Jones Decl. at ¶ 4.) Under Georgia law Ms. Jones is entitled to seek an eviction for nonpayment of rent. (Jones Decl. at ¶ 4.)

On March 27, 2020, Congress passed the Coronavirus Aid, Relief, and Economic Security (CARES) Act, P.L. 116-316, which included in Section 4024 a limited and temporary moratorium on evictions for certain types of federally-backed housing that expired on July 24, 2020.

On September 1, 2020, Defendant Acting Chief Witkofsky issued an order titled, "*Temporary Halt in Residential Evictions to Prevent Further Spread of COVID-19.*" The CDC Order became effective upon publication in the Federal Register, which occurred on September 4, 2020. 85 Fed. Reg. 55292 (Sept. 4, 2020).

The Order said, "Under this Order, a landlord, owner of a residential property, or other person with a legal right to pursue eviction or possessory action, shall not evict any covered person from any residential property in any jurisdiction to which this Order applies during the effective period of the Order." *Id*.

The Order said, "'Evict' and 'Eviction' means any action by a landlord, owner of a residential property, or other person with a legal right to pursue eviction or a

possessory action, to remove or cause the removal of a covered person from a residential property. This does not include foreclosure on a home mortgage." *Id*. at 55293. The Order also said, "[A] person violating this Order may be subject to a fine of no more than $100,000 if the violation does not result in a death or one year in jail, or both, or a fine of no more than $250,000 if the violation results in a death or one year in jail, or both[.]" *Id*. at 55296.

It also applied to "covered persons" who are tenants "of a residential property" who attest that they (1) have "used best efforts to obtain all available government assistance for rent or housing;" (2) "either (i) expects to earn no more than $99,000 in annual income for Calendar Year 2020 … (ii) w[ere] not required to report any income in 2019 to the U.S. Internal Revenue Service, or (iii) received an Economic Impact Payment [under] … the CARES Act;" (3) are "unable to pay the full rent or make a full housing payment due to substantial loss of household income, loss of compensable hours of work or wages, a lay-off, or extraordinary out-of-pocket medical expenses;" (4) they are "using best efforts to make timely partial payments that are as close to the full payment as the individual's circumstances may permit, taking into account other nondiscretionary expenses;" and (5) "eviction would likely render the individual homeless—or force the individual to move into and live in close quarters in a new congregate or shared living setting—because the individual has no other available housing options." *Id*. at 55293.

The Order claimed to have been issued pursuant to Section 361 of the Public Health Service Act, 42 U.S.C. § 264, and 42 C.F.R. § 70.2. *Id*. at 55297. It claimed criminal enforcement authority under 18 U.S.C. §§ 3559, 3571, 42 U.S.C. §§ 243, 268, 271, and 42 C.F.R. § 70.18. *Id*. at 55296.

CDC also set out a series of justifications and "findings." *Id*. at 55294-96. Because "[e]victed renters must move," the Order concluded eviction "leads to multiple outcomes that increase the risk of COVID-19 spread." *Id*. at 55294. It then concluded that "mass evictions" and "homelessness" "would likely increase the interstate spread of COVID-19." *Id*. at 55295. Thus, Acting Chief Witkofsky "determined the temporary halt in evictions in this Order constitutes a reasonably necessary measure under 42 CFR 70.2 to prevent the further spread of COVID-19 throughout the United States. [She] further determined that measures by states, localities, or U.S. territories that do not meet or exceed these minimum protections are insufficient to prevent the interstate spread of COVID-19." *Id*. at 55296.

The Order was effective upon publication until December 31, 2020, "unless extended." *Id*. at 55297.

Mr. Brown has maintained the property in compliance with all legal obligations as a landlord, and the tenant has no other defense to her nonpayment of rent. (Brown Decl. at ¶ 7.) Mr. Brown is entitled to writs of possession and eviction. (Brown Decl. at ¶ 7.) He now intends to seek eviction of his tenant for nonpayment

7

of rent using legal process in Virginia state courts. (Brown Decl. at ¶ 9.) Based on information provided by his tenant, Mr. Brown believes that his tenant is a "covered person" under the CDC Order, and will provide a relevant affidavit if Mr. Brown initiates eviction procedures against her. (Brown Decl. at ¶ 10.) Mr. Brown intends to violate the CDC Order through lawful processes under Virginia law by seeking an eviction order and having a sheriff forcibly remove his tenant from the property. (Brown Decl. at ¶ 11.) Mr. Brown intends to violate the CDC Order even if his tenant presents an attestation in eviction proceedings that she is a "covered person" as defined the CDC Order. (Brown Decl. at ¶ 12.)

Because of the CDC Order, Mr. Brown is suffering significant economic damages, including $8,092 in unpaid rent, as well as monthly maintenance costs, damages to his property and the lost opportunity to rent or use the property at fair market value of at least $925 per month. (Brown Decl. at ¶ 14.) The tenant is also insolvent (and judgment proof), and Mr. Brown will not be able to obtain any economic relief or damages from the tenant once the CDC Order expires at the end of December. (Brown Decl. at ¶ 14.) Mr. Brown's only opportunity to mitigate his loss will be from ousting the tenant who is in wrongful possession of the premises and renting the property to another tenant. (Brown Decl. at ¶ 14.)

Mr. Rondeau has complied with all legal obligations as a landlord, and his tenants had no other defense to eviction under North Carolina law. (Rondeau Decl.

at ¶ 11.) On September 6, 2020, however, Mr. Rondeau's tenants provided him with an affidavit pursuant to the CDC Order. (Rondeau Decl. at ¶ 10.) The tenant declared under penalty of perjury that all conditions required for the CDC Order applied to them. (Rondeau Decl. at ¶ 10.) Mr. Rondeau intends to use legal means under North Carolina law to remove the tenants from the property notwithstanding the CDC Order purporting to halt state eviction proceedings. (Rondeau Decl. at ¶ 12.)

Because of the CDC Order, Mr. Rondeau has also suffered significant economic damages, including $2100 in unpaid rent and fees, as well as monthly maintenance costs, damages to his property and the lost opportunity to rent or use the property at fair market value of at least $1000 per month. (Rondeau Decl. at ¶ 13.) His tenant has also declared that she is insolvent, meaning that his only hope to mitigate his losses will be from ousting the tenant and renting the property to another tenant. (Rondeau Decl. at ¶ 13.) Mr. Rondeau also faces the very real possibility that, if he is unable to evict his tenant and earn rent prior to the Order's expiration in January 2021, he will be unable to meet his mortgage obligations and will lose his house in foreclosure. (Rondeau Decl. at ¶ 14.)

