# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF GEORGIA
# ATLANTA DIVISION

RICHARD LEE BROWN, *et al.*,

    Plaintiffs,

      v.

ALEX AZAR, in his official capacity as
Secretary, U.S. Department of Health
& Human Services, *et al.*,

    Defendants.

Case No. 1:20-cv-3702-JPB

## DEFENDANTS' MEMORANDUM IN OPPOSITION TO
## PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

# TABLE OF CONTENTS

INTRODUCTION ..................................................................................................... 1

BACKGROUND ...................................................................................................... 3

  I.   Statutory and Regulatory Background ............................................... 3

  II.   The COVID-19 Pandemic ................................................................... 7

  III.   The CDC Order .................................................................................. 10

  IV.   Plaintiffs' Claims ............................................................................... 13

ARGUMENT .......................................................................................................... 15

  I.   Plaintiffs Lack Standing .................................................................... 15

  II.   Plaintiffs Have Failed To Join Indispensable Parties ..................... 18

  III.   Plaintiffs Are Not Entitled to Extraordinary Injunctive Relief ..... 20

    A.   Plaintiffs Have Not Shown Irreparable Injury. .......................... 21

     1.  Plaintiffs' Alleged Economic Losses Are Compensable. ......... 22

     2.  Plaintiffs Have Alleged No Irreparable Constitutional Violation .......... 26

    B.  Plaintiffs Have Not Shown A Likelihood of Success on the Merits. ......... 27

     1.  The CDC Order Comports with the Requirements of the APA. ............ 27

a.  CDC acted within its statutory and regulatory authority. ..............27

b.  CDC's Order is not arbitrary and capricious. ....................................38

2.  The Order Does Not Deny Plaintiffs Access to Courts. ..........................41

C.  The Injunction Plaintiffs Seek Is Contrary to the Public Interest. ..............44

VI.  Any Relief Granted Should Be Narrowly Tailored. .....................................46

CONCLUSION .........................................................................................47

## TABLE OF AUTHORITIES

*Abramski v. United States,*
   573 U.S. 169 (2014) ................................................................................. 37

*ACLU of Fla., Inc. v. Miami-Dade Cty. Sch. Bd.,*
   557 F.3d 1177 (11th Cir. 2009) ................................................................. 21

*Ali v. Fed. Bureau of Prisons,*
   552 U.S. 214 (2008) ........................................................................... 34, 35

*Auracle Homes, LLC v. Lamont,*
   No. 20-00829, 2020 WL 4558682 (D. Conn. Aug. 7, 2020) ............... 36, 44

*Babbitt v. Sweet Home Ch. of Cmtys. for a Great Or.,*
   515 U.S. 687 (1995) ................................................................................. 35

*Balt. Gas & Elec. Co. v. Nat. Res. Def. Council, Inc.,*
   462 U.S. 87 (1983) ................................................................................... 39

*BellSouth Telecomms., Inc. v. MCIMetro Access Transmission Servs. LLC,*
   425 F.3d 964 (11th Cir. 2005) ................................................................. 22

*Boddie v. Connecticut,*
   401 U.S. 371 (1971) ................................................................................. 42

*Charlesbank Equity Fund II v. Blinds To Go, Inc.,*
   370 F.3d 151 (1st Cir. 2004) ................................................................... 24

*Chevron U.S.A. Inc. v. Echazabal,*
   536 U.S. 73 (2002) ................................................................................... 37

*Christopher v. Harbury,*
   536 U.S. 403 (2002) ................................................................................. 41

*City of Arlington v. FCC,*
   569 U.S. 290 (2013) ................................................................................. 32

*Commodities & Minerals Enter., Ltd. v. Citibank, N.A.,*
 No. 12-22333, 2012 WL 12844749 (S.D. Fla. Aug. 16, 2012) .................................. 24

*Comm'r v. Heininger,*
 320 U.S. 467 (1943) ........................................................................................ 38

*Davis v. Goord,*
 320 F.3d 346 (2d Cir. 2003) ........................................................................... 43

*Elmsford Apt. Assocs., LLC v. Cuomo,*
 No. 20-4062, 2020 WL 3498456 (S.D.N.Y. June 29, 2020) .......................... 22, 23, 43

*FERC v. Elec. Power Supply Ass'n,*
 136 S. Ct. 760 (2016) ...................................................................................... 37

*FHR TB, LLC v. TB Isle Resort, LP.,*
 865 F. Supp. 2d 1172 (S.D. Fla. 2011) .......................................................... 24

*Fla. Wildlife Fed. Inc. v. U.S. Army Corps of Eng'rs,*
 859 F.3d 1306 (11th Cir. 2017) ................................................................ 18, 19, 20

*Focus on the Family v. Pinellas Suncoast Transit Auth.,*
 344 F.3d 1263 (11th Cir. 2003) ...................................................................... 19

*Frejlach v. Butler,*
 573 F.2d 1026 (8th Cir. 1978) ........................................................................ 21

*Friends of Earth, Inc. v. Laidlaw Envt'l Servs., Inc.,*
 528 U.S. 167 (2000) ........................................................................................ 15

*Fund for Animals, Inc. v. Rice,*
 85 F.3d 535 (11th Cir. 1996) .......................................................................... 38

*Ga. Republican Party v. SEC,*
 888 F.3d 1198 (11th Cir. 2018) .................................................................. 17, 18

*Gill v. Whitford,*
 138 S. Ct. 1916 (2018) .................................................................................... 46

*Gwinnett Cty. NAACP v. Gwinnett Cty. Bd. of Registration & Elections*,
446 F. Supp. 3d 1111 (N.D. Ga. 2020) .................................................................... 26

*Harer v. Casey*,
962 F.3d 299 (7th Cir. 2020) ................................................................................. 43

*Holland v. Nat'l Mining Ass'n*,
309 F.3d 808 (D.C. Cir. 2002) ............................................................................... 47

*Jacobson v. Fla. Sec. of State*,
No. 19-14552, 2020 WL 5289377 (11th Cir. Sept. 3, 2020) .................................... 17

*Jameson v. Pine Hill Dev., LLC*,
No. 07-0111, 2007 WL 623807 (S.D. Ala. Feb. 23, 2007) ...................................... 24

*Jarecki v. G.D. Searle & Co.*,
367 U.S. 303 (1961) ............................................................................................. 35

*Kisor v. Wilkie*,
139 S. Ct. 2400 (2019) ......................................................................................... 32

*League of Indep. Fitness Facilities & Trainers, Inc. v. Whitmer*,
814 F. App'x 125 (6th Cir. 2020) ..................................................................... 36, 46

*Lujan v. Defs. of Wildlife*,
504 U.S. 555 (1992) ............................................................................................. 15

*Madsen v. Women's Health Ctr., Inc.*,
512 U.S. 753 (1994) ............................................................................................. 46

*Mahon v. U.S. Dep't of Agric.*,
485 F.3d 1247 (11th Cir. 2007) ............................................................................. 27

*Mamani v. Berzain*,
825 F.3d 1304 (11th Cir. 2016) ............................................................................. 37

*Marshall v. United States*,
414 U.S. 417 (1974) ............................................................................................. 33

*Miccosukee Tribe of Indians of Fla. v. United States,*
  566 F.3d 1257 (11th Cir. 2009) ..............................................................39, 41

*Moreiras v. Scottsdale Ins. Co.,*
  No. 20-21303, 2020 WL 2084851 (S.D. Fla. Apr. 30, 2020)....................................19

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.,*
  463 U.S. 29 (1983)................................................................................39

*Nat'l Parks Conservation Assoc. v. U.S. Dep't of the Interior,*
  835 F.3d 1377 (11th Cir. 2016) ...................................................................41

*N.E. Fla. Chapter of the Ass'n of Gen. Contractors of Am. v. City of Jacksonville,*
  896 F.2d 1283 (11th Cir. 1990) ...................................................................21

*Nken v. Holder,*
  556 U.S. 418 (2009)...............................................................................44

*NLRB v. SW Gen., Inc.,*
  137 S. Ct. 929 (2017)..............................................................................37

*Norfolk & W. Ry. Co. v. Am. Train Dispatchers Ass'n,*
  499 U.S. 117 (1991)...............................................................................34

*Palmer v. Braun,*
  287 F.3d 1325 (11th Cir. 2002) ...................................................................21

*Rosen v. Cascade Int'l, Inc.,*
  21 F.3d 1520 (11th Cir. 1994) ....................................................................22

*S. Bay Pentecostal Church v. Newsom,*
  140 S. Ct. 1613 (2020).............................................................................33

*Sampson v. Murray,*
  415 U.S. 61 (1974).................................................................................22

*Siegel v. Lepore,*
  234 F.3d 1163 (11th Cir. 2000) .........................................................20, 21, 26

*Sierra Club v. Van Antwerp*,
　526 F.3d 1353 (11th Cir. 2008) ................................................................... 38

*Smith v. Turner*,
　48 U.S. 283 (1849) ........................................................................................ 3

*Snook v. Tr. Co. of Ga. Bank of Savannah, N.A.*,
　909 F.2d 480 (11th Cir. 1990) ................................................................... 21

*St. Lawrence Co. v. Alkow Realty, Inc.*,
　453 So. 2d 514 (Fla. 4th Dist. Ct. App. 1984) ......................................... 22

