IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| RICHARD LEE BROWN, ET AL., <br><br> Plaintiffs, <br><br> v. <br><br> ALEX AZAR, <br><br> IN HIS OFFICIAL CAPACITY AS SECRETARY U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES <br><br> *and* <br><br> U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES <br><br> *and* <br><br> NINA B. WITKOFSKY, <br><br> IN HER OFFICIAL CAPACITY AS ACTING CHIEF OF STAFF U.S. CENTERS FOR DISEASE CONTROL AND PREVENTION, <br><br> Defendants. | CIVIL ACTION NO. <br> 20-cv-03702-JPB |

BRIEF OF *AMICI CURIAE* OF THE AMERICAN ACADEMY OF PEDIATRICS; AMERICAN MEDICAL ASSOCIATION; CHILDREN'S HEALTHWATCH; THE GEORGE CONSORTIUM; GEORGIA CHAPTER, AMERICAN ACADEMY OF PEDITRICS; GLMA: HEALTH PROFESSIONALS ADVANCING LGBTQ EQUALITY; NATIONAL HISPANIC MEDICAL ASSOCIATION; NATIONAL MEDICAL ASSOCIATION; NORTH CAROLINA PEDIATRIC SOCIETY, STATE CHAPTER OF THE AMERICAN ACADEMY OF PEDIATRICS; PUBLIC HEALTH LAW WATCH; SOUTH CAROLINA CHAPTER, AMERICAN ACADEMY OF PEDIATRICS; SOUTHERN POVERTY LAW CENTER;

VIRGINIA CHAPTER, AMERICAN ACADEMY OF PEDIATRICS; EMILY A. BENFER; MATTHEW DESMOND; GREGG GONSALVES; DANYA A. KEENE; KATHRYN M. LEIFHEIT; MICHAEL Z. LEVY; SABRIYA A. LINTON; CRAIG E. POLLACK; JULIA RAIFMAN; GABRIEL L. SCHWARTZ; and DAVID VLAHOV IN SUPPORT OF THE DEFENDANTS.

*Counsel for* Amici Curiae

EMILY A. BENFER
WAKE FOREST UNIVERSITY SCHOOL OF LAW
Legal Intern:                  1834 Wake Forest Road, Winston-Salem, NC 27109
Emilia Todd                                  Telephone: (336) 758-5430
                                          Email: benfere@wfu.edu

JEROME N. FRANK LEGAL SERVICES ORGANIZATION
YALE LAW SCHOOL
Legal Interns:                             J.L. Pottenger, Jr.
Salvatore Minopoli, Patrick Monaghan           Richard L. Tenenbaum
Jacqui Oesterblad, Evan Walker-Wells      127 Wall Street, New Haven, CT 06511
Logan Wren                                Telephone: (203) 432-4800
                                   Email: j.pottenger@ylsclinics.org

SOUTHERN POVERTY LAW CENTER,
Wingo Smith
150 E. Ponce de Leon Avenue, Suite 340
Decatur, GA 30030
Telephone: (334) 956-8200
Email: wingo.smith@splcenter.org

*This brief has been prepared by a professor associated with Wake Forest University School of Law and a clinic operated by Yale Law School, but does not purport to present the schools' institutional views, if any.*

**TABLE OF CONTENTS**

**STATEMENT OF INTEREST OF *AMICI CURIAE* ......................................... 3**

**SUMMARY OF ARGUMENT .......................................................... 4**

**ARGUMENT ....................................................................... 5**

    I. Mass Evictions are Likely in Georgia, North Carolina, South Carolina, Virginia, and Nationwide without the CDC Order.........................................5

        A.  Americans Faced Widespread Housing Insecurity Before the Pandemic 5

        B.  The COVID-19 Pandemic Increased and Worsened Housing Precarity ..7

        C.  Without Legal Protections from Eviction, Filing Rates Have Increased During the Pandemic .............................................................................12

    II. Eviction Moratoriums Slow the Spread of COVID-19 and Prevent Negative Short- and Long-Term Health Outcomes.....................................................15

        A.  Evictions Spread COVID-19, Thwarting Efforts to Contain the Virus ..15

        B.  Eviction Increases the Rate of COVID-19 Among High-Risk Populations, Leading to Long-Term Complications or Death ...............21

        C.  Studies Suggest Eviction Moratoriums Prevent COVID-19 Deaths ......27

    III. Eviction and COVID-19 Have Disproportionately Harmed Marginalized Communities ...................................................................................30

        A.  Evictions Disparately Affect Groups Based on Race and Gender .........30

        B.  COVID-19 Has Killed Black, Indigenous, and Latinx People at Higher Rates.....................................................................................32

**CONCLUSION ...................................................................35**

**IDENTITY AND INTEREST OF *AMICI CURIAE*......................... Appendix A**

**TABLE OF AUTHORITIES.................................................Appendix B**

**STATEMENT OF INTEREST OF *AMICI CURIAE***

The twenty-four *amici* include national and local associations and experts who,

based on their extensive research and work in this area, all recognize that housing is

critical to protecting public health and ensuring health equity during the COVID-19 pandemic. *See* Appendix A for full description.

## SUMMARY OF ARGUMENT

Eviction moratoriums help reduce the spread of COVID-19. Millions of Americans entered the COVID-19 pandemic vulnerable to eviction due to a preexisting affordable housing crisis. The economic recession and widespread job loss resulting from the pandemic increased hardship among renters, who often lack savings to cover expenses during an emergency. COVID-19-related job and wage loss left millions unable to afford rent. This has created an unprecedented eviction crisis that disproportionately affects low-income populations and communities of color and increases COVID-19 infection and mortality. The Centers for Disease Control and Prevention ("CDC") issued an agency order ("CDC Order") to prevent evictions from spreading COVID-19 and worsening public health.

Evidence suggests that eviction moratoriums effectively slow the spread of COVID-19. Without these moratoriums, evictions will likely increase to unseen heights, facilitating the transmission of infectious diseases, including COVID-19. Preliminary research and modeling demonstrate that eviction is associated with increased COVID-19 infection and mortality rates. The consequences of eviction (such as overcrowding, homelessness, and housing instability) increase contact with

4

others and hinder compliance with the key strategies to contain COVID-19, including social distancing, self-quarantining, and hand hygiene.

The people most at risk of eviction are particularly vulnerable to COVID-19. Low-income populations are often exposed to social determinants of poor health and have chronic illness or disability and, as such, are at risk of serious complications or death when they contract COVID-19. People of color are more likely to have lost jobs, face eviction, contract COVID-19, lack access to healthcare, and fall severely ill with the virus. Protecting public health during this pandemic requires protecting those most likely to contract, spread, and die from COVID-19. These deleterious health impacts and the spread of COVID-19 are tied to the act of eviction itself and are likely quite preventable if eviction is halted under the CDC's moratorium.

