## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

RICHARD LEE BROWN, et al.,
    Plaintiffs,

v.

SECRETARY ALEX AZAR, et al.,
    Defendants.

Case No. 1:20-cv-3702-JPB

## BRIEF OF AMICI CURIAE IN OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

Permitting mass evictions during a pandemic is tantamount to throwing gasoline on a raging fire. In the United States alone, the COVID-19 virus cost the lives of more than 210,000 people, caused illness in millions, and produced grave economic consequences. The economic fallout and widespread job loss caused U.S. renter households to fall behind on rent, which could lead to 20 million evictions and displacement of over 40 million individuals in the coming year. Evictions on this scale—in the midst of a national health crisis—endanger everyone's health, but are particularly pernicious for low-income families and communities of color. The most vulnerable American families should be not be forced to shoulder the cost of this public health crisis alone.

Only a September 4, 2020 order from the Centers for Disease Control and Prevention (CDC)—which prohibits landlords from evicting certain covered persons from residential properties for nonpayment of rent through December 31, 2020—has staved off this flood of mass evictions. *See* 85 Fed. Reg. 55292 (Sept. 4, 2020). In issuing the CDC moratorium, the government made a rational and important choice to prioritize public health during a national crisis, despite the economic impact it will have on some landlords. This economic impact cannot compete with the harm to our collective public health should mass evictions proceed unabated. The CDC Order serves public interests of the highest order, and only a clearly meritorious legal challenge seeking to prevent irreparable harm of comparable magnitude could justify preliminarily enjoining it. The Court should deny the motion as this challenge nowhere approaches that standard.

## STATEMENTS OF INTEREST OF AMICI CURIAE[1]

The **National Housing Law Project** (NHLP) is a nonprofit organization that advances housing justice for poor people and communities, primarily through technical assistance and training to legal aid attorneys and by co-counseling on

_____

[1] Amici Curiae certify that no party's counsel authored this brief in whole or in part, that no party or party's counsel contributed money intended to fund the preparation or submission of the brief, and that no person (other than amicus curiae, their members and their counsel) contributed money intended to fund the preparation or submission of the brief.

important litigation. NHLP coordinates the Housing Justice Network, more than 1,600 legal services attorneys, advocates, and organizers dedicated to advancing the housing rights of poor individuals and families throughout the United States for over 40 years. Since 1981 NHLP has published *HUD Housing Programs: Tenants' Rights*, the seminal authority on federal housing laws. From the outset of the COVID-19 emergency, NHLP has been at the forefront of efforts to protect tenants and homeowners against eviction and displacement related to the pandemic and its economic fallout, including advocating for the imposition and extension of simple, broad, and effective eviction moratoria.

**Legal Services of Northern Virginia** (LSNV) is the largest legal aid organization in Northern Virginia, helping thousands of clients each year in civil legal matters. LSNV partners closely with other legal aid organizations, state and local bar associations, as well as the courts to serve the region's low-income and neediest populations. LSNV provides a broad range of civil legal services, and its housing practice specializes in ensuring access to housing, preventing homelessness, and advocating for increased affordable and safe housing in its service area. Since COVID-19 hit its communities, LSNV has led a coordinated response to address the housing legal needs caused by the pandemic and resulting economic crisis.

The **Atlanta Legal Aid Society** (ALAS) was founded in 1924 by volunteer attorneys. ALAS meets the civil legal needs of the poorest and most vulnerable citizens in the Atlanta metro area, with five offices serving Fulton, DeKalb, Cobb, Gwinnett, and Clayton counties. ALAS advises and represents qualifying, low-income clients in a variety of civil legal issue areas, opening over 20,000 new cases in 2019 alone. Since April 1, 2020, ALAS has assisted over 2,700 clients with their housing legal issues, which primarily concerned eviction. Many ALAS clients have utilized CDC declarations to prevent being evicted during the nationwide moratorium.

## ARGUMENT

A preliminary injunction is "an extraordinary remedy never awarded as of right." *Winter v. Natural Resources Defense Council, Inc.,* 555 U.S. 7, 24 (2008). Designed to preserve the legal positions of the parties relative to each other until a trial on the merits, it is—in the eyes of the Eleventh Circuit—a "drastic remedy not to be granted unless the movant clearly established the burden of persuasion" as to each prerequisite. *Siegel v. Lepore*, 234 F.3d 1163, 1176 (11th Cir. 2000). The Plaintiffs must demonstrate all four elements required for injunctive relief: substantial likelihood of success on the merits, threat of irreparable injury absent an injunction, that their threatened injury outweighs the damage to the opposing

party, and the injunction is not adverse to the public interest. *Texas v. Seatrain Int'l, S.A.*, 518 F.2d 175, 179 (5th Cir. 1975).