On September 16, 2020, Mr. Krausz's tenant provided the South Carolina court with a declaration consistent with the CDC Order. (Krausz Decl. at ¶ 11.) The South Carolina court then immediately stayed the eviction. (Krausz Decl. at ¶ 12.)

Mr. Krausz has maintained his property in compliance with all legal obligations as a landlord, and his tenant has no defense for her nonpayment of rent. (Krausz Decl. at ¶ 13.) Mr. Krausz is also entitled to regain possession of his property under South Carolina law. (Krausz Decl. at ¶ 13.) Because of the CDC Order, Mr. Krausz has incurred significant economic damages, including approximately $2,265 in unpaid rent and fees, as well as monthly maintenance costs, damages to his property and the lost opportunity to rent or use the property at fair market value of at least $700 per month. (Krausz Decl. at ¶ 14.) The tenant is also likely insolvent, and Mr. Krausz will not likely be able to obtain any economic relief or damages from her. Mr. Krausz's only opportunity to mitigate his loss will be from ousting the tenant who is in wrongful possession of the premises and renting the property to another tenant. (Krausz Decl. at ¶ 14.)

On August 24, 2020, Ms. Jones filed and served a dispossessory affidavit on her tenant consistent with Georgia law, directing her tenant to vacate the property. (Jones Decl. ¶ 5.) Ms. Jones' tenant requested a hearing, which was held on September 8, 2020, the first business day following the effective date of the CDC Order. (Jones Decl. ¶ 6.) At the hearing Ms. Jones' tenant said that his challenge to the eviction was related to the COVID-19 pandemic, and the court continued all proceedings until January 2021 in purported compliance with the CDC Order. (Jones Decl. ¶ 7.) Based on information provided to Ms. Jones by her tenant, and the

10

tenant's representations in court, Ms. Jones' tenant is a "covered person" as defined by the CDC Order. (Jones Decl. ¶ 8.)

Ms. Jones has maintained her property in compliance with all legal obligations as a landlord, and the tenant has no defense for their nonpayment of rent. (Jones Decl. ¶ 9.) She is entitled to regain possession of the property under Georgia law. (Jones Decl. ¶ 9.) Because of the CDC Order, Ms. Jones has incurred significant economic damages, including about $1,800 in unpaid rent and fees, plus monthly maintenance costs, damages to the property and the lost opportunity to rent or use the property at fair market value of at least $450 per month. (Jones Decl. ¶ 10.) The tenant is also insolvent, and Ms. Jones will not be able to obtain any economic relief or damages from him. (Jones Decl. ¶ 10.) Ms. Jones' only opportunity to mitigate the loss will be from ousting the tenant who is in wrongful possession of the premises and renting the property to another tenant. (Jones Decl. ¶ 10.)

NAA is a trade association for owners and managers of rental housing that is comprised of over 85,185 members managing more than 10 million rental units throughout the United States. (Pinnegar Decl. at ¶ 1.) NAA has members in all 50 states. NAA also has a significant number of members managing "Class C" properties, which typically have lower rents and serve lower-income tenants than Class A or B properties.

There are currently an estimated 43,811,786 renter-occupied housing units in the United States. Approximately 86% of those units are occupied by tenants with annual household incomes below $100,000. Recent studies have estimated that because of the economic downturn associated with COVID-19, there will be a nationwide shortfall of rental payments over the next four months of $21,545,000,000. Stout Risius Ross, LLC, *Estimation of Households Experiencing Rental Shortfall and Potentially Facing Eviction*, https://app.powerbi.com/view?r=eyJrIjoiNzRhYjg2NzAtMGE1MC00NmNjLTllO TMtYjM2NjFmOTA4ZjMyIiwidCI6Ijc5MGJmNjk2LTE3NDYtNGE4OS1hZjI0L Tc4ZGE5Y2RhZGE2MSIsImMiOjN9, (last visited September 17, 2020).

NAA's members have seen a growing problem in the past few months with tenants unable to pay to rent. (Pinnegar Decl. at ¶¶ 3-4.) In a recent national survey, more than half of small landlords reported that they had at least one tenant not pay rent in June. Terner Center for Housing Innovation, U.C. Berkley, *How Are Smaller Landlords Weathering the COVID-19 Pandemic?* (July 2020), https://nahrep.org/downloads/NAHREP-Terner-Center-Landlord-Survey-Factsheet.pdf. More than half of landlords reported that rent collections are down from the first quarter, with 30% of respondents saying they are down more than 25%. *Id*. One-quarter of all respondents had to borrow funds to cover shortfalls in operating costs. *Id.* Moreover, nearly 40% of respondents lacked confidence "in

being able to cover their operating costs over the next quarter," even *without* restrictions on evictions. *Id.*

Nationwide "[o]ne-in-three renters started September with outstanding back rent owed." Igor Popov, Rob Warnock, and Chris Salviati, *Despite Slight Improvement, Rent Payment Struggles Continue*, Apartment List (Sept. 9, 2020), https://www.apartmentlist.com/research/september-housing-payments. Moreover, only about a third of all renters "made an on-time rent payment in the first week of September." *Id*. In the end, approximately 10% of tenants are not expected to pay rent at all during September. *Id.*

Class C properties, moreover, have experienced even greater financial strain. With the expiration of many COVID-related government assistance, Class C properties "have seen a 15 percent point drop" in "full rent payments" from June to July of this year. LeaseLock, *Class C Residents Show Signs of Growing Financial Strain* (July 2020). The total "percentage of rent collected at Class C properties has dipped 17 percentage points and remains more than 40 percentage points below the pre-COVID average." *Id*. Nationwide, only 24% of Class C tenants paid their rent within the first 15 days of July. *Id*.