*Summers v. Earth Island Inst.*,
　555 U.S. 488 (2009) ............................................................................. 15, 18

*Sunset Homeowners Ass'n v. Difrancesco*,
　No. 19-16, 2019 U.S. Dist. LEXIS 65057 (W.D.N.Y. April 15, 2019) ..... 20

*Swain v. Junior*,
　961 F.3d 1276 (11th Cir. 2020) ................................................................. 45

*Talleywhacker, Inc. v. Cooper*, No.,
　No. 20-218, 2020 WL 3051207 (E.D.N.C. June 8, 2020) .................... 36, 45

*TJM 64, Inc. v. Harris*,
　No. 20-02498, 2020 WL 4352756 (W.D. Tenn. July 29, 2020) ..... 36, 44, 46

*Trump v. Hawaii*,
　138 S. Ct. 2392 (2018) ............................................................................... 47

*United States v. Askins & Miller Orthopaedics, P.A.*,
　924 F.3d 1348 (11th Cir. 2019) ................................................................. 25

*United States v. Baldwin*,
　774 F.3d 711 (11th Cir. 2014) ................................................................... 37

*Waite v. All Acquisition Corp.*,
　901 F.3d 1307 (11th Cir. 2018) ................................................................. 19

**Statutes**

5 U.S.C. § 706 ...................................................................................................27

42 U.S.C. § 264 ............................................................................................*passim*

Pub. L. No. 76-861, 54 Stat. 1178 (1940) ....................................................... 44

Pub. L. No. 96-88, 93 Stat. 668 (1979) .............................................................. 5

Pub. L. No. 116-136, 134 Stat. 281 (2020) ....................................................... 9

Act of May 27, 1796, ch. 31, 1 Stat. 474 (1796) ............................................... 3

Act of Feb. 25, 1799, ch. 12, 1 Stat. 619 (1799) ............................................... 4

Act of Feb. 15, 1893, ch. 114, 27 Stat. 449 (1893) ........................................... 4

**Rules**

Fed. R. Civ. P. 12 .............................................................................................. 18

Fed. R. Civ. P. 19 .............................................................................................. 18

**Regulations**

42 C.F.R. § 70.1 .................................................................................................. 6

42 C.F.R. § 70.2 ............................................................................................*passim*

42 C.F.R. § 70.3 .................................................................................................. 7

42 C.F.R. § 70.6 .................................................................................................. 7

42 C.F.R. § 70.12 ................................................................................................ 7

42 C.F.R. § 70.18 ................................................................................................ 7

31 Fed. Reg. 8855 (June 25, 1966) ..................................................................... 5

65 Fed. Reg. 49906 (Aug. 16, 2000) .................................................................... 6

Temporary Halt in Residential Evictions to Prevent the Further Spread of Covid-19, 85 Fed. Reg. 55292 ..........................................................................*passim*

## INTRODUCTION

These are extraordinary times.  The United States is affected by a global pandemic, during which the respiratory disease COVID-19 has infected tens of millions worldwide and resulted in the death of more than 200,000 people within our borders.  *See* Temporary Halt in Residential Evictions To Prevent the Further Spread of COVID-19, 85 Fed. Reg. 55292, 55292 (Sept. 4, 2020).  The disease spreads easily between persons within close contact (approximately six feet) via respiratory droplets.  *Id.*  It can cause severe illness but may also be transmitted by persons who are pre-symptomatic or asymptomatic—meaning that infected persons have the potential to infect others unknowingly.  *Id.*  Despite drastic measures by federal, state, and local government entities, including border closures, stay-at-home orders, mask mandates, and travel restrictions, COVID-19 continues to spread.  *Id.*

In light of these rare circumstances, the Centers for Disease Control and Prevention (CDC) has exercised its authority under the Public Health Service Act (PHSA) and its implementing regulations to order a temporary halt in residential evictions to prevent the further spread of COVID-19 (the Order).  *Id.*  CDC found

that this moratorium is an effective public health measure because, among other things, it facilitates self-isolation by ill and at-risk persons, eases implementation of stay-at-home and social distancing measures, and decreases the likelihood that persons will experience homelessness or move in to congregate settings, such as crowded shelters, both of which increase the risk of COVID-19 spread.  *Id.* at 55295–96.  The Order protects only some of society's most vulnerable:  low-income persons who have lost work or incurred extraordinary medical bills, have made every effort to pay their rent, and would not have available housing options if evicted.  *Id.* at 55297.  It does not excuse any tenant's obligation to pay rent or impair any landlord's ability to impose fees, interest, or other penalties short of eviction.  *Id.* at 55292.  Nor does it prevent landlords from evicting tenants for reasons other than failure to pay rent timely, such as criminal activity or property damage.  *Id.* at 55294.

Plaintiffs are several landlords who want to evict tenants who, they allege, have claimed or might claim protection under the Order, as well as an organization representing landlords.  They seek emergency injunctive relief to invalidate the Order.  But Plaintiffs lack standing to bring suit.  And they cannot meet any of the elements required to qualify for such extraordinary relief in any event.   In

particular, there is no irreparable harm where a plaintiff's injury is monetary and may be cured by damages.  They are also unlikely to succeed on the merits because they have not met their burden to show that the Order violates the Administrative Procedure Act (APA) or denies any Plaintiff the right to access courts.  And the balance of the harms and public interest overwhelmingly favor the government, which is acting to protect the citizenry at large from a potentially deadly disease, as opposed to in the economic interests of a few.  Finally, the relief Plaintiffs seek—invalidation of a nationwide order issued to protect public health during a global pandemic—is overbroad and disproportionate to their alleged injuries.  For all of these reasons, as explained below, Plaintiffs' motion should be denied.

## BACKGROUND

### I.    Statutory and Regulatory Background

The federal government has a long history of acting to combat the spread of communicable disease.  Congress enacted the first federal quarantine law in 1796 in response to a yellow fever outbreak, providing the President with the ability to direct federal officials to help states enforce quarantine laws.  Act of May 27, 1796, ch. 31, 1 Stat. 474 (1796) (repealed 1799); *see Smith v. Turner*, 48 U.S. 283, 300 (1849).  Following a subsequent yellow fever outbreak, Congress repealed this Act,

establishing in its place a federal inspection system for maritime quarantines.  Act of Feb. 25, 1799, ch. 12, 1 Stat. 619 (1799).  And in 1893, Congress authorized the Secretary of the Treasury to adopt additional regulations to prevent the introduction of disease into the United States or across state lines where the Secretary considered state or local regulation inadequate.  Act of Feb. 15, 1893, ch. 114, 27 Stat. 449 (1893).

In 1944, Congress enacted the provision at issue here, section 361 of the PHSA, as part of a broader effort to consolidate and clarify existing public health laws.  H.R. Rep. No. 78-1364, at 1 (1944).  In section 361(a), Congress broadened the federal government's "basic authority to make regulations to prevent the spread of disease into this country or between the States."  *Id.* at 24.  For example, Congress removed references to specific diseases to provide federal health authorities flexibility to respond to new types of contagion and "expressly sanction[ed] the use of conventional public-health enforcement methods" by the federal government in disease-control efforts.  *Id.* at 24–25.

The resulting statute, 42 U.S.C. § 264, authorizes the Secretary of Health and

Human Services (HHS)[1] "to make and enforce such regulations as in his judgment are necessary to prevent the introduction, transmission, or spread of communicable diseases from foreign countries into the States or possessions, or from one State or possession into any other State or possession." 42 U.S.C. § 264(a). Subsection (a) further clarifies that "[f]or purposes of carrying out and enforcing such regulations," the Secretary "may provide for such inspection, fumigation, disinfection, sanitation, pest extermination, destruction of animals or articles found to be so infected or contaminated as to be sources of dangerous infection to human beings, and other measures, as in his judgment may be necessary." *Id.* Subsection (b) imposes specific limits on the Secretary's ability to "provide for the apprehension, detention, or conditional release of individuals"—a power not referenced in subsection (a)—mandating that such impositions on a person's physical movement be specified by Presidential Executive Order. *Id.* § 264(b).

---

[1] Although the statute assigns authority to the Surgeon General, Reorganization Plan No. 3 of 1966 abolished the Office of the Surgeon General and transferred all statutory powers and functions of the Surgeon General to the Secretary of Health, Education, and Welfare, now the Secretary of HHS, 31 Fed. Reg. 8855, 80 Stat. 1610 (June 25, 1966), *see also* Pub. L. No. 96-88, § 509(b), October 17, 1979, 93 Stat. 695 (codified at 20 U.S.C. 3508(b)). The Office of the Surgeon General was re-established in 1987, but the Secretary has retained these authorities.

Subsections (c) and (d) set further limits on the detention of individuals.  *See id.* § 264(c)–(d).  The final subsection provides that the statute and any regulation adopted thereunder supersede state law "to the extent that such a provision conflicts with an exercise of Federal authority."  *Id.* § 264(e).