## ARGUMENT

## I.   Mass Evictions are Likely in Georgia, North Carolina, South Carolina, Virginia, and Nationwide without the CDC Order

### A.  Americans Faced Widespread Housing Insecurity Before the Pandemic

COVID-19 struck the United States when millions of adults and children already lived perilously close to eviction. In the states where plaintiffs' properties are located, nearly a third of renters were rent burdened—defined as spending between

30-50% of their income on housing—before the pandemic.[1] In 2016, the last available year of nationwide eviction data, 3.7 million evictions were filed nationally,[2] with 583,466 of those filings occurring in Georgia, North Carolina, South Carolina, and Virginia alone.[3] As further evidence of the preexisting housing crisis, 29,712 residents experienced homeless in these four states in 2019.[4]

Nationally, one out of four (10.9 million) renters spent over half of their income on housing before the pandemic due to stagnant wages, rising rents, and lack of federal financial support.[5] The cost burden is even greater among households in poverty: one out of four spent over 70% of their income on rent in 2018.[6]

---

[1] *Map and Data*, EVICTION LAB, http://evictionlab.org/map/#/2016 (last visited Oct. 2, 2020). Renter households experience rent burden at the following rates: Georgia at 31.3%, North Carolina at 30.3%, South Carolina at 31.1%, Virginia at 29.9%. *Id.* (based on U.S. Census 2011-2016 American Community Survey).
[2] *On the Brink of Homelessness: How the Affordable Housing Crisis and the Gentrification of America Is Leaving Families Vulnerable: Hearing Before the H. Comm. on Fin. Servs.*, 116th Cong. 3 (2020) (statement of Matthew Desmond, Maurice P. During Professor of Sociology, Princeton University), https://bit.ly/3npCaxH.
[3] *Map and Data*, *supra* note 1.
[4] *Total People Experiencing Homelessness*, U.S. INTERAGENCY COUNCIL ON HOMELESSNESS (last visited Oct. 2, 2020), http://www.usich.gov/homelessness-statistics (summing the values for "total people experiencing homelessness" in 2019 for Georgia, South Carolina, North Carolina, and Virginia).
[5] 10.9 million renter households (25% of all renter households) were spending over 50% of their income on rent each month in 2018. *America's Rental Housing 2020*, JOINT CTR. FOR HOUSING STUD. OF HARV. U. 4, 26 (2020), https://bit.ly/3iJ95tx.
[6] *American Housing Survey,* U.S. CENSUS BUREAU (2020), https://bit.ly/3iFzF6H (select area: national; year: 2019; table: "Housing Costs"; Column Variable 1:

Compounding this material disadvantage, rent-burdened households often lack any economic security or safety net. With the loss of 4 million affordable housing units from 2011-2017,[7] and a shortage of 7 million affordable units available to the lowest-income renters,[8] many renters entered the pandemic vulnerable to eviction.

*B.  The COVID-19 Pandemic Increased and Worsened Housing Precarity*

In July 2020, 50 million renters reported living in households that suffered COVID-19-related job or wage loss, with the highest loss among low-income households.[9] Between April and July, the unemployment rate fluctuated between 10.2% and 14.7%; it fell to 7.9% in September.[10] By comparison, unemployment peaked at

---

"Poverty Level"; Tenure Filter: "Renter"; and *click* "Get Table.") (reflecting fraction of renters paying between 70% and 99% of their monthly household income as housing costs, among renters earning < 100% FPL who report positive income, nonzero rent, and who do not report paying 100% or more of total household income as total housing costs (the latter category may include some extremely rent-burdened individuals—for example, a recently unemployed individual living off savings—but likely also includes a large number of individuals who are assisted by subsidies or other forms of support, as well as response errors).

[7] *The State of the Nation's Housing 2019*, JOINT CTR. FOR HOUSING STUD. OF HARV. U. 4 (2019), https://bit.ly/2GGa9RV.

[8] *The Gap: A Shortage of Affordable Homes*, NAT'L LOW INCOME HOUSING COALITION 1 (Mar. 2020), https://bit.ly/3d9FOa9.

[9] Elizabeth Kneebone & Cecile Murray, *Estimating COVID-19's Near-Term Impact on Renters*, U.C. BERKELEY TURNER CNT. FOR HOUSING INNOVATION (Apr. 24, 2020), https://bit.ly/34DlHgx.

[10] *The Employment Situation—July 2020,* U.S. BUREAU OF LAB. STAT. *14 (Aug. 7, 2020), https://bit.ly/3nuwulQ (May, June, and July figures); *The Employment*

10.0% during the Great Recession.[11] Unemployment rates, which remain significantly above historic averages, are at 5.6% in Georgia, 6.5% in North Carolina 6.3% in South Carolina, and 6.1% in Virginia.[12] In these states, leisure and hospitality—one of the industries with a majority of low-wage jobs—suffered the greatest loss of jobs over the last year.[13] Substantial federal extended unemployment benefits provided crucial relief to families and individuals who suffered job loss and enabled them to pay rent. However, with the expiration of these benefits in July, unemployed renters now lack funds for basic necessities, like food, clothing, and shelter, and are at an even greater risk of financial constraints leading to eviction and associated harms.

---

*Situation—September 2020*, U.S. BUREAU OF LAB. STAT. *14 (Oct. 2, 2020), https://bit.ly/2SFpuEy.

[11] *Spotlight on Statistics: The Recession of 2007-2009*, U.S. BUREAU OF LAB. STAT., 2 (Feb. 2012), https://bit.ly/2GuBoio.

[12] *See Over-the-Year Change in Unemployment Rates for States*, U.S. BUREAU OF LAB. STAT., https://bit.ly/33H4XG7 (last modified Sept. 18, 2020).

[13] *North Carolina*, U.S. BUREAU OF LAB. STAT., https://bit.ly/30MGtJF (last visited Oct. 1, 2020) (NC figure); *The Employment Situation—August 2020*, U.S. BUREAU OF LAB. STAT. *33 (Sept. 4, 2020), https://bit.ly/312Mqm3 (national figure). The twelve-month job loss rate in leisure and hospitality was 23.2% nationally and 15.9% in Georgia, 25.1% in North Carolina, 20.6% in South Carolina, and 20.3% in Virginia. *Geographic Information*, U.S. BUREAU OF LAB. STAT., https://www.bls.gov/regions/home.htm (last visited Oct. 1, 2020) (*Follow* hyperlinks from the map for each state, then *find* leisure and hospitality "12-month % change" for August 2020).

Nationwide, job loss is affecting Americans at significantly different rates based on race, ethnicity, class, disability, sexuality, and geography. Sixty-one percent of Hispanic/Latinx Americans and 44% of Black Americans said that they, or someone in their household, had experienced job or wage loss due to the coronavirus outbreak, compared with 38% of white Americans.[14]

The economic downturn has driven demands for financial assistance to all-time highs. Nationally, requests for rental assistance increased by 92% from the prior year in states with few protections for renters; rental assistance programs have been exhausted within hours of being offered.[15] During the pandemic, rental assistance

---

[14] Kim Parker, Juliana Menasce Horowitz & Anna Brown, *About Half of Lower-Income Americans Report Household Job or Wage Loss Due to COVID-19*, PEW RES. CTR. (Apr. 21, 2020), https://pewrsr.ch/30KzSPX. In addition, people with disabilities have historically higher rates of unemployment than the general population. *Persons with a Disability: Labor Force Characteristics—2019*, U.S. BUREAU OF LAB. STAT. *1 (Feb. 26, 2020), https://bit.ly/34EXgPN. Brodie Fraser et al., *LGBTIQ+ Homelessness: A Review of the Literature*, 16 INT'L J. ENV'L RES. & PUB. HEALTH 1, 1 (2019); Maya Brennan, Ally Livingston & Veronica Gaitán, *Five Facts About Housing Access for LGBTQ People*, URB. INST. (June 13, 2018), https://urbn.is/34AmgI1. Undocumented immigrants do not qualify for unemployment insurance or stimulus checks. Many rural communities experience acute poverty and lack affordable housing, supportive resources, or access to employment. Sarah M. Ramirez & Don Villareja, *Poverty, Housing, and the Rural Slum: Policies and the Production of Inequities, Past and Present*, 102 AM. J. PUB. HEALTH 1164, 1672 (2012).