As the government's brief demonstrates, the Plaintiffs fail to establish the first element required to grant a preliminary injunction—substantial likelihood of success on the merits. Even if Plaintiffs were able to demonstrate likelihood of success on the merits, the preliminary injunction fails under the last three factors. This brief explains why the Plaintiffs' motion for preliminary injunction should be denied under the harm and public interest factors, from the perspective of legal aid organizations providing direct services to low-income tenants, and a national nonprofit that supports that work.

## I.    The Plaintiffs Will Not Suffer Irreparable Harm.

Absent a "substantial likelihood of irreparable injury," injunctive relief is improper. *Siegel*, 234 F.3d at 1176. Irreparable injury is the "sine qua non of injunctive relief." *Id.* (internal citations omitted); *see also Winter,* 555 U.S. at 22 (preliminary injunction is not appropriate unless plaintiff demonstrates it is likely to suffer an irreparable harm without injunction). Because Plaintiffs will suffer only temporary, *reparable* economic harm, their motion fails.

## A.     The Plaintiffs' injuries are purely economic.

To demonstrate irreparable harm, the Plaintiffs must show that their injury "cannot be undone through monetary remedies." *Cate v. Oldham*, 707 F.2d 1176, 1189 (11th Cir. 1983). Plaintiffs' injuries, however, are purely economic. *See Overstreet v. Lexington-Fayette Urban Cty. Gov't,* 305 F.3d 566, 579 (6th Cir. 2002) ("The fact that an individual may lose his income for some extended period of time does not result in irreparable harm, as income wrongly withheld may be recovered through monetary damages in the form of back pay.") Not only would monetary remedies make each Plaintiff whole, the CDC's action requires tenants to make partial payments as they are able and does nothing to prevent Plaintiffs from pursuing arrears. *See* 85 Fed. Reg. 55292. Plaintiffs' motion fails because landlords have multiple possible remedies available to recover lost rent, a purely economic and reparable injury.

## B.     Time alone may repair Plaintiffs' injuries.

In addition to being fully compensable, the monetary harm may be significantly diminished or eliminated by the moratorium's expiration on December 31, 2020. Many tenants represented by LSNV and ALAS have received rental assistance originating from the federal Coronavirus Aid, Relief, and Economic Security Act (CARES Act). Often that rental assistance entirely satisfies

a tenant's debt. Admittedly, this assistance may run out before the end of the

calendar year, leaving some tenants unserved. But Congress has the power to

allocate additional funding, and a bill doing so has already passed the U.S. House

of Representatives.[2] It is likely the Plaintiffs can, will, or already have benefited

from these funds, repairing some or all of the injury of lost rent.

Aside from receiving rental assistance, the passage of time may enable some

tenants to pay their rental debt. Tenants across the country are waiting for

disbursement of unemployment benefits.[3] Record numbers of job losses early in

the COVID-19 crisis[4] forced more than 59 million Americans to file for

unemployment benefits since the start of the pandemic.[5] Many tenants' claims have

lingered for months because states' unemployment systems have been inundated

---

[2] *See* Health and Economic Recovery Omnibus Emergency Solutions Act
(HEROES Act), H.R. 6800, 116th Cong. (2020) (proposing, among other things,
$100 billion in appropriations for rental assistance to struggling tenants).
[3] Christopher Rugaber, *Fraud, Backlogs Disrupt US Unemployment Benefit
Payments*, Wash. Post (Sept. 24, 2020),
https://www.washingtonpost.com/business/many-more-likely-sought-us-jobless-
aid-as-layoffs-persist/2020/09/24/f5143f6c-fe55-11ea-b0e4-
350e4e60cc91_story.html.
[4] The U.S. unemployment rate increased from 4.4% in March 2020 to 14.7% in
April 2020. It has steadily declined since then, however it remained at an
abnormally high rate of 7.9% in September 2020. *See* U.S. Bureau of Labor
Statistics, *Economy at a Glance*, https://www.bls.gov/eag/eag.us.htm (last visited
Oct. 8, 2020).
[5] Federal Reserve Bank of St. Louis, *FRED Economic Research Weekly Initial
Claims*, https://fred.stlouisfed.org/series/ICNSA (last visited Oct. 8, 2020).

with new claims.[6] LSNV and ALAS represent tenants whose pending unemployment benefits—often amounting to many thousands of dollars—can pay off arrears to their landlords. A short delay in receiving rent cannot be deemed irreparable.