NAA's members have tenants in jurisdictions across the country in default of their leases for nonpayment of rent. (Pinnegar Decl. at ¶¶ 4-5.) Overwhelmingly, these members are unable to access lawful eviction proceedings because of the CDC

13

Order. (Pinnegar Decl. at ¶¶ 2-3.) Because of the CDC Order, NAA's members have suffered significant economic damages, including unpaid rent and fees, as well as monthly maintenance costs, damages to their property and the lost opportunity to rent or use their properties at fair market value. (Pinnegar Decl. at ¶¶ 4-5.) NAA's members will be unlikely to obtain any economic relief or damages from their tenants once the CDC Order expires at the end of December because, by definition, any tenant presenting an appropriate attestation will be insolvent. (Pinnegar Decl. at ¶¶ 4-5.) NAA members' only opportunity to mitigate their losses will be from ousting their tenants who are in wrongful possession of the premises. (Pinnegar Decl. at ¶¶ 4-5.)

## II. ARGUMENT

### A. Jurisdiction

A plaintiff has standing to raise a pre-enforcement challenge to a criminal restriction when they can tie economic harm to government action and there is a realistic threat of enforcement. *See Virginia v. Am. Booksellers Ass'n, Inc.*, 484 U.S. 383, 393 (1988) ("We are not troubled by the pre-enforcement nature of this suit. The State has not suggested that the newly enacted law will not be enforced, and we see no reason to assume otherwise. We conclude that the plaintiffs have alleged an actual and well-founded fear that the law will be enforced against them."); *Adinolfe v. United Techs. Corp.*, 768 F.3d 1161, 1172 (11th Cir. 2014) ("Economic harm ...

14

[is] a well-established injur[y]-in-fact under federal standing jurisprudence."); *Ga. Latino All. for Human Rights v. Governor of Ga.*, 691 F.3d 1250, 1257-58 (11th Cir. 2012) ("When, as here, plaintiffs file a pre-enforcement, constitutional challenge to a state statute, the injury requirement may be satisfied by establishing a realistic danger of sustaining direct injury as a result of the statute's operation or enforcement.").

The Administrative Procedure Act (APA) entitles "[a] person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action ... to judicial review thereof." 5 U.S.C. § 702. The APA requires courts to set aside agency action that is rule that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," "contrary to constitutional right" or "in excess of statutory jurisdiction [or] authority." 5 U.S.C. §§ 706(2)(A), (B), (C).[1]

---

[1] Alternatively, the Supreme Court has "long held that federal courts may in some circumstances grant injunctive relief against" federal officials violating federal law. *Armstrong v. Exceptional Child Ctr., Inc.*, --- U.S. ----, 135 S. Ct. 1378, 1384 (2015); *see also Corr. Servs. Corp. v. Malesko*, 534 U.S. 61, 74 (2001) ("[I]njunctive relief has long been recognized as the proper means for preventing entities from acting unconstitutionally."). "The ability to sue to enjoin unconstitutional actions by state and federal officers is the creation of courts of equity, and reflects a long history of judicial review of illegal executive action, tracing back to England." *Armstrong*, 135 S. Ct. at 1384. Moreover, while "the APA is the general mechanism by which to challenge final agency action" "this does not mean the APA forecloses other causes of action." *Sierra Club v. Trump*, 929 F.3d 670, 699 (9th Cir. 2019). Thus, a court has the equitable power to entertain a constitutional claim even if it is not reviewable under the APA—"claims challenging agency actions—particularly constitutional claims—may exist wholly apart from the APA." *Id*. To the extent that any of

15

Rule 65(a) of the Federal Rules of Civil Procedure allows a court to issue a preliminary injunction if there is: (1) a substantial likelihood of success on the merits; (2) that the preliminary injunction is necessary to prevent irreparable injury; (3) that the threatened injury outweighs the harm the preliminary injunction would cause the other litigant; and (4) that the preliminary injunction would not be averse to the public interest. *See Nken v. Holder*, 556 U.S. 418, 434 (2009); *Siebert v. Allen*, 506 F.3d 1047, 1049 (11th Cir. 2007).

### B. Plaintiffs Have a Likelihood of Success on the Merits

### 1. The CDC Order Is Without a Statutory or Regulatory Basis

"Even before the birth of this country, separation of powers was known to be a defense against tyranny," and "it remains a basic principle of our constitutional scheme that one branch of the Government may not intrude upon the central prerogatives of another." *Loving v. United States*, 517 U.S. 748, 756-57 (1996). Thus, "an agency literally has no power to act … unless and until Congress confers power upon it." *La. Pub. Serv. Comm'n v. FCC*, 476 U.S. 355, 374 (1986). "[A]n administrative agency's power to regulate … must always be grounded in a valid grant of authority from Congress." *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 161 (2000).

---

Plaintiffs' constitutional claims are not cognizable under the APA, they bring them here as a matter of equity under this Court's inherent jurisdiction.

16

CDC's Order is purportedly authorized by 42 U.S.C. § 264 and 42 C.F.R. § 70.2, but neither provision grants the agency the broad authority to unilaterally void state laws across the country. Section 264(a) says that the Surgeon General may "make and enforce such regulations as in his judgment are necessary to prevent the introduction, transmission, or spread of communicable diseases from … one State or possession into any other State or possession." And in particular, the statute allows for "such inspection, fumigation, disinfection, sanitation, pest extermination, destruction of animals or articles found to be so infected or contaminated as to be sources of dangerous infection to human beings, and other measures, as in his judgment may be necessary." *Id*.

The regulation, in turn, allows the CDC Director to "take such measures to prevent such spread of the diseases as he/she deems reasonably necessary, including inspection, fumigation, disinfection, sanitation, pest extermination, and destruction of animals or articles believed to be sources of infection" when she "determines that the measures taken by health authorities of any State or possession (including political subdivisions thereof) are insufficient to prevent the spread of any of the communicable diseases from such State or possession to any other State or possession[.]" 42 C.F.R. § 70.2.

Neither § 264(a) nor § 70.2 authorize CDC to issue a nationwide eviction moratorium. At most, those provisions allow limited orders related to certain disease

17

control measures, but it does not justify a wholly unrelated ban on legal eviction proceedings. Traditional canons of construction such as *ejusdem generis*, *expressio unius*, *noscitur a sociis*, and *casus omissus* show that CDC lacks the authority it needs to hold out the Order as the supreme law of the land. *See* Antonin Scalia & Bryan Garner, *Reading Law: The Interpretation of Legal Texts*, 199-213, 107-111, 195-198, 93-100, 174-179 (Thompson/West 2012). These canons show that the link between the relevant federal statutes and CDC Order is too weak and attenuated to allow CDC to lawfully deprive Plaintiffs of state-court eviction processes.