The Secretary of HHS has promulgated regulations implementing these provisions and delegating their enforcement to CDC.  *See* 42 C.F.R. pt. 70; 65 Fed. Reg. 49906, 49907 (Aug. 16, 2000).  In particular, 42 C.F.R. § 70.2 provides the CDC Director (or his or her authorized representative) with discretion to take measures to address uncontrolled contagion.[2]  Specifically, where the CDC Director "determines that the measures taken by health authorities of any State or possession (including political subdivisions thereof) are insufficient to prevent the spread of any of the communicable diseases" between or among States, he is empowered to "take such measures to prevent such spread of the diseases as he/she deems reasonably necessary."  42 C.F.R. § 70.2.  These measures include, but are not limited to, "inspection, fumigation, disinfection, sanitation, pest

---

[2] The term "Director" as used in these regulations signifies "the Director, Centers for Disease Control and Prevention, Department of Health and Human Services, or another authorized representative."  42 C.F.R. § 70.1.

extermination, and destruction of animals or articles believed to be sources of infection." *Id.* Other regulations authorize CDC to limit interstate travel, *see* 42 C.F.R. § 70.3, apprehend and detain persons, *id.* § 70.6, and conduct medical examinations, *id.* § 70.12, to control the spread of disease. The regulations additionally provide for penalties for violations of these regulations. *Id.* § 70.18.

## II.     The COVID-19 Pandemic

In December 2019, a novel coronavirus dubbed SARS-CoV-2 was first detected in Wuhan, Hubei Province, in the People's Republic of China. *See* Declaring a National Emergency Concerning the Novel Coronavirus Disease (COVID-19) Outbreak, 85 Fed. Reg. 15337 (Mar. 13, 2020). The virus causes a respiratory disease known as COVID-19. *Id.*

COVID-19 is a serious illness that spreads easily. Contracting COVID-19 poses a risk of "severe" respiratory illness, meaning that persons who have the disease may require hospitalization, intensive care, or the use of a ventilator. 85 Fed. Reg. at 55292. Severe cases of COVID-19 may be fatal. *Id.* The likelihood of becoming severely ill is greater among certain vulnerable populations. *Id.* at 55295. CDC has cautioned that the virus that causes COVID-19 transmits "very easily and sustainably" between people within "close contact"—approximately six

feet—of one another.  *Id.* at 55293.  Persons not displaying symptoms are capable of transmitting the virus.  *Id.* at 55292.

From its origins in late 2019, COVID-19 spread quickly across the globe, including to the United States.  *See* 85 Fed. Reg. at 15337.  On January 31, 2020, the Secretary of HHS declared a public health emergency due to the rise in confirmed COVID-19 cases in this country.  Determination that a Public Health Emergency Exists, https://www.phe.gov/emergency/news/healthactions/phe/Pages/ 2019-nCoV.aspx (Jan. 31, 2020).  On March 11, 2020, the World Health Organization classified the COVID-19 epidemic as a pandemic due to the increase in infections throughout the world, including in the United States.  85 Fed. Reg. at 15337.  On March 13, 2020, the President declared the COVID-19 outbreak a national emergency.  *Id.*  By late August 2020 the virus had spread to all 50 states. 85 Fed. Reg. at 55292.  To date, it has infected over seven million and caused the death of over 200,000 persons within the United States.  *See* CDC COVID Data Tracker, https://covid.cdc.gov/covid-data-tracker/#cases_casesinlast7days (last visited Oct. 2, 2020).  New cases continue to be reported daily,  *see id.*, and CDC has called COVID-19 "a historic threat to public health."  85 Fed. Reg. at 55294.

To combat the spread of this easily transmitted, widespread, and potentially

deadly virus, governments at all levels have taken "unprecedented or exceedingly rare actions" in the interest of protecting the public health.  *Id.*  These include border closures, travel restrictions, stay-at-home orders, and mask requirements.  *Id.*  In March 2020, Congress provided a 120-day moratorium on eviction filings based on nonpayment of rent, as well as other protections, to tenants residing in certain federally financed rental properties.  CARES Act, Pub. L. No. 116-136, § 4024, 134 Stat. 281 (2020).  Although this measure temporarily helped mitigate the public health effects of tenant displacement during the pandemic, it expired on July 24, 2020.  85 Fed. Reg. at 55294.  And while certain States implemented their own temporary eviction moratoria, *see, e.g.*, New York Tenant Safe Harbor Act, S.8192B/A.10290B (Jun. 30, 2020), some such measures have also begun to expire.[3]  *See* 85 Fed Reg. at 55296 n.36.  Other States provided no separate protection for renters during the pandemic.  *Id.*

---

[3] *See, e.g.*, In Re: Amendment of the Eighth Order Extending Declaration of Judicial Emergency in Response to COVID-19 Emergency, https://www.governor.virginia.gov/media/governorvirginiagov/governor-of-virginia/pdf/ORD-08-07-2020-Amendment-of-8th-DJE-order.pdf (Virginia moratorium expired Sept. 7, 2020); State of Connecticut, Executive Order No. 7DDD, https://portal.ct.gov/-/media/Office-of-the-Governor/Executive-Orders/Lamont-Executive-Orders/Executive-Order-No-7DDD.pdf (Connecticut moratorium expired August 24, 2020).

### III.    The CDC Order

In light of these circumstances, on September 4, 2020, CDC issued an Order under 42 U.S.C. § 264(a) and 42 C.F.R. § 70.2 providing for a temporary halt on residential evictions until December 31, 2020.  85 Fed. Reg. at 55292.  The agency found this moratorium "a reasonably necessary measure . . . to prevent the further spread of COVID-19," and that state and local measures that did not meet or exceed its protections were insufficient to prevent interstate spread.  *Id.* at 55296.

CDC determined that eviction moratoria help reduce the risk of transmission of COVID-19.  *Id.* at 55294.  They do so by facilitating self-isolation for sick and high-risk persons, easing implementation of stay-at-home orders and social distancing measures, reducing the need for congregate housing, and helping to prevent homelessness.  *Id.*

As CDC explained, evictions present a public health concern because the movement of evicted renters could lead to "multiple outcomes that increase the risk of COVID-19 spread."  *Id.*  First, evicted renters are likely to move in with friends or family, leading to potential household crowding with new sources of infection.  *Id.*  This increases the risk of spreading COVID-19 because "transmission occurs readily within households," and "household contacts are

estimated to be 6 times more likely to become infected by an index case of COVID-19 than other close contacts." *Id.*

Second, the risk of transmission in shared housing increases exponentially if evicted persons move into congregate settings, such as homeless shelters, transitional housing, or domestic violence shelters. *Id.* Maintaining social distance may be difficult in these settings, especially where residents must share small spaces, like stairwells and elevators, or equipment, such as kitchen or laundry facilities. *Id.* Indeed, "extensive outbreaks of COVID-19 have been identified in homeless shelters," including in Seattle, Boston, and San Francisco. *Id.* at 55295. These public health risks "may increase seasonally" as persons experiencing homelessness seek shelter in colder months. *Id.* at 55296.

Finally, evicted persons may experience unsheltered homelessness, which places them at "a higher risk for infection where there is community spread of COVID-19." *Id.* at 55295. Their vulnerability to COVID-19 is higher due to exposure to the elements, as well as inadequate access to hygiene, sanitation, and healthcare. *Id.* The risk of unsheltered homelessness has increased during the pandemic, where safety precautions at shelters have reduced their capacities. *Id.*

In addition, research suggests that persons who would be evicted and

become homeless as a result "include many who are predisposed to developing severe disease from COVID-19." *Id.* For example, evicted persons are more likely to experience hypertension, an underlying condition associated with severe COVID-19. *Id.* And among patients with COVID-19, experiencing homelessness has been associated with an increased likelihood of hospitalization. *Id.* at 55296.

These negative public health consequences could become enormous if evictions were to proceed unchecked during the pandemic. *Id.* at 55294–95. Research suggests that as many as 30 to 40 million people in the United States could be at risk of eviction in the absence of state and local protections. *Id.* at 55295. "A wave of evictions on that scale would be unprecedented in modern times." *Id.* Given that approximately 15 percent of moves each year are estimated to be interstate, "mass evictions would likely increase the interstate spread of COVID-19." *Id.*

CDC thus determined that it was reasonably necessary to prevent the interstate spread of COVID-19 to order that "a landlord . . . shall not evict any covered person from any residential property in any State . . . that provides a level of public-health protections below the requirements listed in [the] Order." *Id.* at 55296. To qualify as "covered persons," tenants must certify under penalty of

12

perjury that they have (1) used best efforts to obtain government assistance to make rental payments; (2) expect to earn less than $99,000 in annual income in 2020, were not required to pay income taxes in 2019, or qualified for a stimulus check under the CARES Act; (3) are unable to pay full rent due to "substantial loss of household income, loss of compensable hours of work or wages, lay-offs, or extraordinary out-of-pocket medical expenses"; (4) are using best efforts to make partial payments; (5) would likely experience homelessness or need to move into a shared residence if evicted; (6) understand that rent obligations still apply; and (7) understand that the moratorium ends on December 31, 2020.  *Id.* at 55297.