[15] Jasper Scherer & Sarah Smith, *Houston's $15 Million Rental Assistance Program Fills Up in 90 Minutes*, HOUS. CHRON. (May 13, 2020), https://bit.ly/30GWMHZ; Rachel Garg et al., *Rent Requests Higher in States with Few Protections for Renters*, WASH. U. IN ST. LOUIS: HEALTH COMM. RES.

and shelter requests increased from the prior year by 75% in North Carolina and 84% in Virginia at its peak, with over 31,559 requests in the former.[16]

Without assistance or unemployment insurance, many renters are stretched to the breaking point. Half of the 20.8 million rent-burdened households had less than $10 dollars in savings before the pandemic.[17] Those with more resources have resorted to depleting savings, borrowing from family and friends, taking out loans, and paying rent with credit cards.[18] Renters even reduced their food budgets in order to pay rent. According to the Census Bureau, food insecurity increased from pre-pandemic levels in Georgia by 23.3%, in North Carolina by 17.2%, in South Carolina by 10.3%, and in Virginia by 27.2%.[19] The proportion of Black and Hispanic/Latinx

---

LABORATORY (Apr. 30, 2020), https://bit.ly/36JKFO1 (showing the steep increase in 2-1-1 requests for rental assistance during the pandemic).

[16] *Top Service Requests Oct. 09, 2019 to Oct. 07, 2020*, 2-1-1 COUNTS, http://211counts.org (last visited Oct. 8, 2020) (year-over-year change in total "Shelters" and "Rent Assistance").

[17] PEW CHARITABLE TRS., AMERICAN FAMILIES FACE A GROWING RENT BURDEN 5 (2018), https://bit.ly/2FcNiMZ.

[18] In April, nationally, there was a 30% increase in credit card usage to pay rent, followed by a further 20% increase in May. Rejane Frederick & Jaboa Lake, *Kicking Folks Out While They're Down: How the Premature Lifting of Coronavirus Restrictions Is Increasing Evictions and Worsening the Homelessness Crisis,* CTR. FOR AM. PROGRESS (July 27, 2020, 9:07 AM), https://ampr.gs/2SDVBEU.

[19] *Week 14 Household Pulse Survey: September 2—September 14*, U.S. CENSUS BUREAU, at Food Sufficiency and Food Security Tables 2a & 2b (Sept. 23, 2020), https://bit.ly/33FQfPr (*Follow* spreadsheet tabs for respective states; then calculate the percent increase from pre-pandemic to September 14 of total individuals whose

populations suffering food insecurity is more than two to three times higher than food insecurity among the white population in these states.[20]

Of renters surveyed by the U.S. Census Bureau in September in Georgia, North Carolina, South Carolina, and Virginia, 34% of households with children had slight or no confidence in their ability to pay next month's rent, leaving them at heightened risk of eviction.[21] Black renters report being at risk of eviction in these states at much higher rates than white renters. For example, in Virginia, 40% of Black renters had slight or no confidence in their ability to pay October rent, compared to 13% of white renters.[22] Like America as a whole, the states where Plaintiffs'

---

food sufficiency is considered "sometimes not enough to eat" or "often not enough to eat.")

[20] *Id.* at Food Sufficiency and Food Security Table 2b.

[21] *Week 14 Household Pulse Survey*, *supra* note 19, at Housing Table 2b (48.7% in VA, 33.0% in SC, 30.2% in NC, 28.5% in GA). *See also* Emily Benfer et al., *The COVID-19 Eviction Crisis: An Estimated 30-40 Million People in America Are at Risk,* ASPEN INST. (Aug. 7, 2020), http://www.aspeninstitute.org/blog-posts/the-covid-19-eviction-crisis-an-estimated-30-40-million-people-in-america-are-at-risk (estimating 30 to 40 million adults and children are at risk of eviction nationwide); Stout, *Analysis of Current and Expected Rental Shortfall and Potential Evictions in the U.S.*, NAT'L COUNCIL OF ST. HOUSING AGENCIES 36 (Sept. 25, 2020), https://bit.ly/34ERUnU (finding 1.4 million households in GA (340,000-460,000), NC (300,000-410,000), SC (150,000-210,000), and VA (220,000-320,000) likely unable to pay October rent).

[22] *Week 14 Household Pulse Survey*, *supra* note 19. The respective rates in Georgia were 36% (Black) and 21% (white); in South Carolina, 34% and 25%; and in North Carolina, 26% and 18%. *Id.*

properties are located are facing an urgent and unprecedented eviction crisis that affects almost every community—and disproportionately harms people of color.

### C. Without Legal Protections from Eviction, Filing Rates Have Increased During the Pandemic

The Eviction Lab at Princeton University is the only source of nationwide eviction data; the latest data on eviction filings in all states is from 2016. During the pandemic, the Eviction Lab has tracked the ebbs and flows in real-time eviction filings in 17 cities.[23] Based on this data, the Eviction Lab has identified three drivers of the COVID-19 eviction crisis. First, a significant number of property owners use the eviction process as a rent collection tool, rather than a means of removing tenants for other reasons.[24] Second, many tenants are (and have historically been) evicted for small amounts of money—during the pandemic, typically less than the local median amount for one month's rent and as little as $120—showing that property owners seem to have a low threshold for profit loss before they consider displacing their

[23] *The Eviction Tracking System*, EVICTION LAB, http://evictionlab.org/eviction-tracking (last updated Sept. 26, 2020).
[24] Lillian Leung, Peter Hepburn & Matthew Desmond, *Serial Eviction Filings: Civil Courts, Property Management, and the Threat of Displacement*, SOC. FORCES, Sept. 11, 2020, at 19, https://bit.ly/2FcNPhX.

tenants.[25] Third, tenants lack legal protections or supports to contest evictions, especially as demand for legal assistance has increased during the pandemic.[26] Municipalities with weaker eviction protections see more eviction filings.[27]

The Eviction Lab's research on eviction filings during the pandemic shows that 1) where eviction moratoriums are in place, the intervention effectively chills eviction filings during the pandemic; and 2) without moratoriums in place, eviction filings quickly reach or exceed historic filing rates.[28] Along with the stimulus and extended federal unemployment benefits, the CARES Act slowed evictions by effectively prohibiting eviction of tenants in buildings with federally backed mortgages or federal subsidies until August 25.[29] More recently, the CDC Order forestalls residential evictions where a tenant meets certain criteria.[30] These orders were

---

[25] Renee Louis, Alieza Durana & Peter Hepburn, *Preliminary Analysis: Eviction Claim Amounts During COVID-19 Pandemic* (Aug. 27, 2020), https://evictionlab.org/covid-eviction-claims.

[26] Nationwide, an estimated 90% of landlords have legal counsel compared to only 10% of tenants in eviction proceedings. Matthew Desmond, *Unaffordable America: Poverty, Housing, and Eviction*, FAST FOCUS, NO. 22-2015, at 1-6 (Mar. 2015), https://bit.ly/36MxjAO

[27] *Eviction Tracking System*, *supra* note 23.

[28] *Id.*

[29] Coronavirus Aid, Relief, and Economic Security (CARES) Act, Pub. L. No. 116-136, § 4024, 134 Stat. 281, 491 (2020).

[30] Temporary Halt in in Residential Evictions to Prevent the Further Spread of COVID-19, 85 Fed. Reg. 55292 (Sep. 4, 2020); Nat'l Housing L. Project, CDC Eviction Moratorium – Initial Analysis, (Sep. 4, 2020) https://bit.ly/2GFrn1C.

effective: In the short period between when the CARES Act protections expired and when the CDC Order took effect, new eviction filings rose quickly to exceed historical levels in almost every site without a local moratorium.[31] Following the CDC Order, new filings dropped dramatically in most sites studied. *See* Figure 1.

Figure 1. Weekly eviction filings relative to historical averages in 16 Eviction Tracking System sites, 8/9/2020 to 9/26/2020.[32]



These numbers demonstrate that the CARES Act and the CDC Order effectively prevent eviction filings. Without a nationwide, uniformly adopted eviction moratorium, evictions will likely increase to unseen heights. This would place families and individuals at risk of contracting COVID-19, as well as related and severe health harms.