In addition to unemployment benefits or federal assistance, as the economy rebounds tenants may return to work and pay their rent and/or judgments as they would have before the pandemic crisis. Contrary to Plaintiffs' unsupported assertion, the fact that some tenants are currently unable to pay rent does not mean they are permanently "insolvent" or judgment proof. *See* Pls.' Br. In Supp. Of Mot. For Prelim. Injunction (Pls.' Br.) 36 (ECF No. 18-1). The potential solutions to landlords' economic injuries are numerous and not limited by an eviction moratorium. Moreover, the impact of the economic harm is lessened since many landlords were able to take advantage of a CARES Act provision providing 360-day, no penalty mortgage forbearance if they had a federally-backed mortgage. CARES Act, Pub. L. No. 116-136, § 4022, 134 Stat. 281 (2020). Many private

---

[6] Tony Romm, *Underfunded, Understaffed and Under Siege: Unemployment Offices Nationwide are Struggling to do Their Jobs*, Wash. Post (Apr. 6, 2020), https://www.washingtonpost.com/business/2020/04/06/unemployment-benefits-coronavirus/.

lenders are also offering forbearances. Nationwide, many states issued foreclosure moratoriums and stays.[7]

Lastly, Plaintiffs overstate the meaning and impact of the moratorium. They have not lost access to the courts. Their access to one particular remedy, eviction, was delayed. *See, e.g., Baptiste v. Kennedy*, 2020 WL 5751572 at \*25 (D. Mass. 2020) (rejecting access to court claims against state eviction moratorium under takings, contracts clause, and due process theories); *Elmsford Apartment Assocs., LLC v. Cuomo*, 2020 WL 3498456, at \*16 (S.D.N.Y. 2020) (state eviction moratorium did not violate right to petition clause because restriction was temporary and other kinds of lawsuits were available). Plaintiffs cannot meet the irreparable injury requirement for injunctive relief; their motion fails on that ground alone.

## II. The Public Has a Critical Interest in Preventing Evictions and Stopping the Spread of Disease During a Nationwide Public Health Emergency.

Injunctive relief is not in the public interest. Even if Plaintiffs could show irreparable injury, their motion fails because the balancing of the equities weighs against them.

---

[7] Andrew Pizor & Geoffry Walsh, *Mortgage Relief for Homeowners Affected by COVID-19*, National Consumer Law Center (Sept. 23, 2020), https://library.nclc.org/mortgage-relief-homeowners-affected-covid-19.

When the government is the opposing party in a request for preliminary injunction, the factors assessing harm to the opposing party and weighing the public interest merge. *Nken v. Holder*, 556 U.S. 418, 435 (2009). "[T]he government's interest *is* the public interest." *Pursuing America's Greatness v. Fed. Election Comm'n*, 831 F.3d 500, 511 (D.C. Cir. 2016) (emphasis in original). "In exercising their sound discretion, courts of equity should pay particular regard for the public consequences in employing the extraordinary remedy of injunction." *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 312 (1982). When a preliminary injunction is adverse to the public interest, the court may withhold relief even if the plaintiff would suffer irreparable injury. *Id.*; *see also Yakus v. United States*, 321 U.S. 414, 440 (1944). The greater public interest is in preventing the spread of COVID-19.

The government has a substantial interest in protecting public health and safety. *See Hodel v. Virginia Surface Min. and Reclamation Ass'n*, 452 U.S. 264, 300 (1981). As the nation's leading health protection agency, the CDC is entrusted with "protect[ing] America from health, safety and security threats, both foreign

and in the U.S." [8] The balance of equities favors the government the citizens it aims to protect.

Plaintiffs' requested injunction, on the other hand, is contrary to the public interest since it would leave 30 to 40 million people at risk of eviction amidst a pandemic. Due to the impact these evictions would have on the health of the community, individuals, and marginalized populations, a greater public interest exists in preventing the spread of COVID-19 than in granting Plaintiffs' injunction.