Both the statute and regulation speak in terms of "inspection, fumigation, disinfection, sanitation, pest extermination, [or] destruction of animals or articles," 42 U.S.C. § 264(a); 42 C.F.R. § 70.2, all of which are far afield from *eviction procedures under state law*. Under the *ejusdem generis* canon, both provisions must be limited to actions taken in keeping with these examples. *Ejusdem generis* looks to the genus to which the initial terms belong—controlling communicable diseases through inspection and destruction of animals and articles—and presumes that the drafter has that genus or category in mind for the entire passage; the tagalong general term cannot render the prior enumeration superfluous. *See, e.g.*, *Circuit City Stores, Inc. v. Adams*, 532 U.S. 105, 109, 115 (2001) ("contracts of employment of seamen, railroad employees, or any other class of workers engaged in foreign or interstate commerce" held to include only transportation workers in foreign or interstate

commerce); *McBoyle v. United States*, 283 U.S. 25, 26, 27 (1931) ("automobile, automobile truck, automobile wagon, motor cycle, or any other self-propelled vehicle not designed for running on rails" held not to apply to an airplane). Voiding state eviction laws, of course, bears no relationship to "inspection, fumigation, disinfection, sanitation, pest extermination, [or] destruction of animals or articles," and thus would extend the term "other measures as … may be necessary" far beyond any rational reading. *See* 42 U.S.C. § 264(a).

*Expressio unius*, or the negative-implication canon, supports the same result. This canon has greater force the more specific a statutory enumeration. Scalia & Garner at 108. Here, the enumeration in 42 U.S.C. § 264(a) is so specific to the types of ways to stop the "spread of communicable diseases" that the more general phrase ("and other measures, as in his judgment may be necessary") cannot go much beyond the scope of the narrow specifics that precede it. Nor can the regulation's reference to "reasonably necessary" measures extend to CDC's Order. Evictions, property law, landlord-tenant law, and law relating to non-impairment of contracts are well beyond the genus of the enumeration in § 264(a) and, therefore, CDC has no power to issue the eviction moratorium challenged here.

*Noscitur a sociis*, or the associated-words canon, also instructs that words in a list are associated in a context suggesting that they should have a similar meaning. Scalia & Garner at 195; *Yates v. United States*, 574 U.S. 528, 544 (2015) ("'Tangible

19

object' is the last in a list of terms that begins 'any record [or] document.' The term is therefore appropriately read to refer, not to any tangible object, but specifically to the subset of tangible objects involving records and documents, *i.e.*, objects used to record or preserve information."). So too here. "[A]ny other measures" is appropriately read to refer, not to *any* measures such as eviction moratoriums but only to a subset of measures similar to those enumerated: "inspection, fumigation, disinfection," and so forth. *See* 42 U.S.C. § 264(a). And "reasonably necessary" measures must be also be the same in kind. *See* 42 C.F.R. § 70.2.

*Casus omissus*, or the omitted-case canon, instructs the courts to be careful not to supply "judicial legislation." *Ebert v. Poston*, 266 U.S. 548, 554 (1925). "To supply omissions transcends the judicial function." *Iselin v. United States*, 270 U.S. 245, 251 (1926). Neither the operative statute nor the regulation say anything about displacing state property law, and it would be inappropriate for this Court to supply that which Congress left out of 42 U.S.C. § 264(a). To read these provisions so broadly would be a breathtaking expansion of what Congress clearly meant to allow.

Reading either provision to allow for CDC to create a substantive criminal law for violating a federal eviction moratorium would violate the constitutionally-required rule of lenity. *See Yates v. United States*, 135 S.Ct. 1074, 1088 (2015); *United States v. Jeter*, 329 F.3d 1229, 1230 (11th Cir. 2003). Lenity is a rule of statutory construction that "requires courts to construe ambiguous criminal statutes

20

narrowly in favor of the accused." *United States v. Wright*, 607 F.3d 708, 716 (11th Cir. 2010) (Pryor, J. concurring).

Two constitutional principles underlie lenity: due process and the separation of powers. The rule protects individuals' rights "by requiring fair warning of what the law intends to do if a certain line is passed." *Id.* at 717 (cleaned up). Lenity also protects the separation of powers "by reserving to the legislature the task of determining what conduct to prohibit and what punishment to impose." *Id.*; *see United States v. Bass*, 404 U.S. 336, 348 (1971). Stated another way, lenity "promotes separation of powers by reserving to Congress the power to 'define a crime, and ordain its punishment.'" *Wright*, 607 F.3d at 719 (Pryor, J., concurring) (citation omitted). By construing ambiguous criminal statutes in favor of the accused, the "judicial branch refrains from expansively interpreting criminal statutes so as to prohibit more conduct or punish more severely than Congress intended." *Id.* at 717 (citing *Ladner v. United States*, 358 U.S. 169, 177-78 (1958)).

To the extent that there is any ambiguity in the phrasing "inspection, fumigation, disinfection," etc., the language must be construed against CDC given the criminal penalties the Order imposes. If the language were read to allow the eviction moratorium, CDC could consolidate both legislative and executive functions in a single branch and create new criminal law where none existed before. CDC is explicit that those who violate the Order face criminal consequences,

including up to a year in prison and hundreds of thousands of dollars in fines. 85 Fed. Reg. at 55296. But processing evictions under state law is undoubtedly a lawful exercise of the states' legislative judgment. And it is certainly not *criminal* in the eyes of Congress. Vesting unilateral authority to say otherwise and imprison citizens for *following state law* based on the thinnest reed of being "necessary" for disease control violates lenity. *See Wright*, 607 F.3d at 719 (Pryor, J., concurring).

Even if the provisions *could* be read so broadly as to allow the Order, CDC's actions fail the textual limit of being "reasonably necessary." Section 70.2 requires CDC to first determine that "measures taken by health authorities of any State … are insufficient to prevent the spread of any of the communicable diseases from such State." But CDC's findings are woefully inadequate. CDC relies on the outlandish leap in imagination that because "mass evictions" and "homelessness" might increase the likelihood of COVID-19 infection then allowing any number of evictions in any state is insufficient to prevent the spread of the disease. *See* 85 Fed. Reg. at 55294-96. Such catastrophizing hardly follows basic logic. Why should a single eviction following ordinary process necessarily result in "mass evictions," much less mass homelessness? And why should courts assume that newly evicted individuals will not find less expensive (or perhaps fully subsidized) housing? CDC has not established a factual basis for its assumption that newly evicted individuals might mingle with others in a way more dangerous to public health than dining in

restaurants or attending church services. CDC's Order seems to refute this notion as it does not apply to "foreclosures on a home mortgage," even though such evictions would seem to implicate homelessness to the same degree as residential lessees. *Id*. at 55293. CDC apparently sees nothing unreasonable in states allowing in-person dining, indoor worship, and even in-person bar service but has somehow determined that using ordinary property laws to allow evictions are "insufficient."