The Order does not alter a tenant's obligation to pay rent or comply with any other contractual obligation.  *Id.* at 55294.  It does not prevent the accrual or collection of fees, penalties, or interest under the terms of an applicable contract. *Id.*  It also does not prevent evictions of persons who do not qualify as "covered persons," or evictions based on circumstances other than nonpayment of rent, including criminal activity, damage to property, or violation of contractual obligations other than the timely payment of rent.  *Id.*

## IV.    Plaintiffs' Claims

Plaintiffs are four individual landlords and a "trade association for owners

and managers of rental housing." Am. Compl. ¶¶ 1–5 (ECF No. 12). Each individual Plaintiff alleges that he or she has rented a residential property to tenants who have fallen behind on rent payments, and who either have asserted or might assert that they are covered persons under the CDC Order. *Id.* ¶¶ 45–85. Each landlord desires to seek an eviction in his or her respective state, each of which is alleged not to provide greater protection than the Order. *Id.* ¶¶ 49–50, 59, 62, 72–75, 78–80. Each claims he or she has incurred and will continue to incur economic damage as a result of the tenants' nonpayment of rent, asserts that his or her tenants are likely insolvent, and alleges that eviction of the tenants is necessary to mitigate monetary losses. *Id.* ¶¶ 55–57, 64–66, 77, 83–85.

Plaintiff trade organization, the National Apartment Association (NAA), alleges that it has more than 85,000 members managing rental units in all 50 states. *Id.* ¶ 86. Although it claims that its members generally are similarly situated to the four individual plaintiffs, *id.* ¶¶ 87–92, it identifies no individual member.

Plaintiffs' amended complaint raises eight challenges to the CDC Order. *Id.* ¶¶ 93–175. They press only three of these claims in their preliminary injunction motion: that Defendants exceeded their statutory authority in violation of the APA; acted arbitrarily and capriciously; and impaired their ability to access courts.

Pls.' Br. in Supp. of Mot. for Prelim. Injunction (Pls.' Br.) 16–34 (ECF No. 18-1).

## ARGUMENT

Plaintiffs' motion for preliminary injunction should be denied because their suit is jurisdictionally defective, they failed to join indispensable parties, and they have not carried their burden to demonstrate each of the four elements necessary to warrant the extraordinary remedy of injunctive relief.

## I.    Plaintiffs Lack Standing.

"[T]he irreducible constitutional minimum of standing contains three elements": injury, causation, and redressability.  *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992).  Where, as here, an association files suit on behalf of its members, *see* Am. Compl. ¶¶ 87–92, it has standing only where "its members would otherwise have standing to sue in their own right, the interests at stake are germane to the organization's purpose, and neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit," *Friends of Earth, Inc. v. Laidlaw Envt'l Servs., Inc.*, 528 U.S. 167, 181 (2000). Associational plaintiffs must "make specific allegations establishing that at least one identified member had suffered or would suffer harm" to show associational standing.  *Summers v. Earth Island Inst.*, 555 U.S. 488, 498 (2009).   Here, the

individual Plaintiffs lack standing for failure to properly allege injury in fact caused by the Order because, according to their own allegations, the Order does not apply to their situations.  Nor does the NAA have standing, as it has failed to identify any individual member harmed by the Order.

As an initial matter, each of the individual Plaintiffs alleges that his or her tenants have caused "damages to his property."  Am. Compl. ¶¶ 55, 64, 77, 83. The Order expressly permits evictions due to a tenant "damaging or posing an immediate and significant risk of damage to property."  85 Fed. Reg. at 55294.  The Order thus does not preclude the individual Plaintiffs from evicting tenants who, according to their own allegations, have damaged their property.  They have therefore suffered no concrete injury as a result of the Order.

Second, two of the individual Plaintiffs' tenants do not appear to have submitted the sworn declaration required for them to qualify as "covered persons" entitled to protection under the Order.  *See* Am. Compl. ¶ 51 ("Upon information and belief, Mr. Brown's tenant is a 'covered person' under the CDC Order."); *id.* at ¶ 53 ("Mr. Brown intends to violate the CDC Order even if his tenant presents an attestation in eviction proceedings that she is a 'covered person' as defined in the CDC Order."); *id.* at ¶ 81 ("Based on information provided to Ms. Jones by her

tenant, and the tenant's representations in court, Ms. Jones' tenant is a 'covered person' as defined by the CDC order.").  The submission of a declaration under penalty of perjury—not an assumption that the Order applies—is a threshold requirement for the Order to apply.  *See* 85 Fed. Reg. at 55292 ("To invoke the CDC's order [covered] persons *must* provide an executed copy of the Declaration form (or a similar declaration under penalty of perjury) to their landlord." (emphasis added)).  Unless and until these Plaintiffs' tenants have submitted the required sworn attestation, the Order does not, by its plain terms, apply to them, and they have no standing to challenge it.

Further, although Plaintiff NAA has alleged injury to its members as a general matter, it has not included specific allegations of injury to any individual member.  *See* Am. Compl. ¶¶ 87–92; *see generally* Pinnegar Decl. (ECF No. 18-6).  Dismissal for lack of standing is appropriate where an organizational plaintiff fails to identify at least one member who suffered an injury in fact.  *See Ga. Republican Party v. SEC*, 888 F.3d 1198, 1204 (11th Cir. 2018*)* (dismissing organization that "failed to identify at least one member who has or will suffer harm"); *see also Jacobson v. Fla. Sec. of State*, No. 19-14552, 2020 WL 5289377, at *7 (11th Cir. Sept. 3, 2020).  Even given NAA's purportedly large membership, concrete injury to its

individual members cannot be assumed.  *See Summers*, 555 U.S. at 497 (refusing to assume "there [was] a statistical probability that some of [the plaintiff-organization's] members [were] threatened with concrete injury"); *Ga. Republican Party*, 888 F.3d at 1204 ("the Supreme Court has rejected probabilistic analysis as a basis for conferring standing").  This is particularly true because, as the individual Plaintiffs demonstrate, whether the Order affects a landlord is a fact-dependent question involving tenants' specific circumstances.

## II.   Plaintiffs Have Failed To Join Indispensable Parties.

Plaintiffs are also unlikely to succeed due to a separate threshold deficiency: failure to join indispensable parties.  *See* Fed. R. Civ. P. 19; *cf.* Fed. R. Civ. P. 12(b)(7).  A plaintiff cannot obtain relief in a party's absence where (1) the absent party is "required by virtue of its interest in or importance to the action" and (2) the action cannot "in equity and good conscience, . . . proceed when [the] required party cannot be joined."  *Fla. Wildlife Fed. Inc. v. U.S. Army Corps of Engineers*, 859 F.3d 1306, 1316 (11th Cir. 2017) (citations omitted).  A party is "required" if he has "an interest relating to the subject matter of the action" and "disposing of the action in [his] absence may . . . as a practical matter impair or impede [his] ability to protect the interest."  Fed. R. Civ. P. 19.  This test turns on "pragmatic concerns,

especially the effect on the parties and the litigation." *Focus on the Family v. Pinellas Suncoast Transit Auth.*, 344 F.3d 1263, 1280 (11th Cir. 2003). Joinder is not feasible where "the absent party is not subject to the court's personal jurisdiction." *Moreiras v. Scottsdale Ins. Co.*, No. 20-21303, 2020 WL 2084851, at *2 (S.D. Fla. Apr. 30, 2020). And whether a suit may proceed in a required party's absence depends on a weighing of factors, including whether the absent party would be prejudiced. *Fla. Wildlife Fed'n*, 859 F.3d at 1318.

Here, each of Plaintiffs' tenants is a required party due to both their importance to and interest in the litigation. As discussed *supra*, the underlying actions of the tenants are critical to whether the Order applies to each Plaintiff. And the tenants undoubtedly have an interest in this litigation because each faces potential eviction if Plaintiffs prevail. *See* Brown Decl. ¶¶ 8–9 (ECF No. 18-2); Rondeau Decl. ¶¶ 9, 11 (ECF No. 18-3); Krausz Decl. ¶¶ 9–10 (ECF No. 18-4); Jones Decl. ¶¶ 4–5 (ECF No. 18-5).

At least three of the absent tenants likely could not be joined in this suit due to lack of personal jurisdiction. Due process requires "minimum contacts" with a forum state before its courts may exercise jurisdiction over a party, *see, e.g.*, *Waite v. All Acquisition Corp.*, 901 F.3d 1307, 1312 (11th Cir. 2018), and Plaintiffs allege *no*

contacts with Georgia with respect to the tenants of Plaintiffs Brown, Rondeau, and Krausz, who rent properties, respectively, in Virginia, North Carolina, and South Carolina, *see* Am. Compl. ¶¶ 13–27.

Even if Plaintiff Jones's tenants could be joined, the suit should not proceed in the absence of the other tenants, who would be unduly prejudiced by their inability to participate in litigation that directly concerns their behavior and affects their ability to remain in their homes. *See, e.g.*, *Fla. Wildlife Fed'n*, 859 F.3d at 1318. Plaintiffs are thus unlikely to prevail. *See, e.g.*, *Sunset Homeowners Ass'n v. Difrancesco*, No. 19-16, 2019 U.S. Dist. LEXIS 65057, at *32 (W.D.N.Y. April 15, 2019) (collecting cases denying preliminary injunctions for "failure to demonstrate a likelihood of success on the merits where a necessary party has not been joined").