---

[31] Peter Hepburn & Renee Louis, *Preliminary Analysis: Shifts in Eviction Filings from the CARES Act to the CDC Order*, EVICTION LAB (Sept. 22, 2020), https://bit.ly/30LMeaw.
[32] *Id.*

## II.    Eviction Moratoriums Slow the Spread of COVID-19 and Prevent Negative Short- and Long-Term Health Outcomes

### A.  Evictions Spread COVID-19, Thwarting Efforts to Contain the Virus

Eviction forces families into transiency and crowded residential environments,[33] which increase new contact with others and make compliance with pandemic health guidelines difficult or impossible. Eviction increases the likelihood of "couch surfing" and staying with family and friends who may themselves be at high risk for COVID-19.[34] Residential crowding and increased contact with others drive the spread of respiratory illnesses, such as COVID-19.[35] Even seemingly small

---

[33] Matthew Desmond, *Eviction and the Reproduction of Urban Poverty*, 118 Am. J. Soc. 88, 120 (2012) ("The blemish of eviction greatly diminishes one's chance of securing affordable housing in a decent neighborhood, stymies one's chances of securing housing assistance, and often leads to homelessness and increased residential mobility.").

[34] Michelle D. Layser et al., *Mitigating Housing Instability During a Pandemic* (forthcoming) (manuscript at 4, 14), https://ssrn.com/abstract=3613789.

[35] *See* Eric Lofgren et al., *Influenza Seasonality: Underlying Causes and Modeling Theories*, 81 J. Virology 5429, 5431 (2007) ("The person-to-person spread of virus-laden aerosol particles is greatly enhanced by having a dense population of susceptible individuals surrounding each infective subject, thereby maximizing the potential for the spread of infection."); *see also* B.L. Gleason et al., *Geospatial Analysis of Household Spread of Ebola Virus in Quarantined Village—Sierra Leone, 2014*, 145 Epidemiology & Infection 2921, 2921 (2017) (showing that an increasing number of persons per household was a risk factor for household Ebola acquisition); M. Kermode et al., *Tuberculosis Infection and Homelessness in Melbourne, Australia, 1995-1996*, 3 Int'l J. Tuberculosis & Lung Disease 901, 901, 905 (1999) (finding the case incidence rate among males experiencing homelessness to be roughly thirteen times the state-wide figure, and higher among those

differences in housing have been linked to substantial increases in the transmission rate of infectious disease.[36] Adding as few as two new members to a household can as much as double the risk of other illness.[37] This increased likelihood of transmission for infectious disease generally comports with research on the novel coronavirus, which recognizes that individuals are at particularly high risk of contracting COVID-19 from others in their household.[38]

Smaller, crowded spaces increase the spread of respiratory diseases like COVID-19. During the 1918 influenza epidemic, the difference between having 45 square feet and 78 square feet of living space per person was associated with a ten-

---

accommodated in crowded living environments); Andrew R. Zolopa et al., *HIV and Tuberculosis Infection in San Francisco's Homeless Adults: Prevalence and Risk Factors in a Representative Sample*, 272 JAMA 455, 458 (1994) (finding significant relationship ($p < 0.01$) between "high contact" living situations like shelters and tuberculosis infection among sample of homeless San Francisco residents).

[36] Patrick K. Munywoki et al., *Frequent Asymptomatic Respiratory Syncytial Virus Infections During an Epidemic in a Rural Kenyan Household Cohort*, 212 J. INFECTIOUS DISEASES 1711, 1711 (2015), https://bit.ly/3nwYDJ2; *see also* Abhishek Bakuli et al., *Effects of Pathogen Dependency in a Multi-Pathogen Infectious Disease System Including Population Level Heterogeneity—A Simulation Study*, 14 THEORETICAL BIOLOGY & MED. MODELLING 1, 1 (2017), https://bit.ly/2IaVtdW.

[37] Michael Baker et al., *Household Crowding a Major Risk Factor for Epidemic Meningococcal Disease in Auckland Children*, 19 PEDIATRIC INFECTIOUS DISEASE J. 983, 983 (2000) (adding two adolescents or adults to a six-room home roughly doubles the risk of meningococcal disease).

[38] Qifang Bi et al., *Epidemiology and Transmission of COVID-19 in 391 Cases and 1286 of Their Close Contacts in Shenzhen, China: A Retrospective Cohort Study*, 20 LANCET 911, 911 (2020).

fold increase in the rate of illness.[39] Many people who are evicted turn to homeless shelters, which under some circumstances in Atlanta are required to provide as little as 25 square feet of space per person.[40] Other studies suggest overcrowding spreads tuberculosis[41] and severe cases of influenza among children.[42]

Evicted households are likely to contract—and spread—COVID-19 while moving from shelter to shelter or couch to couch.[43] In many cases, people facing homelessness will sleep in cars or outdoors; they will have access only to public, not private, restrooms.[44] These environments prevent individuals and families from adhering to the CDC's primary interventions: social distancing, maintaining good hygiene practices such as hand washing, self-quarantining, or cleaning masks and other

---

[39] C. Andrew Aligne, *Overcrowding and Mortality During the Influenza Pandemic of 1918: Evidence from U.S. Army Camp A.A. Humphreys, Virginia*, 106 AM. J. PUB. HEALTH 642, 642 (2016) (noting that the relationship between crowding and flu was highly significant ($p < 0.001$)).

[40] The City of Atlanta requires shelters to have fifty square feet of floor space per occupant but has a waiver system by which shelters can operate with as few as twenty-five square feet per occupant. ATLANTA, GA., CODE pt. III, appx. E, art. II, §§ 24, 26. Section 24(b) generally sets a 50 square-feet minimum; § 24(e) allows for a 50% reduction of that minimum.

[41] E. Drucker et al., *Childhood Tuberculosis in the Bronx, New York*, 343 LANCET 1482, 1482 (1994), https://bit.ly/34FEaci.

[42] Kimberly M. Yousey-Hindes & James L. Hadler, *Neighborhood Socioeconomic Status and Influenza Hospitalizations Among Children: New Haven County, Connecticut, 2003-2010*, 101 AM. J. PUB. HEALTH 1785 (2011).

[43] *COVID-19 Pandemic Planning Scenarios*, CTRS. FOR DISEASE CONTROL & PREVENTION (Sept. 10, 2020), https://bit.ly/36RatI6.

[44] Sara K. Rankin, *Punishing Homelessness*, 22 NEW CRIM. L. REV. 99, 126 (2019).

personal protective equipment. By driving families to poorer neighborhoods, eviction may also lead to less frequent COVID-19 testing.[45]

Indeed, the mere threat of eviction can increase stress levels, anxiety, and depression and weaken the immune system.[46] These responses likely ease the spread of infectious diseases, including respiratory illness and the flu. Because of the highly contagious nature of COVID-19, increased contraction of the disease among individuals facing eviction can quickly boost transmission across a large segment of the community. And as we enter the fall and winter months, housing instability increases risk of health harms.[47]

Housing stability is especially critical to pandemic control because infected persons can spread COVID-19 before they start to show symptoms and possibly for

---

[45] Stephanie Schmitt-Grohé, Ken Teoh & Martín Uribe, *Covid-19: Testing Inequality in New York City* 8 COVID ECONOMICS: VETTED AND REAL-TIME PAPERS, April 22, 2020, at 27 (published by the Centre for Economic Policy Research).