## A.     Mass eviction on this unprecedented scale would devastate the broader community.

The magnitude of the imminent eviction crisis arising under COVID-19 threatens to deliver an incomprehensibly dire outcome for the nation, far beyond the disruption evictions caused in ordinary times. In a typical year, approximately 900,000 U.S. renter-occupied households experienced a judicial eviction and its crushing consequences.[9] An Aspen Institute study this summer—cited in the CDC order—predicted that in the absence of a moratorium, between 19-23 million U.S. households were threatened with eviction by September 30, 2020—roughly 20

---

[8] Centers for Disease Control and Prevention, *Mission, Role and Pledge*, https://www.cdc.gov/about/organization/mission.htm (last updated May 13, 2019).

[9] Eviction Lab, *National Estimates: Eviction in America*, Princeton University (May 11, 2018), https://evictionlab.org/national-estimates.

times the normal rate.[10] *See* 85 Fed. Reg. at 55295. As the CDC noted, "[a] wave
of evictions on that scale would be unprecedented in modern times." *See id*.

In late August, right before the CDC announced its moratorium, millions of
tenants were bracing for the reality of eviction. In a CDC survey, a staggering 3.8
million renter-occupied households, or 46.3 percent of respondents, reported that it
was somewhat or very likely they would have to leave their home due to eviction
in the next two months.[11] 14.4 million households, or 25.4 percent of respondents,
had slight or no confidence in their ability to pay rent next month.[12] The global
consulting firm Stout calculated that between 9.7 and 14.2 million eviction actions
could be filed before the end of the year if the CDC moratorium is lifted.[13] Stout's

---

[10] *See* Katherine Lucas McKay et al., *20 Million Renters Are at Risk of Eviction;
Policymakers Must Act Now to Mitigate Widespread Hardship*, The Aspen
Institute (June 19, 2020), https://www.aspeninstitute.org/blog-posts/20-million-
renters-are-at-risk-of-eviction/ (predicting 19-23 million U.S. evictions by Sept.
30, 2020).
[11] U.S. Census Bureau, *Housing Table 3b: Likelihood of Having to Leave this
House in Next Two Months Due to Eviction*, Week 13 Household Pulse Survey:
August 19-August 31 (Sept. 9, 2020),
https://www.census.gov/data/tables/2020/demo/hhp/hhp13.html#tables.
[12] U.S. Census Bureau, *Housing Table 2b: Confidence in Ability to Make Next
Month's Payment for Renter Occupied Housing Units, by Select Characteristics*,
Week 13 Household Pulse Survey: August 19-August 31 (Sept. 9, 2020),
https://www.census.gov/data/tables/2020/demo/hhp/hhp13.html#tables.
[13] Stout Risius Ross, *Analysis of Current and Expected Rent Shortfall and
Potential Eviction in the U.S.* 36 (Sept. 25, 2020), https://www.ncsha.org/wp-
content/uploads/Analysis-of-Current-and-Expected-Rental-Shortfall-and-Potential-
Evictions-in-the-US_Stout_FINAL.pdf.

data further shows the massive societal impact (in dollars) those evictions could have in four southern states and the U.S. more broadly—costing upwards of $159 billion across the U.S. *See* Chart attached as Appendix A. Plaintiffs allege the CDC is "catastrophizing" during what is quite literally an unprecedented catastrophe. *See* Pls.' Br. in Supp. of Mot. for Prelim. Injunction (Pls.' Br.) 22 (ECF No. 18-1).

The catastrophic effects of widespread evictions—in the absence of the CDC's moratorium—will not be confined to the millions of Americans who are at immediate risk of losing their home. Concentrated housing insecurity and widespread resident turnovers destabilize neighborhoods and undermine the social and economic welfare of communities. Schools, businesses, cash-strapped state and local governments, and other community organizations cannot realistically be expected to weather the shock and chaos of such enormous and sudden involuntary displacement of their students, workers, neighbors, customers, or members.

Such an explosion in evictions also threatens to overwhelm homeless shelters, mental healthcare facilities, and emergency rooms. A study conducted in New York in 2018 concluded that "households in housing court that manage to avoid eviction, by virtue of being assigned to a courtroom with a lower eviction rate, are considerably less likely to use homeless shelters, even several years after

the initial non-payment filing."[14] Researchers found that an eviction increased the

probability of  homeless shelter applications by 14%.[15] Additionally, evictions

increased the likelihood of hospitalization for a mental health condition by 9% and

increased emergency room visits by over 70%.[16] If 30 to 40 million people are

evicted before the end of the year, already strained shelters and emergency services

will face an unmanageable influx of people and lack the ability to provide services

to those in need.