CDC also fails to show that the Order is "reasonably necessary" to prevent the spread of disease. Even if one accepts the premise that mass homelessness could create an uptick in COVID-19 infections, why is an eviction moratorium "necessary" to stop it? There is no evidence that allowing normal processes to play out would cause "mass evictions," much less catastrophic homelessness. And there is even less evidence that suspending all evictions nationwide is "necessary" to stop this imagined wave of mass homelessness. There are simply too many leaps in logic and evidence to support such an overwhelming show of federal authority. CDC has made little effort to show the *necessity* of its eviction ban.

In short, CDC's Order cannot be justified by its statutory and regulatory source. Plaintiffs are likely to succeed on their claim that it is an invalid agency action.

## 2. The CDC Order Is Arbitrary and Capricious

A court must set aside "arbitrary and capricious" agency action. 5 U.S.C. § 706(2)(A). This requires a "searching and careful" review to "consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." *Fund for Animals, Inc. v. Rice*, 85 F.3d 535, 541 (11th Cir. 1996) (citation omitted). An agency's action is arbitrary and capricious "if the agency has relied on factors which Congress had not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). Further, when an agency fails to adequately explain its authority for a certain action, its actions are arbitrary and capricious. *Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 140 S. Ct. 1891, 1911-12 (2020). "To put a finer point on it, the APA requires agencies to reasonably explain to reviewing courts the bases for the actions they take and the conclusions they reach." *Bhd. of Locomotive Engineers & Trainmen v. Fed. R.R. Admin.*, --- F.3d ---, 2020 WL 5079389, at *26 (D.C. Cir. Aug. 28, 2020).

In determining whether the agency acted arbitrarily and capriciously, a court asks if the agency "examine[d] the relevant data and articulate[d] a satisfactory

24

explanation for its action." *Black Warrior Riverkeeper, Inc. v. U.S. Army Corps of Engineers*, 781 F.3d 1271, 1288 (11th Cir. 2015) (quoting *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43). While a court may "uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned ... [it] may not supply a reasoned basis for the agency's action that the agency itself has not given." *Id.* at 1288 (citations omitted). A court must also find "substantial evidence" for the agency action. *Adefemi v. Ashcroft*, 386 F.3d 1022, 1027 (11th Cir. 2004) (en banc). Accordingly, the agency decision must be "supported by reasonable, substantial, and probative evidence on the record considered as a whole." *Perez-Zenteno v. U.S. Att'y Gen.*, 913 F.3d 1301, 1306 (11th Cir. 2019) (citation omitted). Reasoned decisionmaking requires the agency to "examine the relevant data" and precludes the agency from offering "an explanation ... that runs counter to the evidence before the agency." *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43

The CDC Order is arbitrary and capricious because it is not supported by a rational determination drawn from substantial evidence. As a threshold, CDC has not met its baseline obligation of showing that local jurisdictions are taking "insufficient" measures to prevent the spread of COVID-19. Recall that 42 C.F.R. § 70.2 purports to grant authority to CDC when the agency "determines that the measures taken by health authorities of any State … are insufficient to prevent the spread of any of the communicable diseases[.]" But CDC hardly bothers to suggest

that states have undertaken "insufficient" measures by simply allowing eviction processes, irrespective of other mitigation strategies. CDC just asserts that because a nationwide halt to evictions could help spread the disease, jurisdictions "that do not meet or exceed these minimum protections are insufficient to prevent the interstate spread of COVID-19." 85 Fed. Reg. at 55296. That is a fallacy. Even if an eviction moratorium *could* prevent infections, that hardly means a jurisdiction allowing evictions has had an "insufficient" response to the disease.

CDC's inadequate explanation breaks down even more when considering what it omits. Nowhere does CDC even mention any of the efforts taken by *any* jurisdiction to combat COVID-19. Nowhere does it explain why allowing eviction proceedings, more than any other purported lacuna in prevention strategies, represents the line that states may not cross. CDC has cited *no* evidence that any infection has arisen because of an eviction proceeding.[2]

Furthermore, CDC's secondary conclusion, that an eviction moratorium is "necessary" to stop the spread of COVID-19, is unsupported by substantial evidence. In fact, CDC is careful never to actually say that the moratorium is necessary—the best it says is that "[i]n the context of a pandemic, eviction moratoria—like

---

[2] Instead, CDC asserts that COVID-19 infection rates are concerning in homeless populations. 85 Fed. Reg. at 55295. This hardly proves that eviction proceedings *must* be stopped, and that state mitigation strategies are inadequate if they also allow for evictions.

quarantine, isolation, and social distancing—can be an effective public health measure utilized to prevent the spread of communicable disease." 85 Fed. Reg. at 55294. But even this tepid statement has no real evidentiary support. As discussed, CDC relies on hyperbole—saying that "mass evictions" and "homelessness" might increase the likelihood of COVID-19, and thus that that the *only* appropriate course of action is to halt evictions nationwide. *See* 85 Fed. Reg. at 55294-96. CDC does not explain sufficiently why this would be so, which by itself warrants rejection of the rule as being inadequately reasoned. *See Perez-Zenteno*, 913 F.3d at 1306. CDC does not explain why other remedial measures are inadequate. Attending school in person and patronizing bars might increase the risk of infection. And North Carolina, where Mr. Rondeau's property is situated, allows both. Yet CDC's Order addresses only evictions as if it were the sole—or even a significant—factor in the spread of the disease. Because CDC did not "examine the relevant data" the Order is invalid. *See Dist. Hosp. Partners, L.P.*, 786 F.3d at 56.

CDC's Order runs counter to the evidence before the agency. CDC's data suggests that evictions are hardly the most pressing concern for virus containment. CDC says the obvious—"The virus that causes COVID–19 spreads very easily and sustainably between people who are in close contact with one another (within about 6 feet), mainly through respiratory droplets produced when an infected person coughs, sneezes, or talks." 85 Fed. Reg. at 55293. And it says "quarantine, isolation,

and social distancing" are sound strategies for reducing transmission. *Id*. at 55294.