### III.   Plaintiffs Are Not Entitled to Extraordinary Injunctive Relief.

A preliminary injunction is an "extraordinary and drastic remedy not to be granted unless the movant [has] clearly established the 'burden of persuasion' as to each of the four prerequisites.'" *Siegel v. Lepore*, 234 F.3d 1163, 1176 (11th Cir. 2000) (citation omitted).  The movant must show (1) "a substantial threat of irreparable injury"; (2) "a substantial likelihood of success on the merits"; (3) "the threatened injury to the plaintiff outweighs the potential harm to the defendant";

and (4) "the injunction will not disserve the public interest." *Palmer v. Braun*, 287 F.3d 1325, 1329 (11th Cir. 2002).  Failure to show any one of these factors is "fatal." *ACLU of Fla., Inc. v. Miami-Dade Cty. Sch. Bd.*, 557 F.3d 1177, 1198 (11th Cir. 2009).

### A. Plaintiffs Have Not Shown Irreparable Injury.

"A showing of irreparable harm is 'the *sine qua non* of injunctive relief.'" *N.E. Fla. Chapter of the Ass'n of Gen. Contractors of Am. v. City of Jacksonville*, 896 F.2d 1283, 1285 (11th Cir. 1990) (quoting *Frejlach v. Butler*, 573 F.2d 1026, 1027 (8th Cir. 1978)).  Even where a plaintiff can establish a substantial likelihood of success on the merits—which for the reasons explained *infra* in Part III.B, Plaintiffs here cannot—injunctive relief is inappropriate without a showing of irreparable harm. *See Snook v. Tr. Co. of Ga. Bank of Savannah, N.A.*, 909 F.2d 480, 486 (11th Cir. 1990)). The Eleventh Circuit has "emphasized on many occasions" that an "asserted irreparable injury 'must be neither remote nor speculative, but actual and imminent.'" *Siegel*, 234 F.3d at 1176 (quoting *City of Jacksonville*, 896 F.2d at 1285). Here, Plaintiffs claim irreparable harm as a result of "noncompensable loss of the value of their property" and unspecified constitutional violations.  Pls.' Br. 36. Neither of these alleged injuries fulfills Plaintiffs' burden.

1.  <u>Plaintiffs' Alleged Economic Losses Are Compensable.</u>

As Plaintiffs recognize, *see* Pls.' Br. 34–35, "[a]n injury is 'irreparable' only if it cannot be undone through monetary remedies."  *City of Jacksonville*, 896 F.2d at 1285; *see also BellSouth Telecomms., Inc. v. MCIMetro Access Transmission Servs. LLC*, 425 F.3d 964, 970 (11th Cir. 2005) ("economic losses alone do not justify a preliminary injunction").  Even economic injuries that are "substantial, in terms of money, time and energy necessarily expended in the absence of a stay, are not enough."  *Sampson v. Murray*, 415 U.S. 61, 90 (1974) (citation omitted).

Plaintiffs' alleged financial injuries have a remedy:  they may sue their tenants for unpaid rent.  *See Elmsford Apt. Assocs., LLC v. Cuomo*, No. 20-4062, 2020 WL 3498456, at *15 (S.D.N.Y. June 29, 2020) (pointing out, with respect to the New York state eviction moratorium, that "tenants are still bound to their contracts, and the landlord may obtain a judgment for unpaid rent if the tenants fail to honor their obligations").  The Eleventh Circuit has found the irreparable-harm element lacking where a plaintiff had, but failed to pursue, an adequate state-law remedy.  *Rosen v. Cascade Int'l, Inc.*, 21 F.3d 1520, 1531 (11th Cir. 1994) ("The test of the inadequacy of a remedy at law is whether a judgment could be obtained, not whether, once obtained it will be collectible." (quoting *St. Lawrence Co. v. Alkow*

*Realty, Inc.*, 453 So. 2d 514, 514–15 (Fla. 4th Dist. Ct. App. 1984))).  The CDC Order "does not relieve any individual of any obligation to pay rent, make a housing payment, or comply with any other [contractual] obligation."  85 Fed. Reg. at 55292.  Nor does it "preclude[] the charging or collecting of fees, penalties, or interest as a result of the failure to pay rent or other housing payment on a timely basis."  *Id.*  Accordingly, by its plain terms, the Order does not relieve Plaintiffs' tenants of their obligations to make rental payments; it also does not constrain Plaintiffs' ability to pursue available legal remedies to seek payment.

Plaintiffs do not challenge any of these points but argue instead that their economic damages may be mitigated only by evicting their current tenants and renting to others because, they assert, their current tenants are insolvent.  *See* Pls.' Br. 36–37.  This contention fails for two reasons.  First, the Order does not preclude Plaintiffs from taking such an action; it merely postpones this remedy for a limited amount of time in furtherance of urgent public health goals.  *See Elmsford*, 2020 WL 3498456, at *15 ("The eviction moratorium does not eliminate the suite of contractual remedies available to the Plaintiffs; it merely postpones the date on which landlords may commence summary proceedings against their tenants.").  A court in the Southern District of Ohio recently denied a landlord's motion for a

temporary restraining order in a nearly identical challenge to the CDC Order on this basis.  As it explained, "Plaintiff has not demonstrated that enforcement of the CDC's Order will cause it irreparable harm," only that it "postpones Plaintiff's collection of debt until after its expiration."  Order, *KBW Inv. Props. LLC v. Azar*, No. 20-4852 (Sept. 25, 2020 S.D. Ohio) (ECF No. 16).  So too here.

Second, Plaintiffs' conclusory assertions that their tenants are insolvent lack support.  *See* Brown Decl. ¶ 14; Rondeau Decl. ¶ 13; Krausz Decl. ¶ 14; Jones Decl. ¶ 10.  Courts within this Circuit routinely find that a plaintiff's economic harm is not irreparable where fears that a judgment would not be collectible were "unsupported" or "speculative."  *Commodities & Minerals Enter., Ltd. v. Citibank, N.A.*, No. 12-22333, 2012 WL 12844749, at *5 (S.D. Fla. Aug. 16, 2012) ("The possibility that [defendant] will be insolvent and unable to pay a future arbitration award is unsupported, speculative, and does not constitute irreparable harm.").[4]

---

[4] *See also, e.g.*, *FHR TB, LLC v. TB Isle Resort, LP.*, 865 F. Supp. 2d 1172, 1213 (S.D. Fla. 2011) (plaintiff's concerns that defendant could not pay damages were "speculative and, even if supported by some specific evidence, are typically inadequate to create the necessary irreparable harm"); *Jameson v. Pine Hill Dev., LLC*, No. 07-0111, 2007 WL 623807, at *5 (S.D. Ala. Feb. 23, 2007) ("Any suggestion that defendants are or may become unable to satisfy a monetary judgment . . . is so speculative that it cannot rise to the level of irreparable harm . . . ."); *accord Charlesbank Equity Fund II v. Blinds To Go, Inc.*, 370 F.3d 151, 162 (1st Cir. 2004) ("A

On the other hand, the Eleventh Circuit has found that a defendant's insolvency may constitute irreparable harm only in "extraordinary circumstances" where a plaintiff has made a well-supported showing that a future monetary judgment will be inadequate. *See United States v. Askins & Miller Orthopaedics, P.A.*, 924 F.3d 1348, 1359 (11th Cir. 2019) (determining defendant was "judgment-proof" where evidence demonstrated that for "several years, [plaintiff] expended considerable resources making numerous—and unsuccessful—attempts to collect").

Moreover, the individual circumstances of the Plaintiffs weigh against a finding that their economic damages are collectively irreparable. Plaintiff Brown, for example, claims damages suggesting his tenant has failed to pay rent for over eight months, or since at least January 2020; he thus appears not to have pursued remedies for alleged nonpayment of rent even prior to the declaration of the pandemic. *See* Brown Decl. ¶¶ 5–6. Two of the other individual landlords assert that their tenants made rental payments as recently as July 2020. *See* Rondeau Decl. ¶ 7; Krausz Decl. ¶ 8. And only Plaintiff Rondeau has asserted (without evidence) that he may have difficulty paying his mortgage as a result of his current

---

finding of irreparable harm must be grounded on something more than conjecture, surmise, or a party's unsubstantiated fears of what the future may have in store.").

tenant's nonpayment.  *See* Rondeau Decl. ¶ 14.  All of these facts undercut Plaintiffs' claim that their harm is "irreparable," such that extraordinary nationwide relief is necessary on an expedited basis.  And individualized issues with demonstrating irreparable harm are only magnified with a large organization like NAA, which has not made any specific allegations about irreparable harm its members will suffer as a result of the Order.  *See* Pinnegar Decl. ¶ 5.

2.  Plaintiffs Have Alleged No Irreparable Constitutional Violation.

Plaintiffs' only other assertion of irreparable harm is a vague allusion to constitutional violations.  Pls.' Br. 36.  The Eleventh Circuit has rejected the "conten[tion] that a violation of constitutional rights always constitutes irreparable harm." *Siegel*, 234 F.3d at 1177 (citing cases).  Rather, "[t]he only areas of constitutional jurisprudence where we have said that an on-going violation may be presumed to cause irreparable injury involve the right of privacy and certain First Amendment claims." *Id.* at 1178.  Neither the right to privacy nor the First Amendment are at issue here.  In any event, Plaintiffs cannot fulfill their burden to show irreparable harm with vague reference to constitutional injury.  *See Gwinnett Cty. NAACP v. Gwinnett Cty. Bd. of Registration & Elections*, 446 F. Supp. 3d 1111, 1125–26 (N.D. Ga. 2020) (no irreparable harm where plaintiffs "allude[d]

to a general constitutional harm," but "failed to articulate any specifics").