[46] Dusica Lecic Tosevski & Milica Pejovic Milovancevic, *Stressful Life Events and Physical Health*, 19 CURRENT OPINION PSYCHIATRY 184, 185, 187 (2006); *see* Hugo Vásquez-Vera et al., *The Threat of Home Eviction and Its Effects on Health Through the Equity Lens: A Systemic Review*, 175 SOC. SCI. & MED. 199, 202-05 (2017). *See generally* Linda M. Niccolai, Kim M. Blankenship & Danya E. Keene, *Eviction from Renter-Occupied Households and Rates of Sexually Transmitted Infections: A County-Level Ecological Analysis*, 46 SEXUALLY TRANSMITTED DISEASES 63 (2019) (linking increased eviction rates to higher rates of sexually transmitted diseases).

[47] Paige Zhang et al., *Cold Weather Conditions and Risk of Hypothermia Among People Experiencing Homelessness: Implications for Prevention Strategies*, 16 INT. J. FOR ENVIRON. RES. ON PUBLIC HEALTH 18, 3259 (2019).

weeks after symptoms appear.[48] According to the CDC, approximately 40% of in-fected individuals may never show symptoms—but nonetheless may transmit the virus to others.[49] Due to the high rate of transiency among people who face eviction, eviction is likely to spread COVID-19 by exposing healthy individuals to those who are unaware they are carrying the virus or those who know they have COVID-19 but are unable to self-isolate.[50] In order to prevent COVID-19 spread, individuals and families must be able to shelter in place with the same household.

Eviction is associated with decreased access to primary and specialty medical care, regardless of an individual's housing status post-eviction.[51] In addition, those facing eviction have difficulty prioritizing their health needs while fighting to

---

[48] *COVID-19 Basics*, HARV. MED. SCH., https://bit.ly/3nviSa3 (last updated Oct. 1, 2020) (summarizing studies that "have shown that symptoms could appear as soon as three days after exposure to as long as 13 days later").

[49] *COVID-19 Pandemic Planning Scenarios, supra* note 43, at tbl.1.

[50] Michael Levy, Justin Sheen, Anjalika Nande, Ben Adlam, Andrew Greenlee & Daniel Schneider, *COVID-19 Eviction Simulations*, GITHUB (2020), https://bit.ly/2GE4Pyf.

[51] *See* Mary Clare Kennedy et al., *Residential Eviction and Risk of Detectable Plasma HIV-1 RNA Viral Load Among HIV-Positive People Who Use Drugs*, 21 AIDS & BEHAV. 678, 681, 683 (2017). Even where physical access is not im-pacted, eviction may lead to decreased engagement in healthcare as a result of the physical and emotional toll of eviction, resulting in missed appointments and lack of adherence to prescribed treatment. *See* Niccolai, Blankenship & Keene, *supra* note 46, at 66.

maintain housing.[52] From this baseline, eviction itself amplifies individual risk of COVID-19 complications and mortality. This can be particularly harmful to people who are already at risk, such as people immunocompromised due to cancer care, HIV/AIDS, or other conditions.[53] Even when infected individuals present COVID-19 symptoms, eviction decreases the likelihood that they will seek timely medical attention that could stem community transmission. [54] Evicted individuals are also

---

[52] Danya E. Keene, *"That Wasn't Really a Place to Worry About Diabetes": Housing Access and Diabetes Self-Management Among Low-Income Adults*, 197 SOC. SCI. & MED. 71 (2018).

[53] *Selected Circulatory Diseases Among Adults Aged 18 and Over, By Selected Characteristics: United States, 2018,* CTRS. FOR DISEASE CONTROL & PREVENTION (2018), https://bit.ly/2IanmCV; *Selected Respiratory Diseases Among Adults Aged 18 and Over, By Selected Characteristics: United States, 2018*, CTRS. FOR DISEASE CONTROL & PREVENTION (2018), https://bit.ly/34BweJk; *Diabetes Prevalence and Glycemic Control Among Adults Aged 20 and Over, By Sex, Age, and Race and Hispanic Origin: United States, Selected Years 1988-1994 Through 2013-2016*, CTRS. FOR DISEASE CONTROL & PREVENTION (2018), https://bit.ly/36KcsxL. *See also* Elise D. Riley et al., *COVID-19 and HIV Spotlight the U.S. Imperative for Permanent Affordable Housing*, CLINICAL INFECTIOUS DISEASES (forthcoming 2020) (manuscript at 4), https://bit.ly/3def48C (describing homelessness as a risk factor for HIV).

[54] ROBERT COLLINSON & DAVID REED, THE EFFECTS OF EVICTIONS ON LOW-INCOME HOUSEHOLDS 25 (Dec. 2018), https://bit.ly/3lrYftK ("Evictions could also worsen health if evicted households are more financially constrained and cut back on preventative care or healthy behavior to afford new moving costs, such as a security deposit or broker's fee.")

more likely to use emergency departments, which cater to disproportionately vulnerable patients,[55] for their healthcare needs when they do seek care.[56]

Whether through increased crowding, decreased ability to maintain safe, clean, and hygienic living spaces, or limited access to healthcare, eviction is particularly threatening to individual and public health during a pandemic.

B. *Eviction Increases the Rate of COVID-19 Among High-Risk Populations, Leading to Long-Term Complications or Death*

People most vulnerable to eviction are more likely to suffer from poor health conditions that place them at high risk of severe or fatal cases of COVID-19. This thwarts efforts to suppress the infection rate. The lower a person's socioeconomic status, the greater their economic hardship and risk of eviction and the higher their chance of suffering from chronic disease, including conditions like heart disease, pulmonary disease, and diabetes.[57] All of these may increase the mortality risk

---

[55] *See, e.g.*, Alison Rodriguez, *Nearly Half of All Medical Care in the US Is in Emergency Departments*, AJMC (Oct. 24, 2017), https://bit.ly/34AKvWF ("The increase in emergency room cases were able to be accounted for by certain groups including African Americans, Medicare and Medicaid beneficiaries, residents of the South and West, and women . . . [likely revealing] the vulnerable populations that potentially face healthcare inequalities."). The World Health Organization categorizes a vulnerable population as one that is "unable to anticipate, cope with, resist and recover from the impacts of disasters." *Vulnerable Groups*, WHO, https://bit.ly/3d7XrXY (last visited Oct. 6, 2020).

[56] *See* COLLINSON & REED, *supra* note 54, at 3.

[57] *Id.* at 57.

of COVID-19.[58] The CDC has identified several comorbidities that increase risk of severe illness with COVID-19, including pulmonary disease, high blood pressure, diabetes, obesity, chronic liver or kidney disease, and respiratory disease.[59] All of these conditions are more prevalent among low-income populations and people of color, the populations most at risk of eviction prior to and during the pandemic.[60]

People at the highest risk of eviction are more likely to live in substandard housing conditions that threaten their health,[61] such as poor ventilation, pest infestations, and mold—all closely associated with the development of respiratory conditions and general poor health.[62] Similarly, evictions force renters into living conditions that increase exposure to social determinants that drive poor health.[63]

---

[58] *Id.*.

[59] *People with Certain Medical Conditions*, CTRS. FOR DISEASE CONTROL & PREVENTION (Sept. 11, 2020), https://bit.ly/3jVuuRL; *People at Increased Risk*, CTRS. FOR DISEASE CONTROL & PREVENTION (Sept. 11, 2020), https://bit.ly/2GNtvEi.

[60] Emily Benfer et al., *supra* note 21; *Housing is the Best Medicine: Supportive Housing and the Social Determinants of Health*, CORP. FOR SUPPORTIVE HOUSING (July 2014), https://bit.ly/2SFpvIQ.

[61] One in ten poor households lived in inadequate housing. Wilhelmine D. Miller et al., *Healthy Homes and Communities: Putting the Pieces Together*, 40 AM. J. PREVENTIVE MED. S48, S51 (2011).

[62] Emily A. Benfer & Allyson E. Gold, *There's No Place Like Home: Reshaping Community Interventions and Policies to Eliminate Environmental Hazards and Improve Population Health for Low-Income and Minority Communities*, 11 HARV. L. & POL'Y REV. S1, S1, S6 (2017).