Displacing so many people during a raging pandemic will likely result in

significant increases in transmission of COVID-19, costing lives.[17] The CDC

identified "limiting close face-to-face contact" as the "best way to reduce the

spread" of COVID-19.[18] Staying at home, quarantining, and self-isolation are

essential measures for reducing community spread of COVID-19.[19] Studies find

---

[14] Robert Collinson & Davin Reed, *The Effects of Evictions on Low-Income Households* 4 (Dec. 2018), https://www.law.nyu.edu/sites/default/files/upload_documents/evictions_collinson_reed.pdf.

[15] *Id.* at 3.

[16] *Id.* at 3-4.

[17] *See* Public Health Amicus Brief.

[18] Centers for Disease Control and Prevention, *Social Distancing*, https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/social-distancing.html (last updated July 15, 2020).

[19] Centers for Disease Control and Prevention, *When to Quarantine*, https://www.cdc.gov/coronavirus/2019-ncov/if-you-are-

that although some evictions lead to homelessness, many more result in "doubling up" with others, "effectively increasing household size and household crowding."[20] In all the scenarios studied, higher eviction rates led to an increase in disease, with substantially higher risk for evicted individuals.[21]

Reports also show that those who go to homeless shelters face a particularly high risk of infection. In Boston, 146 of 397 people living in one shelter tested positive for COVID-19.[22] One of the largest homeless shelters in Oahu, Hawaii was forced to temporarily shut down after 56 residents and 6 staff members were diagnosed with COVID-19.[23] More than 100 COVID-19 cases were recently traced

---

sick/quarantine.html?CDC_AA_refVal=https%3A%2F%2Fwww.cdc.gov%2Fcoronavirus%2F2019-ncov%2Fif-you-are-sick%2Fquarantine-isolation.html (last updated Sept. 10, 2020).

[20] Michael Levy et al., *COVID-19 Eviction Simulations,* https://github.com/alsnhll/COVID19EvictionSimulations (last visited Oct. 8, 2020).

[21] National Low Income Housing Coalition, *Preliminary Research Shows Evictions Contribute to Spread of COVID-19* (Sept. 8, 2020), https://nlihc.org/resource/preliminary-research-shows-evictions-contribute-spread-COVID-19.

[22] Lynn Jolicoeur, *Boston Homeless Advocates Say Asymptomatic Virus Spread Shows 'Urgent' Need for Universal Testing*, WBUR (Apr. 15, 2020) https://www.wbur.org/commonhealth/2020/04/15/boston-homeless-population-coronavirus-asymptomatic-universal-testing.

[23] Allyson Blair, *Homeless Shelter Reopens Following COVID-19 Outbreak, but with Fewer Beds*, Hawaii News Now (Sept. 14, 2020), https://www.hawaiinewsnow.com/2020/09/14/quarantine-site-converted-back-homeless-shelter-iwilei-with-half-beds/.

back to an outbreak at a homeless shelter in Anchorage, Alaska.[24] Massive
increases in shared housing and homelessness threaten to drastically accelerate
community transmission.

An increase in COVID-19 transmission will cost lives, prolong the economic
downturn, and make it more difficult for children to safely return to schools.
Evictions have a host of extreme, negative consequences for people losing their
homes and their broader community. Right now, people's lives depend on others'
ability to stay at home, quarantine, and take basic precautions to prevent the spread
of COVID-19. The greater public interest is in reducing evictions that have
deleterious effects on public health and safety "in the face of a deadly pandemic
with no vaccine, no cure, limited testing capacity, and the ability to spread quickly
through asymptomatic vectors." *Malam v. Adducci*, 2020 WL 2468481, *4 (May
12, 2020) (finding that civil immigration detainees with high risks of complications
from COVID-19 were at risk of irreparable injury as a result of loss of health or
death, thus requiring their immediate release from detention).

---

[24] Aubrey Wieber, *Feds to Help Manage Anchorage's COVID-19 Outbreak Among
the Homeless*, Anchorage Daily News (Sept. 11, 2020),
https://www.adn.com/alaska-news/anchorage/2020/09/11/feds-to-help-manage-
anchorages-COVID-19-outbreak-among-the-homeless/.