But that evidentiary thread could only be sufficient to support restrictions that

actually address "people who are in close contact with one another." CDC has simply

not shown that an eviction leads to homelessness and, in turn, makes close contact

more likely. But, as discussed, many daily activities, like shopping, dining, school,

worship, etc., clearly do implicate physical closeness. The evidence simply fails to

support CDC's Order, and it is thus arbitrary and capricious.

### 3. The CDC Order Violates Plaintiffs' Right to Access the Courts

"The Constitution promises individuals the right to seek legal redress for

wrongs reasonably based in law and fact." *Harer v. Casey*, 962 F.3d 299, 306 (7th

Cir. 2020); *see also Christopher v. Harbury*, 536 U.S. 403, 415 (2002) ("However

unsettled the basis of the constitutional right of access to courts, our cases rest on the

recognition that the right is ancillary to the underlying claim, without which a

plaintiff cannot have suffered injury by being shut out of court.").

As the Supreme Court recognized more than 100 years ago:

> The right to sue and defend in the courts is the alternative of force. In
> an organized society it is the right conservative of all other rights, and
> lies at the foundation of orderly government. It is one of the highest and
> most essential privileges of citizenship, and must be allowed by each
> state to the citizens of all other states to the precise extent that it is
> allowed to its own citizens. Equality of treatment in this respect is not
> left to depend upon comity between the states, but is granted and
> protected by the Federal Constitution.

*Chambers v. Balt. & Ohio R.R.*, 207 U.S. 142, 148 (1907).

The right is grounded in Article IV's Privileges and Immunities Clause, the First Amendment Petition Clause, the Fifth and Fourteenth Amendment Due Process Clauses and the Fourteenth Amendment's Equal Protection Clause. *Christopher*, 536 U.S. at 415 n.12. Regardless of the specific source, citizens have a fundamental right of "access to the courts." *Hudson v. Palmer*, 468 U.S. 517, 523 (1984); *accord Christopher*, 536 US. at 414.

Typically, claims of denial of access to the courts involve "systemic official action [that] frustrates a plaintiff or plaintiff class in preparing and filing suits at the present time." *Christopher*, 536 U.S. at 413. Such a claim "is ancillary to the underlying claim, without which a plaintiff cannot have suffered injury by being shut out of court." *Id*. at 415. When a government official erects barriers that constitute a "complete foreclosure of relief" for a valid underlying action, the government has denied a plaintiff's right to access the courts. *Harer*, 962 F.3d at 311-12. After all, "[o]f what avail is it to the individual to arm him with a panoply of constitutional rights if, when he seeks to vindicate them, the courtroom door can be hermetically sealed against him by a functionary who, by refusal or neglect, impedes the filing of his papers?" *McCray v. State of Md.*, 456 F.2d 1, 6 (4th Cir. 1972).

Perhaps the most famous case involving the right to access is also the most applicable here. In *Boddie v. Connecticut*, 401 U.S. 371, 372, 374, 380 (1971), the

Supreme Court invalidated a state law requiring prepayment of filing fees for divorce proceedings because it foreclosed the "sole means … for obtaining a divorce" for indigent litigants. "[G]iven the basic position of the marriage relationship in this society's hierarchy of values and the concomitant state monopolization of the means for legally dissolving [the marriage] relationship" "due process does prohibit a State from denying, solely because of inability to pay, access to its courts to individuals who seek judicial dissolution of their marriages." *Id.* at 374; *see also Christopher*, 536 U.S. at 413 (citing *Boddie* as an access-to-courts case).

The *Boddie* decision ensures that classes of litigants are not locked out of the courthouse. A law requiring a litigant to post a bond to access a trial in a court of record was invalid, because it was "the only effective means of resolving the dispute at hand." *Lecates v. Justice of Peace Court No. 4 of State of Del.*, 637 F.2d 898, 908 (3d Cir. 1980) (citation omitted). So too was a public school barred from requiring a tenured teacher to pay for the costs of a disciplinary proceeding, as there was no way for a teacher to "exercise" his rights "other than in a manner penalizing those seeking to assert it." *Rankin v. Indep. Sch. Dist. No. I-3, Noble Cty., Okl.*, 876 F.2d 838, 841 (10th Cir. 1989). Courts have recognized that the constitutional guarantee does not rely "solely on the fundamental nature of the marriage relationship" but instead turns on whether "(1) resort to the courts is the sole path of relief, and (2) governmental control over the process for defining rights and obligations is

exclusive." *Lecates*, 637 F.2d at 908-09. Indeed, even a limited property interest in continuing employment as a teacher was of equal weight as the interest in obtaining a divorce in *Boddie*. *Rankin*, 876 F.2d at 841.

The CDC Order has unlawfully stripped Plaintiffs of their constitutional right to access the courts. Mr. Brown, Mr. Rondeau, Mr. Krausz and Ms. Jones have undisputed rights to evict their tenants under state law but have been totally barred by the Order from exercising those rights. Mr. Brown has a valid lease agreement and has provided habitable premises to his tenant. (Brown Decl. at ¶¶ 5-7.) Yet the tenant has refused to pay him rent, now owing him almost *ten times* the monthly rent—a total of $8092. (Brown Decl. at ¶ 6.) Ms. Jones' tenant has also fallen behind and owes four months of back rent. (Jones Decl. at ¶¶ 3-4.) And Mr. Rondeau and Mr. Krausz have actually obtained eviction orders from their respective state courts because of their tenants' nonpayment of rent. (Rondeau Decl. at ¶ 9; Krausz Decl. at ¶ 10.) If not for CDC's Order, Plaintiffs would be fully entitled to have their tenants ejected from their properties so that they could either use them or seek rent from solvent tenants. Plaintiffs have therefore met the initial requirement of showing the merit of their underlying claims. *See Christopher*, 536 U.S. at 413.