**B. Plaintiffs Have Not Shown A Likelihood of Success on the Merits.**

Although Plaintiffs' amended complaint raises numerous challenges to the Order, their preliminary injunction motion presses only their APA and right-of-access-to-courts claims. *See* Pls.' Br. 16–34. None of these claims is substantially likely to succeed on the merits.

1. The CDC Order Comports with the Requirements of the APA.

Under the APA, a court may set aside agency action only when it determines that action is "arbitrary, capricious, an abuse of discretion, unconstitutional, in excess of statutory authority, without observance of procedure as required by law, or unsupported by substantial evidence." *Mahon v. U.S. Dep't of Agric.*, 485 F.3d 1247, 1253 (11th Cir. 2007); *see* 5 U.S.C. § 706(2). Plaintiffs' claims that CDC exceeded its statutory and regulatory authority, Pls.' Br. 16–23, and that the Order is arbitrary and capricious, *id.* at 24–28, both fail.

a. CDC acted within its statutory and regulatory authority.

Congress vested the Secretary of HHS with broad authority to take decisive action if required to control the spread of dangerous infectious diseases, which the Secretary has delegated to the public health experts at the CDC. *See* 42 U.S.C.

§ 264; 42 C.F.R. § 70.2.  CDC acted within the scope of that authority and in the interest of public health in issuing the challenged Order.

Section 361 of the PHSA empowers the Secretary "to make and enforce such regulations *as in his judgment are necessary* to prevent the introduction, transmission, or spread of communicable diseases" from abroad or among the states.  42 U.S.C. § 264(a) (emphasis added).  The plain text of the statute thus evinces a legislative determination to defer to the "judgment" of public health authorities about what measures they deem "necessary" to prevent contagion, *see id.* — a determination made in the light of history and experience, given the havoc wreaked by past scourges like yellow fever, *see supra* pp. 3–4.  And the examples Congress gave of specific measures the Secretary may take to control infectious disease — which are illustrative, not exhaustive — underscore the breadth of this authority, showing that it may infringe on personal liberties or property rights where needed to protect the public health.  Such measures include the authority to impose limitations on individuals' freedom of movement, including the "apprehension, detention, or conditional release of individuals."  *Id.* § 264(b)–(c).  They also include intrusions on private property, such as its "inspection, fumigation, disinfection, sanitation," and even "destruction."  *Id.* § 264(a).

The regulations implementing section 361 delegate to the CDC Director the authority, in the event of state control measures insufficient to prevent the interstate spread of disease, to "take such measures to prevent such spread of the diseases as he/she deems reasonably necessary." 42 C.F.R. § 70.2. Like the statute, the regulation gives the Director broad authority to take measures that he deems necessary to protect public health. *See id.* It makes clear that, in order to control disease transmission, intrusions on private property, such as "inspection, fumigation, disinfection, sanitation," and even "destruction" may be required. *Id.*

Here, CDC's determination that a "temporary halt in evictions" is a "reasonably necessary measure under 42 C.F.R. 70.2 to prevent the further spread of COVID–19 throughout the United States," 85 Fed. Reg. at 55296, is well supported and falls firmly within the scope of its authority.

A number of findings support CDC's decision. First is the understanding that "[t]he virus that causes COVID-19 spreads very easily and sustainably between people who are in close contact with one another (within about 6 feet)." *Id.* at 55293. In addition, research suggests that, in the absence of eviction moratoria, tens of millions of Americans could be at risk of eviction, on a scale that would be "unprecedented in modern times." *Id.* at 55295. The CDC has also

determined that, in light of statistics regarding interstate moves, such "mass evictions would likely increase the interstate spread of COVID-19." *Id.*

Based on this knowledge, CDC found that, in the context of this pandemic, eviction moratoria are an "effective public health measure utilized to prevent the spread of communicable disease." *Id.* Eviction moratoria "facilitate self-isolation" by ill or at-risk persons; aid the implementation of "stay-at-home and social distancing directives," and, by reducing homelessness, decrease "the likelihood of individuals moving into close quarters in congregate settings." *Id.*

Evictions increase the risk of the spread of COVID-19 in multiple ways. An evicted renter who cannot afford alternative housing often "move[s] into close quarters in shared housing or other congregate settings" that pose a high risk of transmission among household contacts. *Id.* at 55294. Due to potential crowding and shared facilities, persons residing in homeless shelters may have difficulty adhering to social distancing and other measures intended to prevent the spread of COVID-19. *Id.* at 55294–95. Unsheltered homeless persons are at a higher risk of infection due to lack of access to hygienic measures, sanitation, and medical care, as well as exposure to the elements. *Id.*

These are among the reasons that the Order imposing a temporary halt of

residential evictions to combat the spread of COVID-19 constitutes a "reasonably necessary" measure under the regulations, and is therefore within the broad authority of the CDC, conferred by the PHSA, to undertake measures to protect public health by preventing disease transmission.

Plaintiffs argue that the Order falls outside CDC's statutory and regulatory authority because (1) various canons of construction cabin their otherwise broad and clear language, Pls.' Br. 18–22, and (2) regardless, the Order is not, in Plaintiffs' view, a "necessary" measure, *id.* at 22–23.   In support of their statutory construction argument, Plaintiffs' essential contention is that the list of measures CDC might take to prevent disease transmission limits the phrase "such measures to prevent such spread of the diseases as he/she deems reasonably necessary" to exclude temporary eviction moratoria.  Pls.' Br. 18–20.  This argument fails.

As an initial matter, the plain text of the regulation and its authorizing statute were intentionally and clearly drafted to give the federal public health authorities maximum flexibility to undertake measures that they deem necessary, in light of their public health expertise, to prevent the interstate spread of disease. *See* 42 U.S.C. § 264(a); 42 C.F.R. § 70.2.  The terms of the statute—including the examples of measures that the Secretary may adopt—invite the Secretary's

exercise of expert judgment to determine what regulations may be appropriate to "prevent the introduction, transmission, or spread of communicable diseases." 42 U.S.C. § 264(a).  Indeed, Congress's use of the phrase "such regulations as in his judgment are necessary" shows that it intended to defer to agency expertise, as "Congress knows to speak in plain terms when it wishes to circumscribe, and in capacious terms when it wishes to enlarge, agency discretion." *City of Arlington v. FCC*, 569 U.S. 290, 296 (2013).  This point is bolstered by the fact that, although subsection (a) makes no mention of the Secretary's ability to detain persons, it is plainly contemplated as within the scope of what may be "necessary" in his "judgment," given the restrictions placed on any such regulations in subsections (b) through (d).  *See* 42 U.S.C. § 264(a)–(d).

The regulation reflects Congress's intent to provide flexibility in combatting the spread of disease.  *See* 42 C.F.R. § 70.2.  It provides the CDC Director with significant flexibility to "take such measures to prevent such spread of the diseases as he/she deems reasonably necessary."  42 C.F.R. § 70.2.  In light of the textual grant of broad authority to the Secretary and the CDC Director in the statute and regulation, the Court should decline to impose an atextual constraint on the measures that medical experts may deem necessary to protect the public health

when neither Congress nor the agency did so explicitly.

Moreover, the expansive language in the statute (and regulation) is consistent with the Supreme Court's recognition that "[w]hen Congress undertakes to act in areas fraught with medical and scientific uncertainties, legislative options must be especially broad and courts should be cautious not to rewrite legislation." *Marshall v. United States*, 414 U.S. 417, 427 (1974).  Chief Justice Roberts recently reaffirmed this principle in connection with the COVID-19 pandemic.  *See S. Bay Pentecostal Church v. Newsom*, 140 S. Ct. 1613 (2020) (Roberts, C.J., concurring) (observing that "[w]hen [state] officials undertake to act in areas fraught with medical and scientific uncertainties, their latitude must be especially broad") (citation omitted).   This principle comports with legislative history demonstrating that Congress used broad language in section 361 of the PHSA to provide federal health authorities flexibility to respond to novel disease outbreaks. *See* H.R. Rep. No. 78-1364, at 24–25.

The canons of statutory construction that Plaintiffs invoke do not so constrain the measures CDC may take as to preclude a temporary eviction moratorium to prevent the spread of an easily transmissible, potentially deadly disease.  Plaintiffs principally rely upon the canon of ejusdem generis, or the idea

that "when a general term follows a specific one, the general term should be understood as a reference to subjects akin to the one with specific enumeration." *Ali v. Fed. Bureau of Prisons*, 552 U.S. 214, 223 (2008) (quoting *Norfolk & W. Ry. Co. v. Am. Train Dispatchers Ass'n*, 499 U.S. 117, 129 (1991)).   Here, however, "the structure of the phrase . . . does not lend itself to the application of the canon." *Id.* at 225.  The regulation provides that the CDC Director "may take such measures to prevent such spread of the diseases as he/she deems reasonably necessary, including inspection, fumigation, disinfection, sanitation, pest extermination, and destruction of animals or articles believed to be sources of infection."   42 C.F.R. § 70.2.  Rather than a catch-all phrase at the end of a list, the general term "such measures" as are "reasonably necessary" is the baseline authority provided to the Director.  *See id.*  The ensuing list of measures should therefore be understood as examples of things that fall within his authority, not limits on it.  This reading is bolstered by the similar structure of the statute.  There, the scope of the Secretary's authority to promulgate regulations, which includes regulations governing the detention of persons, is not cabined by the later-inscribed list of measures that he

may provide for in enforcing those regulations.[5]  *See* 42 U.S.C. § 264(a).