[63] Eviction is a legal record that scars a tenant's rental history and shrinks credit scores. Many private property owners and public housing authorities count eviction against families, which results in exclusion from federally-assisted housing. Even

Eviction itself leads to numerous comorbidities.[64] Eviction and housing instability are associated with increased incidence of high blood pressure, higher mortality regardless of cause,[65] increased risk of coronary heart disease independent of other underlying risk factors,[66] poor self-reported general health,[67] and an increased propensity to smoke.[68] Evictions are associated with several interrelated conditions, including anxiety, depression, sexually transmitted infections, [69] HIV-related

---

when an eviction case is dismissed, the mere fact of a past filing can result in the denial of rental applications for affected families, leaving these renters with few options. *See* Matthew Desmond & Monica Bell, *Housing, Poverty, and the Law*, 11 ANN. REV. L. & SOC. SCI. 15, 19 (2015); Matthew Desmond, *supra* note 33, at 91; Matthew Desmond, *supra* note 26. Eviction is both a barrier to employment and cause of unemployment. Matthew Desmond & Carl Gershenson, *Housing and Employment Insecurity Among the Working Poor*, 63 SOC. PROBS. 46, 47 (2016). An eviction makes it more difficult and more expensive to rent a new home, borrow money, or purchase a home. *Eviction Filings Are Barrier to Finding Future Housing—Even for Tenants Who Are Not Evicted*, L. COMM. FOR BETTER HOUSING (Mar. 7, 2018), https://bit.ly/3dcqFFe.

[64] *Homelessness & Health: What's the Connection?,* NAT'L HEALTHCARE FOR THE HOMELESS COUNCIL (Feb. 2019), https://bit.ly/34GF74a; *People with Certain Medical Conditions*, CTRS. FOR DISEASE CONTROL & PREVENTION (Sept. 11, 2020), https://bit.ly/2Ibypf5.

[65] Yerko Rojas, *Evictions and Short-Term All-Cause Mortality: A 3-Year Follow-Up Study of A Middle-Aged Swedish Population*, 62 INT'L J. OF PUB. HEALTH 343, 346 (2016).

[66] Dusica Lecic Tosevski & Milica Pejovic Milovancevic, *Stressful Life Events and Physical Health*, 19 CURRENT OPINION PSYCHIATRY 184, 185, 187 (2006); *see* Vásquez-Vera et al., *supra* note 46, at 205.

[67] Vásquez-Vera et al., *supra* note 46, at 202, 204.

[68] Julia Bolívar Muñoz et al., *The Health of Adults Undergoing an Eviction Process*, 30 GACETA SANITARIA 4, 4 (2016).

[69] Niccolai, Blankenship & Keene, *supra* note 46, at 65.

treatment outcomes,[70] drug use,[71] exposure to violence,[72] mental health hospitaliza-

tion,[73] and suicide.[74] During the COVID-19 pandemic, a study from researchers at

Boston University and Johns Hopkins schools of public health found that suicidal

ideation increased more than fourfold; stressors including difficulty paying the rent

were associated with suicidal ideation.[75] For women, eviction is associated

with physical and sexual assault,[76] drug use and related harms,[77] mental illness,[78]

---

[70] Mary Clare Kennedy et al., *supra* note 51, at 7-8.

[71] Andreas Pilarinos et al., *The Association Between Residential Eviction and Syringe Sharing Among a Prospective Cohort of Street-Involved Youth*, 14 HARM REDUCTION J. 1, 3 (2017).

[72] Mary Clare Kennedy et al., *Residential Eviction and Exposure to Violence Among People Who Inject Drugs in Vancouver, Canada*, 41 INT'L J. DRUG POL'Y 59, 61-63 (2017).

[73] COLLINSON & REED, *supra* note 54, at 3.

[74] Rojas & Stenberg, *supra* note 65, at 412-13.

[75] Julia Raifman, Catherine Ettman, Lorraine Dean, Colleen Barry & Sandro Gale, COVID-19 Related Stressors and Suicidal Ideation (unpublished manuscript on file with counsel).

[76] Nihaya Daoud et al., *Pathways and Trajectories Linking Housing Instability and Poor Health Among Low-Income Women Experiencing Intimate Partner Violence (IPV): Toward A Conceptual Framework*, 56 WOMEN & HEALTH 208, 209-10 (2016).

[77] Alexandra B. Collins et al., *Surviving the Housing Crisis: Social Violence and The Production Of Evictions Among Women Who Use Drugs In Vancouver, Canada*, 51 HEALTH & PLACE 174, 179 (2018).

[78] Patty R. Wilson & Kathryn Laughon, *House to House, Shelter to Shelter: Experiences of Black Women Seeking Housing After Leaving Abusive Relationships*, 11 J. FORENSIC NURSING 77, 77 (2015).

and future housing precarity.[79] The health conditions and high health care costs associated with eviction make future eviction more likely.[80] In this way, eviction worsens longstanding patterns of economic and housing instability and poor health.[81]

Eviction is particularly traumatizing to children and affects emotional and physical well-being and development for years, if not for lifetimes.[82] Eviction increases the likelihood of emotional trauma, lead poisoning,[83] food insecurity,[84] and

---

[79] Craig Evan Pollack, Kathryn M. Leifheit & Sabriya L. Linton, *When Storms Collide: Evictions, COVID-19, and Health Equity*, HEALTH AFF. (Aug. 4, 2020), https://bit.ly/36JuHnd.

[80] Gabriel L. Schwartz, Kathryn M. Leifheit, Lisa Berkman, Jarvis T. Chen & Mariana C. Arcaya, Health Selection into Eviction: Adverse Birth Outcomes and Children's Risk of Eviction Through Age Five (unpublished manuscript under publication review); Gabriel L. Schwartz*, Cycles of Disadvantage: Eviction & Children's Health in the United States* (2020) (unpublished Ph.D. dissertation, Harvard University) (on file with author)*; see also* Heidi L. Allen et al., *Can Medicaid Expansion Prevent Housing Evictions?,* HEALTH AFF. (Sept. 2019), https://bit.ly/30IZwEQ.

[81] MATTHEW DESMOND, EVICTED (2016); Heidi L. Allen et al., *supra* note 80; Pollack, Leifheit & Linton, *supra* note 79.

[82] HEATHER SANDSTROM & SANDRA HUERTA, URBAN INST., THE NEGATIVE EFFECTS OF INSTABILITY ON CHILD DEVELOPMENT: A RESEARCH SYNTHESIS 6 (2013), https://urbn.is/2SCVfhB.

[83] Gabriel L. Schwartz, Kathryn M. Leifheit, Lisa Berkman, Mariana Arcaya & Jarvis T. Chen, Is Eviction Poisonous? A Survival Analysis of Eviction and Lead Poisoning in a National Urban Birth Cohort (unpublished manuscript) (on file with author); Schwartz, *supra* note 80. *See also Homelessness Just 'One of The Concerns' When Someone Is Evicted*, NEWSWISE (Jan. 28, 2020), https://bit.ly/3loT-QHR.

[84] Kathryn M. Leifheit, *Eviction in Early Childhood and Neighborhood Poverty, Food Security, and Obesity in Later Childhood and Adolescence: Evidence from a Longitudinal Birth Cohort*, 11 SSM—POPULATION HEALTH 1, 6 (2020).

academic decline for children.[85] Eviction is also strongly associated with adverse childhood experiences, which have long-term negative health impacts, including increased risk of cardiovascular disease and pulmonary disease in adulthood and decreased life expectancy.[86] Children whose mothers are evicted during pregnancy are more likely to have adverse birth outcomes, such as low birthweight or preterm pregnancies.[87] Families of children born with adverse birth outcomes are substantially more likely to be evicted in the first five years of their child's life.[88] The evidence is clear: Child health and housing security are closely intertwined.[89]

Ultimately, eviction primarily affects the members of society most vulnerable to COVID-19 and triggers a cycle of poor health and housing instability.