**B.  Uncontrolled eviction during a pandemic would have a devastating impact on low-income individuals.**

Unlike Plaintiffs' temporary, economic harm, the fallout from evictions, particularly during a pandemic, are irreparable. *See, e.g., Chastain v. Northwest Georgia Housing Authority*, 2011 WL 5979428, at *13 (N.D. Ga. 2011). Homelessness is an irreparable harm. *See, e.g., Basham v. Freda,* 805 F. Supp. 930, 932 (M.D. Fla.1992), *aff'd,* 985 F.2d 579 (11th Cir.1993). Interruption of educational opportunism for children is likely an irreparable harm. *See, e.g.*, *N.J. v. New York*, 872 F. Supp. 2d 204, 214 (E.D.N.Y. 2011). Contrasting these harms prevented by the CDC moratorium with speculative economic losses demonstrates that the public interest is served by denying the injunction.

As of October 8, 2020, more than 1 million people have died from COVID-19 and more than 36 million cases have been reported globally.[25] The United States has documented the most confirmed cases and deaths of any country in the world.[26] More than 7.5 million cases of COVID-19 have been confirmed and more than

---

[25] World Health Organization*, WHO Coronavirus Disease (COVID-19) Dashboard*, https://covid19.who.int (last visited Oct. 8, 2020).
[26] *Id.*

211,000 people have died.[27] The health risks are the greatest for the 29-43% of households facing eviction.[28]

It is almost impossible to overstate the serious and long-term consequences that a single eviction can inflict on a person or family. After an eviction is granted, adults and children are forcibly displaced from their homes. Families that cannot afford rent, often cannot afford storage and may lose all of their possessions, including critical identity documents and cherished family belongings. Parents working in low wage jobs without paid leave are often unable to maintain stable employment as they are forced to direct time and energy into attending court appearances, finding new housing, and meeting immediate needs.[29] Families with an eviction record face a major impediment to securing future housing and credit.[30] With severely limited housing options, families are routinely forced into living arrangements that are unsafe (especially during a contagious pandemic) or violent,

---

[27] Centers for Disease Control and Prevention, *United States COVID-19 Cases and Deaths by State*, https://covid.cdc.gov/covid-data-tracker/#cases_totalcases (last visited Oct. 8, 2020).

[28] Katherine Lucas McKay et al., *supra* note 10.

[29] Matthew Desmond & Carl Gershenson, *Housing and Employment Insecurity among the Working Poor*, Social Problems 4-5 (Jan. 11, 2016), https://scholar.harvard.edu/files/mdesmond/files/desmondgershenson.sp2016.pdf?m=1452638824.

[30] Adam Porton et al., *Inaccuracies in Eviction Records: Implications for Renters and Researchers,* Housing Policy Debate 13 (July 28, 2020), https://www.tandfonline.com/doi/full/10.1080/10511482.2020.1748084.

including when doubling up with other families, living out of a car or outdoors, or living in an emergency shelter.

Homeless children endure a multitude of harms when their families are displaced. They often have poor school attendance as the entire family works to find emergency housing or transportation to school.[31] Half of homeless, school-age children experience anxiety and depression, which can make it difficult to focus in class.[32] They are twice as likely to be suspended from school or required to repeat a grade.[33] Children also face health challenges as a result of their homelessness. They are more likely to suffer from chronic illnesses, malnutrition, ear infections, and exposure to environmental toxins.[34] One in four have witnessed violence, which can lead to a range of emotional and behavioral difficulties, including depression, withdrawal, aggression, and acting out.[35] Under normal circumstances,

---

[31] Kathryn Howell, *Eviction and Educational Instability in Richmond, Virginia*, RVA Eviction Lab 4 https://cura.vcu.edu/media/cura/pdfs/cura-documents/EvictionandEducationalInstabilityinRichmond.pdf; Sascha Brodsky, *Choosing Between Shelter and School*, The Atlantic (Dec. 8, 2016), https://www.theatlantic.com/education/archive/2016/12/shelter-versus-school/509825/.
[32] American Psychological Association, *Effects of Poverty, Hunger and Homelessness on Children and Youth,* https://www.apa.org/pi/families/poverty (last visited Oct. 8, 2020).
[33] *Id.*
[34] *Id.*
[35] *Id.*

these outcomes are unacceptable. They would be especially disastrous if the moratorium was enjoined, permitting evictions to reshape 20 times the number of families as usual.