The Order constitutes a "complete foreclosure of relief" because it denies Plaintiffs the *only* lawful means of regaining possession of their property. *See Harer*, 962 F.3d at 311-12. Mr. Brown ordinarily would be entitled to terminate the rental

31

agreement and retake possession through eviction proceedings for his tenant's nonpayment. Va. Code §§ 55.1-1245(f), 55.1-1251. But court proceedings are a Virginia landlord's *sole* means of reacquiring possession of his residential property. A sheriff must enforce a writ of eviction. *See* Va. Code § 8.01-470 (writs of eviction generally). A residential landlord is forbidden from taking possession of his own property. Va. Code § 55.1-1252. In fact, "[i]f a landlord unlawfully removes or excludes a tenant from the premises … the *tenant* may obtain an order from a general district court to recover possession, require the landlord to resume any such interrupted essential service, or terminate the rental agreement and, in any case, recover the actual damages sustained by him and reasonable attorney fees." Va. Code. § 55.1-1243(a) (emphasis added). Thus, "self help" evictions are unlawful in the Commonwealth and can themselves be prosecuted as an unlawful eviction. *See Evans v. Offutt*, 6 Va. Cir. 528, 1978 WL 208147, at *5 (Cir. Ct. Arl. Cty. 1978).

For Mr. Rondeau, Mr. Krausz and Ms. Jones the rules are largely the same. In North Carolina, when a landlord proves a tenant has breached his lease agreement a magistrate "shall give judgment that the defendant be removed from, and the plaintiff be put in possession of, the demised premises[.]" N.C. Gen. Stat. § 42-30. Before executing a writ of possession, a sheriff must provide the tenant with at least five days' notice. N.C. Gen. Stat. § 42-36.2(a). "It is the public policy of the State of North Carolina, in order to maintain the public peace, that a residential tenant shall

be evicted, dispossessed or otherwise constructively or actually removed from his dwelling unit only in accordance with the procedure" set out in the law. N.C. Gen. Stat. § 42-25.6. Since 1981, North Carolina has "prohibited" "all self-help evictions in residential tenancies." *Stanley v. Moore*, 454 S.E.2d 225, 228 (N.C. 1995).

In South Carolina, a landlord must also utilize a court eviction process and obtain a writ of ejectment from judge. *See* S.C. Code § 27-40-710. The writ must be executed by a state official, and a landlord may not attempt to evict a tenant through self-help. S.C. Code § 27-40-760. A landlord is also liable to a tenant for the greater of three months' rent or twice actual damages for an unlawful ouster if he attempts to evict a tenant outside the court process. S.C. Code § 27-40-660.

Georgia also requires residential landlords to use court eviction proceedings, and only permits eviction by a sheriff's execution of a writ of possession. *See* Ga. Code § 44-7-55(d). Without being issued such a writ, a landlord may not retake possession of her residential property. *See id.* A landlord who resorts to self-help evictions faces criminal punishment. *See* Ga. Code § 44-7-14.1.

This process is the same in essentially the same form across the country. "[T]he growing modern trend holds that self-help is never available to dispose of a tenant." Shannon Dunn McCarthy, *Squatting: Lifting the Heavy Burden to Evict Unwanted Company*, 9 U. Mass. L. Rev. 156, 178 (2014). "Most states have eliminated the ability of homeowners to use self-help in the residential housing

context." *Id*. Eviction proceedings are the sole means for nearly all of NAA's 85,485 member landlords to retake possession of their property. (*See* Pinnegar Decl. at ¶ 2.)

The CDC Order has thus deprived Plaintiffs of their only path for recovery of their property. Because the "governmental control over the process for defining rights and obligations" for evictions "is exclusive," see *Lecates*, 637 F.2d at 908-09, and the Order has closed the "only effective means of resolving the dispute at hand," see *Boddie*, 401 U.S. at 376, Plaintiffs' rights to access the courts have been violated.

## C. Plaintiffs Will Suffer Irreparable Harm Absent a Preliminary Injunction

To satisfy the irreparable harm requirement, Plaintiffs need only demonstrate that absent a preliminary injunction, they are "likely to suffer irreparable harm before a decision on the merits can be rendered." *Winter v. NRDC*, 555 U.S. 7, 22 (2008) (citation omitted). When a plaintiff is an organization representing affected members, courts aggregate the harm affecting an organization's members. *See, e.g.*, *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1135 (9th Cir. 2011).

"An injury is 'irreparable' only if it cannot be undone through monetary remedies." *Cunningham v. Adams*, 808 F.2d 815, 821 (11th Cir. 1987). "When an alleged constitutional right is involved, most courts hold that no further showing of irreparable injury is necessary." *Kikumura v. Hurley*, 242 F.3d 950, 963 (10th Cir.

2001) (citation omitted).[3] This is because the constitutional injuries cannot be made whole. *See Kikumura*, 242 F.3d at 963.

Monetary harms are irreparable when there is no adequate remedy available. *MacGinnitie v. Hobbs Group, LLC*, 420 F.3d 1234, 1242 (11th Cir. 2005). Often, "[t]hese injuries are in the form of lost opportunities, which are difficult, if not impossible, to quantify." *Id.*; *see also Ferrero v. Assoc. Materials, Inc.*, 923 F.2d 1441, 1449 (11th Cir.1991) ("loss of customers and goodwill is an 'irreparable' injury"). Harm is also irreparable when "damages may be unobtainable from the defendant because he may become insolvent before a final judgment can be entered and collected." *Hughes Network Sys., Inc. v. InterDigital Commc'ns Corp.*, 17 F.3d 691, 694 (4th Cir. 1994) (quoting *Roland Mach. Co. v. Dresser Indus., Inc.*, 749 F.2d 380, 386 (7th Cir. 1984), and collecting cases).

Plaintiffs have suffered and will continue to suffer from irreparable harm in

---

[3] *See also Mich. State A. Philip Randolph Inst. v. Johnson*, 833 F.3d 656, 669 (6th Cir. 2016) ("When constitutional rights are threatened or impaired, irreparable injury is presumed."); *Jolly v. Coughlin*, 76 F.3d 468, 482 (2d Cir. 1996) ("The district court properly relied on the presumption of irreparable injury that flows from a violation of constitutional rights."); *Davis v. D.C.*, 158 F.3d 1342, 1346 (D.C. Cir. 1998) ("A prospective violation of a constitutional right constitutes irreparable injury."); *Northeastern Fla. Chapter of the Assoc. of Gen. Contractors v. City of Jacksonville*, 896 F.2d 1283, 1285 (11th Cir. 1990) (citing cases and saying, "The rationale behind these decisions was that chilled free speech and invasions of privacy, because of their intangible nature, could not be compensated by monetary damages; in other words, plaintiffs could not be made whole").

two forms: (1) violation of their constitutional rights; and (2) noncompensable loss of the value of their property. As discussed, the CDC Order is unconstitutional, and thus Plaintiffs need not show any harm beyond that fundamental violation of their rights. *See Assoc. of Gen. Contractors*, 896 F.2d at 1285.