Even if this and other canons that Plaintiffs invoke were properly applied here, however, the temporary eviction moratorium is not so different than the actions contemplated in the statute or regulation as to exceed CDC's authority. The canon of ejusdem generis focuses on "the common attribute" of specific items to aid in the interpretation of a "catchall phrase." *Ali*, 552 U.S. at 225.  In a similar fashion, the noscitur a sociis canon "counsels that a word 'gathers meaning from the words around it.'" *Babbitt v. Sweet Home Ch. of Cmtys. for a Great Or.*, 515 U.S. 687, 702 (1995) (quoting *Jarecki v. G.D. Searle & Co.*, 367 U.S. 303, 307 (1961)).  Here, the regulation permits CDC to take a number of actions that constitute an intrusion upon or seizure of an individual's property, including "inspection," "fumigation," and even "destruction," where the Director deems it reasonably necessary to

---

[5] The fact that the second sentence of subsection 264(a) places the phrase "as in his judgment may be necessary" at the end of the list of possible measures the Secretary may provide for does not alter this result.  42 C.F.R. § 70.2 is within the scope of his authority under the first sentence of subsection (a), and in delegating authority to CDC in the regulation, the Secretary has purposefully chosen phrasing that makes clear the Director's ability to take measures to prevent the spread of disease according to his public health expertise is not unduly cabined by the examples of possible measures listed in the regulation.

prevent the spread of disease.  42 C.F.R. § 70.2.  The temporary moratorium on evictions is a comparable imposition on property in the interest of preventing contagion.   And while the scale of the temporary moratorium is no doubt expansive, it is entirely consistent with more extensive public health measures enacted to combat the widespread and "historic" threat to public health COVID-19 poses, such as border closures, travel restrictions, business closures, and stay-at-home orders.  *See* 85 Fed. Reg. at 55292; *see also, e.g.*, *League of Indep. Fitness Facilities & Trainers, Inc. v. Whitmer*, 814 F. App'x 125, 129 (6th Cir. 2020) (granting emergency stay of injunction against state order closing fitness facilities due to COVID-19); *Auracle Homes, LLC v. Lamont*, No. 20-00829, 2020 WL 4558682, at *21 (D. Conn. Aug. 7, 2020) (refusing to enjoin state eviction moratorium); *TJM 64, Inc. v. Harris*, No. 20-02498, 2020 WL 4352756, at *8 (W.D. Tenn. July 29, 2020) (refusing to enjoin local restrictions on businesses); *Talleywhacker, Inc. v. Cooper*, No. 20-218, 2020 WL 3051207, at *14 (E.D.N.C. June 8, 2020) (same).

Nor does the rule of lenity apply here, as Plaintiffs have identified no "grievous ambiguity or uncertainty" as to what the statute authorizes.[6]  *United*

---

[6] The other canons to which Plaintiffs point are even less applicable.  *See* Pls.' Mot. 20–22.  For example, the principle of "expressio unius est exclusio alterius,

*States v. Baldwin*, 774 F.3d 711, 733 (11th Cir. 2014).  Indeed, application of the rule of lenity is not appropriate where, for example, "the statute's text, taken alone, permits a narrower construction" or where the "text creates some ambiguity," provided that the ambiguity could be resolved using traditional tools of statutory interpretation.  *Abramski v. United States*, 573 U.S. 169, 188 n.10 (2014).

Plaintiffs' disagreement with CDC's finding that the Order is "reasonably necessary" is equally misguided.  They hypothesize, without any support, that other public health measures could have been taken to curb the pandemic, or that the effects of evictions and resulting homelessness on the spread of COVID-19 may not be as drastic as the research cited by CDC suggests.  Pls.' Br. 22–23.  But it is not for Plaintiffs (or a reviewing court) to determine what is necessary to protect the public health.  *See, e.g.*, *FERC v. Elec. Power Supply Ass'n*, 136 S. Ct. 760, 782

---

'expressing one item of [an] associated group or series excludes another left unmentioned,'" *NLRB v. SW Gen., Inc.*, 137 S. Ct. 929, 940 (2017) (quoting *Chevron U.S.A. Inc. v. Echazabal*, 536 U.S. 73, 80 (2002)), serves no use where "language suggesting exclusiveness is missing" and the items referred to are instead exemplars of what an interpretation "may include," *Echazabal*, 536 U.S. at 81.  And as explained above, the Order falls within the plain language of the statute and the regulation; Defendants need not ask the Court to rewrite their text to make it so. *See Mamani v. Berzain*, 825 F.3d 1304, 1310 (11th Cir. 2016).

(2016). Instead, such decisions are textually committed to the judgment of the CDC Director. 42 C.F.R. § 70.2; *see* 42 U.S.C. § 264(a). And even if the Court were to disregard the agency's expert judgment, the term "reasonably necessary" does not require that any one public health measure be a panacea in order to be authorized under the regulation and statute. *See Comm'r v. Heininger*, 320 U.S. 467 (1943) (interpreting tax law's reference to "necessary" business expenses as covering those that are those "appropriate and helpful" to a business). The Order here is a "reasonably necessary" measure to prevent the interstate spread of COVID-19, as CDC found for all of the reasons explained above. *See supra* pp. 10–13, 29–30. Plaintiffs are thus unlikely to succeed on the merits of their claim that CDC has exceeded its authority in issuing the Order.

> ### b. CDC's Order is not arbitrary and capricious.

Plaintiffs are likewise unlikely to succeed on the merits of their claim that the Order is arbitrary and capricious—which is largely a repackaging of their argument that the Order is not reasonably necessary. Arbitrary and capricious review is "exceedingly deferential." *Sierra Club v. Van Antwerp*, 526 F.3d 1353, 1360 (11th Cir. 2008) (quoting *Fund for Animals, Inc. v. Rice*, 85 F.3d 535, 541 (11th Cir. 1996)). Under this standard, courts may not "substitute [their] judgment for the

agency's as long as its conclusions are rational." *Miccosukee Tribe of Indians of Fla. v. United States*, 566 F.3d 1257, 1264 (11th Cir. 2009). Agency action is arbitrary and capricious only where "the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). Although courts "may not supply a reasoned basis for the agency's action that the agency itself has not given," they will "uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned." *Id.* (internal citations omitted). Where an agency "is making predictions, within its area of special expertise, at the frontiers of science, . . . a reviewing court must generally be at its most deferential." *Balt. Gas & Elec. Co. v. Nat. Res. Def. Council, Inc.*, 462 U.S. 87, 103 (1983).

Plaintiffs claim that the Order is arbitrary and capricious for two reasons: (1) CDC allegedly did not demonstrate that local measures were insufficient to prevent the spread of COVID-19, and (2) CDC allegedly has not shown that the eviction moratorium was "reasonably necessary" to prevent the spread of COVID-

19.  Pls.' Br. 25–28.  These contentions are unpersuasive.

First, Plaintiffs ignore CDC's explicit findings that measures in state and local jurisdictions that do not provide protections for renters equal or greater than the protections provided in the Order are insufficient to prevent the spread of COVID-19.  85 Fed. Reg. at 55296.  These findings are supported by evidence presented in the Order—already discussed at length, *see supra* pp. 10–13, 29–30—showing why CDC expects eviction moratoria to help to prevent the spread of COVID-19.  The Order also sets forth evidence that evictions contribute to the spread of the disease.  *See id.*  The Order further notes that many States and jurisdictions do not provide protections against evictions during the pandemic.  85 Fed. Reg. at 55296 n.36.  Given CDC's determination that eviction moratoria may help to curb the spread of COVID-19, and that the absence of such measures is likely to contribute to the interstate spread of the disease, its determination that States lacking protection against evictions have taken insufficient measures is satisfactory to trigger the CDC Director's authority under 42 C.F.R. § 70.2.

Plaintiffs' second arbitrary-and-capricious argument mirrors their argument that an eviction moratorium is not "reasonably necessary" within the meaning of the regulation, and similarly fails.  *See supra* pp. 37–38.  By contending

that CDC has not shown that an eviction moratorium is "the *only* appropriate course" to control the spread of COVID-19, and asking why CDC took this measure instead of regulating other activities that might spread COVID-19, *see* Pls.' Br. 26–28, Plaintiffs impermissibly ask this Court to substitute its judgment for that of CDC.  Such a request is contrary to the APA under any circumstances. *See, e.g.*, *Miccosukee Tribe of Indians of Fla.*, 566 F.3d at 1264.  But it is particularly inappropriate here, where CDC's public-health and disease-prevention expertise provide the basis for its determinations.  *See Nat'l Parks Conservation Assoc. v. U.S. Dep't of the Interior*, 835 F.3d 1377, 1384 (11th Cir. 2016) ("courts are required to defer to conclusions reached by an agency that are base[d] on its specialized expertise").  And the decision to impose an eviction moratorium is consistent with both the judgment of Congress and that of numerous States.  *See supra* p. 9.  It can hardly be irrational for CDC to reach the same conclusion.