---

[85] Gabriel L. Schwartz, Kathryn M. Leifheit, Jarvis T. Chen, Mariana C. Arcaya & Lisa Berkman, Childhood Eviction and Cognitive Skills: Developmental Timing-Specific Associations in an Urban Birth Cohort (unpublished manuscript under publication review) (on file with author); Schwartz, *supra* note 80; *see also* Desmond, *supra* note 26; Thomas Kottke et al., *Access to Affordable Housing Promotes Health and Well-Being and Reduces Hospital Visits*, 22 PERMANENT J. 1, 2-3 (2017); Stephen Gaetz et al., *Youth Homelessness and Housing Stability: What Outcomes Should We Be Looking For?*, 32 HEALTHCARE MGMT. F. 73 (2019).

[86] Maxia Dong et al., *Childhood Residential Mobility and Multiple Health Risks During Adolescence and Adulthood: The Hidden Role of Adverse Childhood Experiences*, 159 ACHIEVES OF PEDIATRICS & ADOLESCENT MED. 1104, 1107 (2005).

[87] Kathryn M. Leifheit, *Severe Housing Insecurity in Pregnancy: Association with Adverse Birth Outcomes in a Cohort of Urban Mothers and Infants*, AM. PUB. HEALTH ASS'N (Nov. 5, 2019), https://bit.ly/3lvdBNN.

[88] Schwartz et al., *supra* note 80; Schwartz, *supra* note 80.

[89] AM. ACAD. OF PEDIATRICS, PROVIDING CARE FOR CHILDREN AND ADOLESCENTS FACING HOMELESSNESS AND HOUSING INSECURITY (2020), https://bit.ly/3dbi0CT.

*C. Studies Suggest Eviction Moratoriums Prevent COVID-19 Deaths*

Preliminary analyses show that lifting eviction moratoriums may be associated with an increased rate of COVID-19 infection and death. Two recent studies demonstrate this relationship. First, researchers from University of California-Los Angeles, John Hopkins University, Boston University, University of California-San Francisco, and Wake Forest University used varying expiration dates of state eviction moratoriums as a natural experiment to evaluate whether lifting moratoriums was associated with increased COVID-19 spread and mortality.[90] The study considered forty-three states and the District of Columbia, which instituted moratoriums during the pandemic, and compared the twenty-six states that lifted their moratoriums to those that did not.[91] After controlling for mask orders, stay at home orders, school closures, and testing rates, as well characteristics of states and underlying time trends, lifting moratoriums was associated with 1.4 times higher COVID-19 mortality after seven weeks and 2.1 times higher mortality after eighteen weeks.[92] Similarly, lifting moratoriums was associated with 1.1 times higher incidence of

---

[90] Kathryn M. Leifheit, Sabriya L. Linton, Julia Raifman, Gabriel L. Schwartz, Emily A. Benfer, Frederick J. Zimmerman & Craig Evan Pollack, Expiring Eviction Moratoriums and COVID-19 Incidence and Mortality (Oct. 2020) (unpublished manuscript) (on file with author).

[91] *Id.*

[92] *Id.* at 3.

COVID-19 after three weeks, and 1.5 times higher incidence after eighteen weeks compared to maintaining eviction moratoriums.[93] *See* Figure 2.

Figure 2. Adjusted rate ratios comparing A) Daily COVID-19 incidence (new cases per 100,000; in blue) and mortality (deaths per 100,000; in red) between states that lifted eviction moratoriums and states that maintained moratoriums and B) Cumulative excess COVID-19 cases and deaths associated with the lifting of eviction moratoriums.[94]



Researchers from the University of Pennsylvania, Harvard University, and University of Illinois Urbana-Champaign modeled the potential impacts of lifting

---

[93] *Id.*

[94] *Id.* Rate ratios were modeled using log linear regression with fixed effects for state and calendar week, adjusting for testing rate, stay-at-home orders, school closures, and mask mandates. Cumulative excess cases and deaths were calculated by multiplying adjusted, marginal estimates of increased incidence and death by person-time.

eviction moratoriums on COVID-19 infection and mortality rates.[95] The model is primarily concerned with the epidemiological consequences of increased crowding as a result of eviction because evicted individuals tend to "double up," which increases household size and thus boosts opportunities for viral spread.[96] The model also takes account of various interventions, such a lockdowns, that cities have imposed since the start of the pandemic.[97] When applied to metropolitan areas like Atlanta, with smaller initial outbreaks but relatively early easing of lockdown restrictions and increasing transmission throughout the summer, the model suggested eviction rates would have a significant impact on the ultimate number of COVID-19 cases and deaths. With an eviction rate of 0.25% per month, the model predicted a roughly 0.6% increase in total infections. With a monthly eviction rate of just 2% (half of Georgia's pre-pandemic rate of 4.6%),[98] the model predicted a roughly 8% increase in total infections, approximately 102 additional infections in Georgia per week and 3,700 additional infections nationally per week.[99] Without an eviction moratorium or rental assistance, the numbers would likely be much higher.

---

[95] Levy, Sheen, Nande, Adlam, Greenlee & Schneider, *supra* note 50.

[96] *Id.*

[97] *Id.*

[98] *Map and Data, supra* note 1.

[99] *Id.* "Bystander" households, who do not experience eviction, would also experience an increased risk of infection due to spillover across the city.

### III.   Eviction and COVID-19 Have Disproportionately Harmed Marginalized Communities

*A. Evictions Disparately Affect Groups Based on Race and Gender*

Historic trends and recent data demonstrate that people of color are more likely to face eviction during the pandemic. Race-based discrimination in eviction is evident in numerous studies: Black renters face eviction at the highest rates.[100] One study determined that Black households are more than twice as likely as white households to be evicted.[101] In another study of multiple cities, approximately 80% of people facing eviction were Black.[102] Black women are evicted at higher rates than other groups,[103] with 1 in 5 Black female renters reporting that they have experienced eviction compared with 1 in 12 Hispanic/Latinx women and 1 in 15 white women.[104] Of all gender and race combinations, Black women renters are at the highest risk: in 17 out of 36 states studied, they face filings for eviction at double the rate of white

---

[100] BENJAMIN F. TERESA, RVA EVICTION LAB, THE GEOGRAPHY OF EVICTION IN RICHMOND: BEYOND POVERTY (2017), https://bit.ly/3iFEmxu; Deena Greenberg, Carl Gershenson & Matthew Desmond, *Discrimination in Evictions: Empirical Evidence and Legal Challenges*, 51 HARV. C.R-C.L. L. REV. 115 (2016).

[101] Greenberg, Gershenson & Desmond, *supra* note 100, at 117.

[102] Chester Hartman & David Robinson, *Evictions: The Hidden Housing Problem*, 14 HOUSING POL'Y DEBATE 461, 467 (2003). Cities studied included New York, Chicago, Baltimore, Philadelphia, Los Angeles, and Oakland.

[103] Desmond, *supra* note 33, at 91.