Individuals will feel the consequences of mass eviction for years. Many who are evicted struggle to obtain safe and decent housing for years afterwards because landlords regularly refuse to rent to tenants with an eviction judgment on their record. With fewer options, families are left with no choice but to rent substandard housing, often plagued by mold, rodent or cockroach infestations, unremediated lead hazards, or other habitability issues that cause and exacerbate health issues.

Eviction often sets off a chain of negative and chaotic life events and can "fundamentally redirect [an evicted person's] way, casting them onto a different, and much more difficult, path."[36] There is evidence that evicted mothers experience higher rates of depression even two years afterward.[37] In turn, this can "affect their relationships with their romantic partners and children, kin and neighbors; could cause them to withdraw from social institutions, dampening their civic engagement and level of community embeddedness; and could sap their

---

[36] Matthew Desmond & Rachel Tolbert Kimbro, *Eviction's Fallout: Housing, Hardship, and Health*, Social Forces 23 (2015), https://scholar.harvard.edu/files/mdesmond/files/desmondkimbro.evictions.fallout.sf2015_2.pdf.
[37] *Id.* at 1.

energy, preventing them from seeking or keeping gainful employment or participating fully in their children's development."[38] Failing to stop a landslide of evictions now has the added pernicious effect of hurting landlords in the future— the more economic and social harm that is done to this population now, the less likely they are to ever recover and pay any or all of the accumulated debt. Denying Plaintiff's requested injunction serves the greater public interest by shielding tens of millions of Americans to the harmful and long-lasting effects of eviction and displacement.

### C.  A massive increase in evictions will disproportionately harm minority groups.

The COVID-19 pandemic has not touched all of America equally. Minority groups have been disproportionately harmed. Considerable data reveals racial and ethnic minorities face increased risk of contracting and dying from COVID-19 due to longstanding structural inequities, including racial discrimination, lack of access to healthcare, and income and wealth disparities.[39]

---

[38] *Id.* at 23.

[39] *See, eg.,* Centers for Disease Control and Prevention, *Health Equity Considerations & Racial & Ethnic Minority Groups,* https://www.cdc.gov/coronavirus/2019-ncov/community/health-equity/race-ethnicity.html (last updated July 24, 2020).

Recent research correlated COVID-19 and the historic redlining of neighborhoods, which caused higher minority presence and higher rates of poverty in neighborhoods. The data shows "statistically significant associations between greater redlining and pre-existing conditions for heightened risk of morbidity in COVID-19 patients like asthma, COPD, diabetes, hypertension, high cholesterol, kidney disease, obesity and stroke."[40] Moreover, researchers identified that Black and Latinx workers—disproportionately concentrated in employment industries that are not able to switch to remote work—are uniquely vulnerable to the pandemic.[41] These risk factors put minority populations at greater risk of serious illness, hospitalization, and death from contracting the virus.

As a result of these conditions, Latinx and American Indian/Alaska Native people experienced a 2.8 times greater rate of contracting COVID-19 than white

---

[40] National Community Reinvestment Coalition, *Redlining and Neighborhood Health*, https://ncrc.org/holc-health/?mc_cid=a9108bde40&mc_eid=e6da65b132 (last visited Oct. 8, 2020).
[41] Elise Gould & Valerie Wilson, *Black Workers Face Two of the Most Lethal Preexisting Conditions for Coronavirus—Racism and Economic Inequality*, Economic Policy Institute (June 1, 2020), https://www.epi.org/publication/black-workers-covid/; *see also,* Elise Gould et al., *Latinx Workers Particularly Women—Face Devastating Job Losses in the COVID-19 Recession,* Economic Policy Institute (Aug. 20, 2020) https://www.epi.org/publication/latinx-workers-covid/.

people in the United States.[42] Black people experienced a 2.6 times greater rate of COVID-19 cases relative to white people.[43] Devastatingly, Black people have died from COVID-19 at 2.1 times the rate of white people.[44]

In addition to bearing the burden of this health crisis, racial and ethnic minorities have suffered more acutely the economic effects of the pandemic. Black and Latinx people lost employment and experienced financial strain at a significantly higher rate. Approximately, 72% of Latinx households and 60% of Black households reported experiencing serious financial problems during the pandemic, compared to 36% of white households.[45] 63% of Latinx households report an adult member of their household lost their job or wages during the pandemic, as compared to 46% of households overall.[46] These higher rates of financial insecurity place renters of color at much higher risk of eviction.