Plaintiffs cannot recover any of the economic damages they continue to incur because tenants covered by the CDC Order, by definition, are insolvent. Indeed, the Order expressly applies only to *insolvent* tenants, who are "unable to pay the full rent." 85 Fed. Reg. at 55293. For Mr. Brown, Mr. Rondeau Mr. Krausz, and Ms. Jones the economic harms are immediate. To date, Mr. Brown's tenant owes him more than $8000 in unpaid rent. (Brown Decl. at ¶ 6.) That says nothing of the costs of maintaining the of the property or the lost revenue Mr. Brown could generate were he able to place the property on the market. (Brown Decl. at ¶ 14.) Mr. Rondeau's tenant owes more than $2100 in rent and fees, yet Mr. Rondeau carries a mortgage on the property that is almost equal to his monthly mortgage payment. (Rondeau Decl. at ¶¶ 4, 7.) If he is unable to collect any rents until the Order's 2021 expiration, Mr. Rondeau faces the real possibility of losing his property in foreclosure. (Rondeau Decl. at ¶ 14.) Mr. Krausz and Ms. Jones are owed more than $2265 and $1800, respectively, in unpaid rent, and they too must continue to incur expenses in providing the tenant with a habitable home. (Krausz Decl. at ¶ 14; Sonya Jones Dec. ¶ 10.) Their tenants have also demonstrated that they do not have the money to

satisfy their obligations, which is why eviction is such an essential remedy. Eviction is the only remedy that could allow Mr. Brown, Mr. Rondeau, Mr. Krausz or Ms. Jones to place their properties on the market and seek rent from a solvent lessee, and it is the only one that would relieve them of their unilateral obligations to maintain the property for a tenant in breach.

NAA's members suffer these same harms on a nationwide scale. They can expect only a third of tenants to make on-time payments, with even fewer tenants in Class C properties making *any* payments by the 15th of the next month. *See* Popov, et al., *supra*. While 10% of tenants nationwide will likely not pay any rent, those numbers will likely be higher for low-income tenants. *See id.*; LeaseLock, *supra*. Even a 10% default rate would be catastrophic for NAA's members, as those landlords would have no recourse through eviction. These numbers will likely rise every month, as more and more tenants fell behind, forcing NAA's 85,485 to cover millions in costs for defaulting tenants, with no hope of any recovery from either the tenants or any of the defendants. (*See* Pinnegar Decl. at ¶¶ 1, 4-5.)

A preliminary injunction is therefore necessary to secure Plaintiffs' opportunity to recover the value of their properties as to both the "insolvent" tenants and the "loss of valuable business opportunities" that the Order has denied them. *See MacGinnitie*, 420 F.3d at 1242; *Hughes Network Sys., Inc.*, 17 F.3d at 694.

**D. The Balance of Equities Weighs Heavily in Favor of Plaintiffs**

A preliminary injunction is proper when "the balance of equities tips in [its] favor, and that an injunction is in the public interest." *Winter*, 555 U.S. at 20. "These factors merge when the Government is the opposing party." *Nken*, 556 U.S. at 435.

"[T]here is a strong public interest in requiring that the plaintiffs' constitutional rights no longer be violated[.]" *Laube v. Haley*, 234 F.Supp. 2d 1227, 1252 (M.D. Ala. 2002); *see also Melendres v. Arpaio*, 695 F.3d 990, 1002 (9th Cir. 2012) ("[I]t is always in the public interest to prevent the violation of a party's constitutional rights."); *Republican Party of Minn. v. White*, 416 F.3d 738, 753 (8th Cir. 2005) ("It can hardly be argued that seeking to uphold a constitutional protection ... is not per se a compelling state interest."); *League of Women Voters of Fla. v. Browning*, 863 F. Supp. 2d 1155, 1167 (N.D. Fla. 2012) ("The vindication of constitutional rights ... serve[s] the public interest almost by definition.").

The CDC Order is unconstitutional and thus the balance of equities weighs heavily in favor of the preliminary injunction. Whatever the need for a government response to the COVID-19 pandemic, the Order advance one specific policy solution in violation of the constitutional interests of property holders across the nation. CDC's Order is a ham-fisted effort to address the pandemic in a strained and illogical

way. Moreover, it is a gross violation of CDC's constitutional limitations. The equities therefore require that the CDC Order be preliminarily enjoined.[4]

## III. CONCLUSION

For the reasons set out above, the Court should enter a preliminary injunction against the CDC Order.

---

[4] For largely the same reasons no bond should be required here. Federal Rule of Civil Procedure 65(c) says, "No restraining order or preliminary injunction shall issue except upon the giving of security by the applicant, in such sum as the court deems proper, for the payment of such costs and damages as may be incurred or suffered by any party who is found to have been wrongfully enjoined or restrained." But Plaintiffs are entitled to evict their tenants, and the TRO would do nothing more than restore the judicial process wrongly denied to them. The CDC can hardly incur damages by following the federal constitution and a process created by state laws.

September 18, 2020

Respectfully,

*/s/ James W. Hawkins*
James W. Hawkins
Georgia State Bar No. 338767
JAMES W. HAWKINS, LLC
5470 Blair Valley Run
Cumming, GA 30040
V: 678-697-1278
F: 678-540-4515
jhawkins@jameswhawkinsllc.com

*/s/ Caleb Kruckenberg*
**Caleb Kruckenberg**
Litigation Counsel
New Civil Liberties Alliance
1225 19th St. NW, Suite 450
Washington, DC 20036
caleb.kruckenberg@ncla.legal
(202) 869-5210
*Appearing Pro Hac Vice*
*Counsel for Plaintiffs*

**CERTIFICATE OF COMPLIANCE**

I hereby certify that the foregoing court filing has been prepared in 14-point

Times New Roman font and complies with LR 5.1, NDGa and LR 7.1(D), NDGa.

*/s/ Caleb Kruckenberg*
Caleb Kruckenberg
*Counsel for Plaintiffs*

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that on September 18, 2020, I electronically filed the

foregoing with the Clerk of Court using the CM/ECF system which sent

notification of such filing to all counsel of record.

*/s/ Caleb Kruckenberg*
Caleb Kruckenberg
*Counsel for Plaintiffs*