### 2.   The Order Does Not Deny Plaintiffs Access to Courts.

Nor does the CDC Order unlawfully deny Plaintiffs access to the courts. Denial of access cases generally fall into two categories:  those where the plaintiff alleges that "systemic official action frustrates a plaintiff or plaintiff class in preparing and filing suits at the present time," *Christopher v. Harbury*, 536 U.S. 403,

413 (2002), and those where the plaintiffs bring "claims not in aid of a class of suits yet to be litigated, but of specific cases that cannot now be tried," *id.* at 414. Plaintiffs here presumably mean to bring a claim falling into the first category, but their argument rests upon multiple misunderstandings of the Order.

Most importantly, the Order does not prevent a landlord from filing an eviction action in state court.  First, the Order expressly permits eviction for various reasons other than nonpayment of rent.  *See* 85 Fed. Reg. at 55294 (property damage, criminal activity, etc.).  Second, nowhere does the Order prohibit a landlord from attempting to demonstrate that a tenant has wrongfully claimed its protections.  And third, even where a tenant is entitled to its protections, the Order does not bar a landlord from commencing a state court eviction proceeding, provided that that actual eviction does not occur while the Order remains in place. *See id.* at 55292 ("the order prevents these persons from being evicted or removed from where they are living through December 31, 2020"); *id.* at 55293 (defining "evict" as "to remove or cause the removal of").  This case thus bears no relationship to classic judicial access cases in which the plaintiff is entirely deprived of a judicial forum because he cannot afford a filing fee.  *Cf., e.g., Boddie v. Connecticut*, 401 U.S. 371 (1971) (cited in Pls.' Br. 29).

Nor does the Order constitute a "complete foreclosure of relief" on any claim. *See Harer v. Casey*, 962 F.3d 299, 311–12 (7th Cir. 2020) (cited in Pls.' Br. 28). Where tenants fail to pay rent, nothing in the Order precludes landlords from filing a breach of contract action seeking payment. Plaintiffs may prefer a different remedy, but they plainly have access to a judicial forum. As one court explained in rejecting a similar challenge to a state eviction moratorium, "Plaintiffs can still sue their tenants for arrearages through a breach of contract action in the New York Supreme Court—and the fact that is not their preferred remedy is of no moment." *Elmsford*, 2020 WL 3498456, at *16; *see also id.* at *17. The Order is also temporary, *see* 85 Fed. Reg. at 55296, and "'mere delay' to filing a lawsuit cannot form the basis of a Petition Clause violation when the plaintiff will, at some point, regain access to legal process." *Elmsford*, 2020 WL 3498456, at *16 (quoting *Davis v. Goord*, 320 F.3d 346, 352 (2d Cir. 2003)); *see also id.* at *17.

Finally, it bears emphasis that Plaintiffs' fundamental contention—that the federal government is powerless to delay a landlord's eviction of a residential tenant under state law—would have sweeping consequences. As just one example, for the past eighty years, federal law has provided that members of the armed forces may be entitled to a temporary stay of eviction proceedings under

certain circumstances.  *See* Soldiers' and Sailors' Civil Relief Act of 1940, Pub. L. No. 76-861, 54 Stat. 1178 (1940) (codified as amended at 50 U.S.C. § 3951(b)(1)). Defendants are unaware of any court that has even contemplated the possibility that this provision is unconstitutional.

### C.  The Injunction Plaintiffs Seek Is Contrary to the Public Interest.

Finally, the balance of the harms overwhelmingly favors the government, and the injunction Plaintiffs seek is manifestly contrary to the public interest.  *See Nken v. Holder*, 556 U.S. 418, 435 (2009) (pointing out that "[t]hese factors merge when the Government is the opposing party").  CDC issued the Order to prevent the spread of an easily transmissible, potentially serious, and sometimes fatal disease that has infected over seven million and been reported as the cause of death of over 200,000 persons within the United States.  *See* 85 Fed. Reg. at 55292; *see also* CDC COVID Data Tracker.

Numerous federal courts have recognized the paramount public interest in preventing the spread of COVID-19, including in connection with a state eviction moratorium.  *See, e.g.*, *Auracle Homes*, 2020 WL 4558682, at *21 ("given the nature of this pandemic, the balance of the equities and the public interest favor denying a preliminary injunction"); *TJM 64*, 2020 WL 4352756, at *8 (refusing to enjoin local

ordinance requiring closure of bars and clubs due to COVID-19 because such an injunction "would not be in the public interest" and would "present a risk of serious public harm and foster the continued spread [of the] COVID-19 virus"); *Talleywhacker*, 2020 WL 3051207, at *14 (finding that "the public interest does not weigh in favor of injunctive relief" in a situation "where defendant has taken intricate steps to craft reopening policies to balance the public health and economic issues associated with the COVID-19 pandemic," and "neither the court nor plaintiffs are better positioned to second-guess those determinations"). This Circuit has recognized that "it doubtlessly advances the public interest to stem the spread of COVID-19."[7] *Swain v. Junior*, 961 F.3d 1276, 1293 (11th Cir. 2020).

Plaintiffs, on the other hand, are acting in their individual economic interests. As demonstrated *supra*, they have not shown these interests will be irreparably harmed by the temporary restrictions in the Order. And even if they had, other federal courts have found that, due to the extraordinary nature of this pandemic, the public interest in protecting health outweighs even serious

---

[7] Indeed, this District recently continued a suspension of jury trials until January 2021 due to the ongoing spread of COVID-19. *See* General Order 20-01, Eighth Amendment (ECF No. 19).

economic harm to individual plaintiffs, including the complete loss of a business. *TJM 64*, 2020 WL 4352756, at *8 (denying injunctive relief despite finding that plaintiffs would suffer "devastating economic injury" as a result of COVID-19 closure orders); *see also League of Indep. Fitness Facilities & Trainers*, 814 F. App'x at 129 (finding that "[t]hough Plaintiffs bear the very real risk of losing their businesses, the Governor's interest in combatting COVID-19 is at least equally significant").  In light of all of these considerations, the balance of the harms and the public interest tilt decisively in favor of the government.

## IV.   Any Relief Granted Should Be Narrowly Tailored.

Even if the Court were to disagree with Defendants' arguments, any relief should be no broader than necessary to provide Plaintiffs with relief and therefore should extend only to plaintiffs who have standing to sue.[8]  "A plaintiff's remedy must be tailored to redress the plaintiff's particular injury," *Gill v. Whitford*, 138 S. Ct. 1916, 1934 (2018), and "injunctive relief should be no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs," *Madsen v.*

---

[8] Although Plaintiffs purport to bring claims on behalf an organization with nationwide membership, the NAA lacks standing, *see supra* pp. 17–18, and its presence in this litigation thus cannot support any request for nationwide relief.

*Women's Health Ctr., Inc.*, 512 U.S. 753, 765 (1994).

Nationwide injunctions, in contrast, "take a toll on the federal court system—preventing legal questions from percolating through the federal courts, encouraging forum shopping, and making every case a national emergency for the courts and for the Executive Branch." *Trump. v. Hawaii*, 138 S. Ct. 2392, 2425 (2018) (Thomas, J., concurring); *see also, e.g.*, *Holland v. Nat'l Mining Ass'n*, 309 F.3d 808, 815 (D.C. Cir. 2002) ("Allowing one circuit's statutory interpretation to foreclose . . . review of the question in another circuit" would "squelch the circuit disagreements that can lead to Supreme Court review."). Here, the CDC Order is being challenged in two other federal courts, underscoring why this Court should not attempt to decide its legality for all parties and for all time. *See KBW Inv. Props. v. Azar*, No. 20-4852 (S.D. Ohio); *Tiger Lily LLC v. HUD*, No. 20-2692 (W.D. Tenn.).

## CONCLUSION

Plaintiffs' motion for preliminary injunction should be denied.

Dated:  October 2, 2020                    Respectfully submitted,

JEFFREY BOSSERT CLARK
Acting Assistant Attorney General

47

ERIC BECKENHAUER
Assistant Director, Federal Programs
Branch

/s/ Leslie Cooper Vigen
LESLIE COOPER VIGEN
Trial Attorney (DC Bar No. 1019782)
Steven A. Meyers
Senior Trial Counsel (NY Bar No. 4823043)
United States Department of Justice
Civil Division, Federal Programs
Branch
1100 L Street, NW
Washington, DC 20005
Tel:  (202) 305-0727
Fax:  (202) 616-8470
E-mail:  leslie.vigen@usdoj.gov

*Counsel for Defendants*

48

**CERTIFICATE OF COMPLIANCE**

I hereby certify, pursuant to Local Rules 5.1 and 7.1(D), that I prepared the foregoing brief using Book Antiqua, 13-point font.

/s/ Leslie Cooper Vigen
LESLIE COOPER VIGEN
United States Department of Justice

**CERTIFICATE OF SERVICE**

I hereby certify I served this document today by filing it using the Court's CM/ECF system, which will automatically notify all counsel of record.

Dated:  October 2, 2020

/s/ Leslie Cooper Vigen
LESLIE COOPER VIGEN
United States Department of Justice