[104] Rachel Dovey, *What 80 Million Eviction Records Can Tell City Leaders*, NEXT CITY (Apr. 9, 2018), https://bit.ly/30L3aOm.

renters.[105] Family status is also a contributing factor to risk of eviction: The single greatest predictor of eviction is the presence of a child.[106] A study designed to explore this phenomenon found that even though on average a household with children owed slightly less than the households without children and on average committed fewer lease violations, the probability of receiving an eviction judgment was 16-17% higher for households with children.[107]

In one study conducted during the pandemic, the majority of tenants facing eviction reported unemployment or a decrease in income related to COVID-19 hardship as the reason for rent shortfall.[108] Others cited severe health issues that would make them vulnerable to COVID-19 complications.[109] Fifty percent of these tenants were women.[110] For people of color, who have one-twelfth of the wealth accumulation of white people[111] due to decades of racially discriminatory U.S. housing

---

[105] Sophie Beiers et al., *Clearing the Record: How Eviction Sealing Laws Can Advance Housing Access for Women of Color*, ACLU (Jan. 10, 2020), https://bit.ly/2GNr4Sa.

[106] Matthew Desmond et al., *Evicting Children*, 92 SOC. FORCES 303, 303 (2013).

[107] *Id.* at 314-17 (2013).

[108] Ninette Sosa, *A Closer Look: Arkansas Evictions During COVID-19; Tenant Stories*, KNWA FOX24 (Aug. 3, 2020), http://www.nwahomepage.com/news/a-closer-look/a-closer-look-arkansas-evictions-during-covid-19-tenant-stories.

[109] *Id.*

[110] *Id.*

[111] Janelle Jones, *The Racial Wealth Gap: How African-Americans Have Been Shortchanged Out of the Materials to Build Wealth*, ECON. POL'Y INST. (Feb. 13, 2017, 12:01 PM), http://www.epi.org/blog/the-racial-wealth-gap-how-african-

policy,[112] the loss of employment or an unexpected emergency can precipitate greater hardship and housing instability. Over 70% of Black and Latinx adults entered the pandemic lacking emergency funds to cover three months of expenses, while over half of white adults had such savings.[113] As mentioned above, 34.4% of Black adult renters are at risk of eviction in Virginia, compared to 12% of white adult renters.[114]

Without government interventions like the CDC order, the downward fall will be immediate and precipitous for millions of Americans. During this severe economic downturn and the long-term negative consequences of housing instability, eviction may represent a death-knell of financial stability, housing security, and health for many families and communities.

B. *COVID-19 Has Killed Black, Indigenous, and Latinx People at Higher Rates*

---

americans-have-been-shortchanged-out-of-the-materials-to-build-wealth (comparing median wealth of white and black families).

[112] *See* RICHARD ROTHSTEIN, THE COLOR OF LAW, *passim* (2017) (reviewing how de jure segregation and wealth inequality was shaped by government-directed redlining and home-ownership programs).

[113] Mark Hugo Lopez et al., *Financial and Health Impacts of COVID-19 Vary Widely by Race and Ethnicity*, PEW RES. CTR. (May 5, 2020), http://www.pewresearch.org/fact-tank/2020/05/05/financial-and-health-impacts-of-covid-19-vary-widely-by-race-and-ethnicity.

[114] *The Eviction Tracking System*, *supra* note 23.

COVID-19 has disproportionately harmed people of color. The CDC reports Black Americans are dying at 2.1 times the rate of non-Hispanic whites.[115] Indigenous Americans as well as Hispanic/Latinx persons face an infection rate almost 3 times the rate of non-Hispanic whites.[116] Asian, Black and Hispanic/Latinx persons are 1.3, 4.7, and 4.6 times more likely to be hospitalized with COVID-19, respectively.[117] Lack of health insurance drives 3.3-4.2% of COVID-19 diagnoses, with higher rates in counties with larger Black populations.[118] Others have found similarly stark disparities in COVID-19 death rates: 2.3 times higher for Black people, 1.5 for Hispanic and Latinx,[119] and 1.75 for indigenous people.[120] Black and Hispanic/Latinx people are dying at the rate of white people a decade or more older.[121]

---

[115] *COVID-19 Hospitalization and Death by Race/Ethnicity*, CTRS. FOR DISEASE CONTROL & PREVENTION (Aug. 18, 2020), http://www.cdc.gov/coronavirus/2019-ncov/covid-data/investigations-discovery/hospitalization-death-by-race-ethnicity.html.

[116] *Id*.

[117] *Id*.

[118] Gregorio A. Millett et al., *Assessing Differential Impacts of COVID-19 on Black Communities*, 47 ANNALS EPIDEMIOLOGY 37, 37 (July 2020), https://bit.ly/3iJ9BYv.

[119] *The COVID Racial Data Tracker*, COVID TRACKING PROJECT, http://covid-tracking.com/race (last visited Oct. 5, 2020).

[120] *The Color of Coronavirus: COVID-19 Deaths by Race and Ethnicity in the U.S.*, APM RES. LAB (Sept. 16, 2020), https://bit.ly/36K8ZPL (comparing white death rate of 47 per 100,000 with indigenous people death rate of 82 per 100,000).

[121] Tiffany Ford, Sarah Reber & Richard V. Reeves, *Race Gaps in COVID-19 Deaths Are Even Bigger Than They Appear*, BROOKINGS (June 16, 2020), https://brook.gs/3lrRBU2.

Driving these numbers are deep underlying disparities in health related to the inability to social-distance in many low-wage jobs, crowded living conditions due to poverty and eviction, bias among health care providers, and disparate access to health care.[122] Other social determinants of health, like poverty and access to clean air and water, have driven larger proportions of people of color to develop comorbidities with COVID-19, like asthma or hypertension, that likely help explain their higher mortality rates. Further, most COVID-19 hotspots have been in regions or cities that have larger Black, indigenous, or Hispanic/Latinx populations.[123] Limited state-level data on racial disparities in COVID-19 suggest that Georgia, North Carolina, South Carolina, and Virginia each have not escaped—and may have helped drive—these national disparities.[124]

People of color are more likely to suffer job loss, face eviction, and contract and face severe illness due to COVID-19. Preventing evictions is critical to saving the lives of Americans regardless of race;  but for people of color, evictions are

---

[122] Emily A. Benfer, Seema Mohapatra, Lindsay F. Wiley & Ruqaiijah Yearby, *Health Justice Strategies to Combat the Pandemic: Eliminating Discrimination, Poverty, and Health Inequity During and After COVID-19*, YALE J. HEALTH POL'Y L. & ETHICS (forthcoming 2020) (on file with authors), https://bit.ly/2GzVW9c.

[123] Ford, Reber & Reeves, *supra* at 121.

[124] *See, e.g.*, *Racial Data Dashboard*, COVID TRACKING PROJECT, http://covid-tracking.com/race/dashboard (last visited Oct. 5, 2020) (demonstrating disproportionately higher rates of infection and death for non-white groups relative to percentage of population by state).

significantly more likely to result in complications and death from COVID-19. Public health and health justice requires that *all* people have equal opportunity to achieve good health and protect themselves from COVID-19.[125] Protecting public health during this pandemic requires protecting those most likely to contract, spread, and die from COVID-19, including people in poverty and people of color, who are more likely to be evicted and more likely to suffer severe harm during the pandemic. Eviction moratoriums are a critical public health tool that should be employed now.

## CONCLUSION

There is a close, proven connection between eviction and public health. Eviction moratoriums have mitigated COVID-19 spread and death. The CDC Order may be able to help control the pandemic, protect the public health, and prevent severe harm for millions of adults and children, especially in communities of color.

Dated: October 9, 2020                         Respectfully submitted,

/s/  *Emily A. Benfer*                          /s/  *Wingo F. Smith*
Emily A. Benfer                                Wingo F. Smith, Georgia Bar No. 147896


/s/  J.L. Pottenger, Jr.                       /s/  *Richard L. Tenenbaum*
J.L. Pottenger, Jr.                            Richard L. Tenenbaum

---

[125] Emily Benfer, *Health Justice: A Framework (and Call to Action) for the Elimination of Health Inequity and Social Injustice*, 65 Am. U. L. Rev. 275, 275 (2015), https://bit.ly/2SDjCvE.