---

[42] Centers for Disease Control and Prevention, *Hospitalization and Death by Race/Ethnicity*, https://www.cdc.gov/coronavirus/2019-ncov/covid-data/investigations-discovery/hospitalization-death-by-race-ethnicity.html#footnote01 (last updated Aug. 18, 2020).

[43] *Id.*

[44] *Id.*

[45] NPR, Robert Wood Johnson Foundation, & Harvard T.H. Chan School of Public Health, *The Impact of Coronavirus on Households, By Race/Ethnicity* 6 (Sept. 2020), https://cdn1.sph.harvard.edu/wp-content/uploads/sites/94/2020/09/NPR-Harvard-RWJF-Race-Ethnicity-Poll_091620.pdf.

[46] *Id.* at 9.

These realities have uniquely intensified housing insecurity for Black and Latinx households. Whereas 15% of white households have reported serious problems paying their rent or mortgage during the pandemic, 32% of Latinx and 28% of Black households are facing these problems.[47] Immediately preceding the CDC Order, 35% of Black households and 34.5% of Latinx households had slight or no confidence in their ability to pay next month's rent, as compared to 18.3% of white households.[48]

An injunction will undeniably result in substantial harm to the public, and will be particularly detrimental for minorities who are at greater risk of being unable to pay rent, suffering eviction, and facing serious illness and death from COVID-19. Enjoining the CDC's moratorium runs counter to racial justice efforts across the country and will frustrate the public interest in moving toward equality for all Americans.

## CONCLUSION

Without the CDC Order, the country has no uniform policy designed to prevent a national eviction crisis that would exacerbate a public health crisis. For

_____

[47] *Id.* at 8.
[48] U.S. Census Bureau, *supra* note 12.

all of the foregoing reasons, the Court should DENY Plaintiffs' motion for

preliminary injunctive relief.

Respectfully submitted this 9th day of October, 2020,

**Atlanta Legal Aid Society, Inc.**

*/s/* Lindsey M. Siegel
Lindsey M. Siegel (GA Bar No. 730072)
John O. Gainey (GA Bar No. 258784)
Charles R. Bliss (GA Bar No. 063385)

246 Sycamore Street, Suite 120
Decatur, GA 30030
Ph: (770) 817-7522

**National Housing Law Project**
Eric Dunn (active in Virginia)
Kate Walz (active in Illinois)

919 E Main Street
Richmond, VA 23219
Ph: (415) 546-7000
Applying for Admission *Pro Hac Vice*

**Legal Services of Northern Virginia**
Dipti Pidikiti-Smith VSB # 73318
Jenny Fulmer VSB # 74950
Flor Salvador VSB # 83320

10700 Page Avenue, Suite 100
Fairfax, Virginia 22030
Ph: (703) 684-0738
Fax: (571) 386-0605
Applying for Admission *Pro Hac Vice*
*Counsel for Amici Curiae*

## **CERTIFICATE OF COMPLIANCE**

I hereby certify that the foregoing document was prepared using Times New Roman, 14-point, and otherwise conforms to the requirements of Local Rule 5.1.

/s/ Lindsey M. Siegel
Lindsey M. Siegel (GA Bar No. 730072)
*Attorney for Amici Curiae*

## **CERTIFICATE OF SERVICE**

I hereby certify that on October 9, 2020, I electronically filed the Brief of Amici Curiae in Opposition to Plaintiffs' Motion for Preliminary Injunction using the Court's CM/ECF system, which will automatically send electronic copies to the following counsel of record:

James W. Hawkins
Georgia State Bar No. 338767
James W. Hawkins, LLC
5470 Blair Valley Run
Cumming, GA 30040
Ph: (678) 697-1278
F: (678) 540-4515
jhawkins@jameswhawkinsllc.com

Caleb Kruckenberg
New Civil Liberties Alliance
1225 19th St. NW, Suite 450
Washington, DC 20036
Ph: (202) 869-5210
caleb.kruckenberg@ncla.legal
*Appearing Pro Hac Vice*
*Counsel for Plaintiffs*

Leslie Cooper Vigen
1100 L Street, NW
Washington, DC 20005
Ph: (202) 305-0727
F: (202) 616-8470
leslie.vigen@usdoj.gov
*Counsel for Defendants*

Dated:  October 9, 2020

/s/ Lindsey M. Siegel
Lindsey M. Siegel (GA Bar No. 730072)
*Attorney for Amici Curiae*