IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

RICHARD LEE BROWN, ET AL.,    :

    :    CIVIL ACTION NO.:
    :    1:20-cv-3702-JPB
    :
        Plaintiffs,    :
    :
    v.    :
    :
SEC. ALEX AZAR, ET AL.,    :
    :
        Defendants.    :

## PLAINTIFFS' REPLY IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION

Plaintiffs Richard Lee (Rick) Brown, Jeffrey Rondeau, David Krausz, Sonya Jones, and the National Apartment Association (NAA) reply to Defendants' Opposition (ECF No. 22), in support of their motion for a preliminary injunction against Defendants, Secretary Alex Azar, U.S. Dept. of Health and Human Services, Acting Chief of Staff Nina B. Witkofsky, and U.S. Centers for Disease Control and Prevention (collectively "CDC") (ECF No. 18).

When asked to defend an agency's unprecedented attempt to unilaterally void the property laws of all 50 states without so much as inviting comments from the hundreds of thousands of harmed property owners across the country, one would expect CDC to *at least* claim that its Order was an essential tool in the fight against

1

COVID-19. But CDC has studiously avoided such a claim. Instead, the agency has defended itself purely through distraction, calls for unlimited power, and, in the end, a tepid argument that its Order "may" in the end, provide some possible benefit to the public. This Court should reject CDC's actions out of hand.

## I. PLAINTIFFS HAVE STANDING TO SUE BECAUSE THE CDC ORDER HAS PREVENTED THEM FROM USING STATE PROCESS

CDC's arguments against standing supply a window into the weakness of its response. At least one plaintiff had a lawfully issued eviction order in hand and his state-court-granted relief was halted *solely* because of a CDC declaration. Yet, incredibly, CDC says that all "[p]laintiffs lack standing to bring suit." Defs. Resp., ECF No. 22, at 2. CDC, however, never meaningfully engages with the relevant law, nor even the facts of the case, and even a cursory analysis demonstrates that every plaintiff has a concrete stake in this case.[1]

To have standing, a "plaintiff must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to

---

[1] After this case was filed Mr. Rondeau's tenant vacated Mr. Rondeau's house. Standing is determined "at the time of suit," *Friends of the Earth, Inc. v. Laidlaw, Inc.*, 528 U.S. 167, 185 (2000), so this recent development does not deprive this Court of jurisdiction. Even if Mr. Rondeau's case has now become moot, this Court "may entertain a moot case if it arises from a situation that is capable of repetition, yet evading review." *Bourgeois v. Peters*, 387 F.3d 1303, 1308 (11th Cir. 2004) (citation omitted). Given the short duration of the CDC Order, but the high likelihood that many others, including remaining Plaintiffs, will be harmed by it, Mr. Rondeau's case falls under this exception to the mootness doctrine.

be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016). An injury in fact is "'an invasion of a legally protected interest' that is 'concrete and particularized' and 'actual or imminent, not conjectural or hypothetical.'" *Id*. at 1548. This is a "relatively modest" burden, *Bennett v. Spear*, 520 U.S. 154, 171 (1997), and "even harms that flow indirectly from the action in question can be said to be 'fairly traceable' to that action." *Focus on the Family v. Pinellas Suncoast Transit Auth.*, 344 F.3d 1263, 1273 (11th Cir. 2003).

Every plaintiff carries this "modest" burden because but for CDC's Order they would be entitled to evict their respective tenants using their state-court processes. By being forbidden to do so, each has suffered profound economic and related harms. Mr. Krausz could not bring a clearer case against the Order as he obtained a lawful eviction order, and had an eviction *scheduled* with local authorities. Am. Compl., ECF No. 12, ¶¶ 68-77; Krausz Decl., ECF No. 18-4, ¶¶ 2-14.[2] But when his local court was presented with a CDC declaration, the authorized eviction was halted. Am. Compl. ¶¶ 74-76; Krausz Decl. ¶ 11-12. Mr. Brown is entitled to evict his tenant for nonpayment under Virginia law, but his tenant is a "covered person" under the CDC Order and Mr. Brown has not been able to access the Virginia courts, and Mr. Brown has suffered continued economic harm from being unable to evict

---

[2] Mr. Rondeau was in the same circumstance before his tenant vacated the property. *See* Rondeau Decl., ECF No. 18-3, ¶¶ 2-14.

his tenant. Am. Compl. ¶¶ 50-55; Brown Decl., ECF No. 18-2, at ¶¶ 2-14. Likewise, Ms. Jones is entitled to an immediate eviction under Georgia law, but her local court refused even to give her a hearing because of the CDC Order. Am. Compl. ¶¶ 78-83; Jones Decl., ECF No. 18-5, ¶¶ 6-7. Finally, for NAA, its members face these same situations across the nation—but for the CDC Order, they would be entitled to immediate evictions. Am. Compl. ¶¶ 87-91. Because of the CDC Order, however, NAA's members have incurred millions of dollars in irrecoverable damages. Am. Compl. ¶ 89-92; Pinegar Decl., ECF No. 18-6, ¶ 5.

CDC does not challenge these facts (nor could it), nor does it even bother engaging with Mr. Krausz's circumstances. Instead, CDC says that because "each of the individual Plaintiffs alleges that his or her tenants have caused 'damages to his property'" and the CDC Order "permits evictions due to a tenant 'damaging or posing an immediate and significant risk of damage to property'" then they "have therefore suffered no concrete injury as a result of the Order." Defs. Resp. at 16. This is an absurd argument. Each plaintiff is entitled to an eviction for *nonpayment*, and Mr. Krausz *obtained* an eviction orders solely on that basis. Am. Compl. ¶¶ 50, 68-73, 78-80; Brown Decl. ¶ 7; Krausz Decl. ¶¶ 9-10, 13; Jones Decl. ¶ 4. Unable to use appropriate court process, Plaintiffs must face wear and tear and ordinary damage to their property while their tenants remain without legal authorization. Am. Compl. ¶¶ 55, 77, 83; Brown Decl. ¶ 14; Krausz Decl. ¶ 14; Jones Decl. ¶ 10. But

4

none faces "an immediate and significant risk of damage to property," and none has obtained, nor could obtain, evictions on other grounds. CDC has never even bothered to explain how it thinks each plaintiff could obtain such an eviction under the laws of their respective states. CDC has offered no support for its speculation that Plaintiffs have some other avenue of relief.[3]

CDC's remaining claims about some of the other plaintiffs are also insufficient. CDC notes that Mr. Brown and Ms. Jones have "tenants [who] do not appear to have submitted the sworn declaration required for them to qualify as 'covered persons' entitled to protection under the Order," but that does not defeat standing. *See* Defs. Resp. at 16. Mr. Brown is undoubtedly entitled to an eviction and has a good faith belief that his tenant is a "covered person." Brown Decl. ¶¶ 7, 10. Ms. Jones never had the chance to receive the CDC declaration because her local jurisdiction shut down her proceeding because of *its* determination that her tenant qualified under the CDC Order. Jones Decl. ¶¶ 6-8.

CDC notes that "although Plaintiff NAA has alleged injury to its members as a general matter, it has not included specific allegations of injury to any individual

---

[3] Notably, its argument about damage to the property is CDC's only discussion of Mr. Krausz and, of course, only "one plaintiff must have standing to seek" the "form of relief request in the complaint." *Town of Chester v. Laroe Estates Inc.*, 137 S. Ct. 1645, 1651 (2017). So, even if another plaintiff lacked standing, this Court would still need to proceed to the merits of this case.

member." Defs. Resp. at 16. NAA, as a member organization of nearly 90,000 property owners, is happy to oblige CDC's request for more information. As set out in a supplemental declaration, Management Services Corporation (MSC) and Berkshire Residential Investments (Berkshire) are just two of those harmed members. Pinnegar Supp. Decl. ¶¶ 2, 7. MSC is a Virginia company owning more than 3,500 rental units and is entitled to immediate evictions of some of its tenants under Virginia law for nonpayment of rent but has received CDC declarations stopping the process. Pinnegar Supp. Decl. ¶¶ 2-5. Berkshire is a Georgia company with more than 1,500 units, and it likewise is entitled to pursue evictions under state law but has also been given CDC declarations shutting down the legal process. Pinnegar Supp. Decl. ¶¶ 8-10. Unable to use state legal process, these members cannot retake possession of their properties and are deprived of any use of their properties for the duration of the CDC Order. Pinnegar Supp. Decl. ¶¶ 6, 11.

## II. PLAINTIFFS' TENANTS ARE NOT NECESSARY PARTIES BECAUSE THEY ARE FULLY ENTITLED TO PARTICIPATE IN THE STATE COURT PROCESS

CDC's next argument, that Plaintiffs "have failed to join indispensable parties," Defs. Resp. at 18, is another distraction. Every tenant of the properties at issue is fully entitled to the benefit of state court proceedings where they can challenge their evictions. That is, in fact, all that Plaintiffs want. None of the tenants

is a necessary party to this dispute between Plaintiffs and CDC about whether CDC has the legal authority to void state-court process.

"Federal Rule of Civil Procedure 19 sets out two steps for determining whether a party must be joined as indispensable." *Winn-Dixie Stores, Inc. v. Dolgencorp, LLC*, 746 F.3d 1008, 1039 (11th Cir. 2014). First, under Rule 19(a), the court determines "whether the person in question is one who should be joined if feasible." *Focus on the Family*, 344 F.3d at 1280 (citation omitted). "Second, for all such necessary parties, a court determines whether the Rule 19(b) factors permit the litigation to continue if the party cannot be joined[.]" *Winn-Dixie*, 746 F.3d at 1039. If a party is not "necessary," then a court never proceeds to consideration of equitable factors because the rule simply does not apply. *Id.*

A party is "necessary" under Rule 19(a)(1)(A) if "in that person's absence, the court cannot accord complete relief among existing parties," or, under Rule 19(a)(1)(B) if the party "claims an interest relating to the subject of the action" that will be inadequately "protect[ed]" by the existing litigation or the party faces the "substantial risk" of incurring multiple or inconsistent obligations. "Complete relief," under 19(a)(1)(A) looks only to *those already parties*." *MasterCard Int'l Inc. v. Visa Int'l Serv. Ass'n, Inc.*, 471 F.3d 377, 385 (2d Cir. 2006) (emphasis in original). If the court can grant complete relief between the existing parties, then it is inapplicable. *Id.*; *see also Winn-Dixie*, 746 F.3d at 1039-40 (commercial landlords

were not "necessary" parties in dispute because adverse party "was fully able to pay damages and comply with injunctions").

Rule 19(a)(1)(B) looks to whether the non-party has rights that are "in danger" if she is not made a party. *Winn-Dixie*, 746 F.3d at 1040. But if the non-party has another forum where she can protect her interests, then her rights are not in danger. *Id*.; *see also MasterCard*, 471 F.3d at 385 (even though case discussed contract that "may be affected by this litigation" non-party contract signatory was not necessary because litigation could not "render the [] [c]ontract invalid," and future litigation was possible); *Pinckney v. SLM Fin. Corp.*, 236 F.R.D. 587, 589-90 (N.D. Ga. 2005) (Hunt, J.) ("complete relief" was available to non-party in future litigation).

Of course, even if a party is "necessary" and "cannot be joined," a court should only dismiss the lawsuit if "in equity and good conscience" the action may not proceed among the existing parties. Fed. R. Civ. P. 19(b); *see also Challenge Homes, Inc. v. Greater Naples Care Ctr., Inc.*, 669 F.2d 667, 669 (11th Cir. 1982). Rule 19(b) enumerates the most significant factors considered in determining whether an absent party is indispensable, which includes, with emphasis, "whether the *plaintiff* will have an adequate remedy if the action is dismissed for nonjoinder."

CDC devotes two sentences to its argument. *See* Defs. Resp. at 19. It says first that the tenants are "a required party due to both their importance to and interest in the litigation." Defs. Resp. at 19. It then says, "And the tenants undoubtedly have an

8

interest in this litigation because each faces potential eviction if Plaintiffs prevail." Defs. Resp. at 19. Neither point is persuasive because CDC's assertions have no relationship to Rule 19's requirements. Being mentioned in a lawsuit or caring about its outcome cannot make one a legally "necessary party."

Instead, under the Rule's plain text, the tenants are not necessary parties. Rule 19(a)(1)(A) has no application here because the plaintiffs can obtain complete relief from CDC, and CDC seeks no relief at all. Plaintiffs want only the opportunity to use state court procedures. The only thing barring access to state process is CDC's Order. Under Rule 19(a)(1)(B) the tenants' interests are not "in danger" if they are not made parties, because they will still be able to challenge their evictions under state law. *See Winn-Dixie*, 746 F.3d at 1040. For Mr. Rondeau and Mr. Krausz, their tenants already had that opportunity and have valid judgments of eviction against them. And for Mr. Brown, Ms. Jones, and NAA's members, their tenants will only face eviction at the conclusion of lawful state proceedings. None of the tenants will have their rights impaired if CDC's Order is invalidated.

Moreover, CDC's statement that each tenant "faces potential eviction if Plaintiffs prevail" is inaccurate. Each tenant faces state eviction *proceedings*. Some of the tenants have already received adverse judgments in state courts. The rest will have their day in court before any eviction can occur. The CDC Order's invalidity does not alter the underlying validity (or invalidity) of the eviction judgments and

9

orders. This litigation concerns only CDC's efforts to prevent state officers from enforcing those judgments. As CDC points out, all the delinquent tenants will face execution of state court judgments eventually. Thus the CDC Order does not determine the tenants' respective rights, and they are not necessary parties.

Finally, even if the tenants were necessary parties, equity does not warrant dismissal. Contrary to CDC's argument that the tenants "would be unduly prejudiced by their inability to participate in litigation that directly concerns their behavior and affects their ability to remain in their homes," Defs. Resp. at 20, the tenants will suffer no prejudice if CDC's Order is invalidated. The tenants are entitled to state court proceedings, including any available avenues to remain in their homes. A judgment here invalidating CDC's Order would not restore or extinguish any tenants' right. However, dismissing this action for nonjoinder would prejudice *Plaintiffs* severely. Plaintiffs have all been harmed by CDC's Order, but there is no jurisdiction in which they could join each tenant to this action. Thus, dismissal would deprive Plaintiffs of an "adequate remedy" and therefore would be improper for this reason as well. *See* Fed. R. Civ. P. 19(b)(4).

## III. PLAINTIFFS HAVE SUFFERED IRREPARABLE INJURY BY BEING UNCONSTITUTIONALLY DEPRIVED OF THEIR PROPERTY

CDC's arguments about irreparable harm fundamentally misunderstand what Plaintiffs face. CDC talks only about Plaintiffs' "financial injuries" that it says they

can remedy by suing "for unpaid rent," Defs. Resp. at 22, but collecting past-due rent is a *different* harm than the one at issue here. Because of the CDC's Order, Plaintiffs have been deprived of their unique real property and all associated economic—and other—value until the Order is no longer in effect. At the same time, Plaintiffs must incur additional costs by housing tenants who are in wrongful possession. Plaintiffs are trapped in an involuntary, one-sided agreement with no remedy. And they will likely never be able to recover their losses from the tenants. Their constitutional rights have been violated in the process. These non-economic harms are irreparable.

As an initial matter, courts across the country have recognized that being deprived of residential property is a *per se* irreparable injury. "Real estate has long been thought unique, and thus, injuries to real estate interests frequently come within the ken of the chancellor." *K-Mart Corp. v. Oriental Plaza, Inc.*, 875 F.2d 907, 915 (1st Cir. 1989); *see also RoDa Drilling Co. v. Siegal*, 552 F.3d 1203, 1210 (10th Cir. 2009) (citing authorities); *Carpenter Tech. Corp. v. City of Bridgeport*, 180 F.3d 93, 97 (2d Cir. 1999). "[I]t is well-settled that unauthorized interference with a real property interest constitutes irreparable harm as a matter of law, given that a piece of property is considered to be a unique commodity for which a monetary remedy for injury is an inherently inadequate substitute." *BHA, Inc. v. NPS*, 777 F. Supp. 2d 424, 435 (E.D.N.Y.2011); *see also Watson v. Perdue*, 410 F. Supp. 3d 122, 131

(D.D.C. 2019) ("unauthorized interference with a real property interest constitutes irreparable harm as a matter of law"); *Del Monte Int'l, GMBH v. Ticofrut S.A.*, No. 16-cv-23894, 2017 WL 3610582, at \*9 (S.D. Fla. Mar. 7, 2017) (same); *Kharazmi v. Bank of Am.*, No. 1:11-cv-2933, 2011 WL 13221071, at \*3 (N.D. Ga. Sept. 2, 2011) (Totenberg, J.) (same); *Third Church of Christ, Scientist v. City of New York*, 617 F. Supp. 2d 201, 215 (S.D.N.Y. 2008), *aff'd* 626 F.3d 667 (2d Cir. 2010) (same).

Plaintiffs have been wrongly deprived of access to his or her unique property. Solely by operation of the CDC Order, they are unable to retake possession of what everyone agrees, and several courts have already ordered, they rightfully should be able to possess. *See* Brown Decl. ¶ 14; Krausz Decl. ¶ 14; Jones Decl. ¶ 10. Even if it were possible for them to recover damages someday, that prospect does not replace the fact that CDC is forbidding them from gaining possession of their own property, despite state laws ordering its return. NAA's nearly 90,000 members suffer these same harms writ large. *See* Pinegar Decl. ¶ 5. This constitutes "irreparable harm as a matter of law." *See BHA, Inc.*, 777 F. Supp. 2d at 435.

Even if this case were just about purely economic losses, the losses are still irreparable. CDC concedes that financial injuries incurred against a "judgment proof" party could be irreparable. *See* Defs. Resp. at 25 (citing *United States v. Askins & Miller Orthopaedics, P.A.*, 924 F.3d 1348, 1359 (11th Cir. 2019)). It just argues, factually, that Plaintiffs can probably still get some relief, someday, from

their tenants, because Plaintiffs never proved the tenants are insolvent. Defs. Resp.

at 22, 24. But the CDC Order *requires* the tenant to be insolvent and "unable to pay

the full rent … due to a substantial loss of household income" and using "best efforts

to make timely partial payments." *Temporary Halt in Residential Evictions to*

*Prevent Further Spread of COVID-19*, 85 Fed. Reg. 55292, 55293 (Sept. 4, 2020).

Each of the tenants here has paid *nothing* towards their outstanding obligations. *See*

Brown Decl. ¶ 14; Krausz Decl. ¶ 14; Jones Decl. ¶ 10. Mr. Krausz's tenant signed

a declaration under penalty of perjury that they have no resources and cannot pay

anything towards their outstanding rent. *See* Krausz Decl. ¶¶ 11, 14. It is not

speculative that this tenant is insolvent—they have sworn they are.[4]

CDC's insistence that Plaintiffs will someday be compensated for their harm

is false. This also distinguishes *Elmsford Apt. Assocs., LLC v. Cuomo*, No. 20-4062,

2020 WL 3498456, at *15 (S.D.N.Y. June 29, 2020), CDC's primary authority. *See*

Defs. Resp. at 22. In *Elmsford* the court dealt with a New York eviction moratorium,

but, importantly, the state procedure required no attestation that the tenant was

insolvent. *See* 2020 WL 3498456, at 5. Instead, the *property owner* had to affirm

---

[4] CDC's argument that the "Eleventh Circuit has found the irreparable-harm element lacking where a plaintiff had, but failed to pursue, an adequate state-law remedy" is curious. *See* Defs. Resp. at 22 (citing *Rosen v. Cascade Int'l, Inc.*, 21 F.3d 1520, 1531 (11th Cir. 1994)). Plaintiffs have no state-law remedies because CDC deprived them of any. Plaintiffs are asking to go to their state courts and obtain relief.

that she believed the tenant was not facing a financial hardship. *Id*. The court in *Elmsford* did not assess whether the injuries were "irreparable," meaning that the case has no application here. *See id*.[5]

Aside from being deprived of their residential properties, and forced to incur irremediable financial consequences, each plaintiff faces constitutional harms that cannot be remedied with damages. CDC casts this notion aside, pointing out that the Eleventh Circuit has concluded that the Court has not accepted the view that "a violation of constitutional rights *always* constitutes irreparable harm[.]" Defs. Resp. at 26 (quoting *Siegel v. LePore*, 234 F.3d 1163, 1177-78 (11th Cir. 2000) (emphasis added)). Of course, the *Siegel* decision did not hold that constitutional injury *cannot* be irreparable—it just refused to extend certain authority concerning First Amendment rights to a voter recount case. *See id*. The *sine qua non* of irreparable

---

[5] CDC's other argument, that the harms are somehow Plaintiffs' fault because they either waited too long or not long enough to seek evictions is nonsensical. CDC says, "Plaintiff Brown, for example, claims damages suggesting his tenant has failed to pay rent for over eight months, or since at least January 2020; he thus appears not to have pursued remedies for alleged nonpayment of rent even prior to the declaration of the pandemic." Defs. Resp. at 25. But then CDC objects that "[t]wo of the other individual landlords assert that their tenants made rental payments as recently as July 2020." Defs. Resp. at 25. Mr. Brown was forced to wait because of other moratoria and court limitations, but now the only thing standing in the way of his access to relief is CDC's Order. Amend. Compl. ¶¶ 32-33. Mr. Krausz has incurred more recent harms and never had any opportunity to use state process. Amend. Compl. ¶ 77. No matter when these harms *started*, CDC's Order prevents them from being remediated in any way *now*.

injury is that "it cannot be undone through monetary remedies." *Cunningham v. Adams*, 808 F.2d 815, 821 (11th Cir. 1987). Plaintiffs incurred a constitutional injury but have no hope of obtaining damages from anyone. These harms are irreparable.

## IV. PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS

Plaintiffs have asserted three separate grounds for striking down CDC's Order. While any one of the three would suffice to invalidate the Order, Plaintiffs have demonstrated a likelihood of success on all three.

### A. The CDC Order Is Without Statutory or Regulatory Basis, as CDC's Reading of Its Statutory and Regulatory Authority Cannot Be Upheld

CDC insists that it has the "broad" statutory authority to void any provision of state law so long as it merely declares the action to be "reasonably necessary" in its sole judgment as one that "may help curb the spread of COVID-19." Defs. Resp. at 31, 38, 40. CDC's view of its own power is breathtaking and, if correct, would mean that there is no action CDC could not take. CDC, in its sole judgment, could write and rewrite the substantive laws of every state at will, never to face any judicial limitation. But the text does not support CDC's view of the relevant statute.

As a threshold, it is critical to note that CDC does *not* claim that its interpretation of the relevant law and regulation is entitled to any deference from this Court. Indeed, while emphasizing what it calls its "broad authority" under the statute, CDC is careful not to suggest that this Court owes it any respect in its *legal*

interpretation of the underlying statutory text. The text of the relevant provisions "just means what it means—and the court must give it effect, as the court would any law." *Kisor v. Wilkie*, 139 S. Ct. 2400, 2415 (2019).[6]

CDC argues that the statutory provision, 42 U.S.C. § 264(a), empowers it to take any act, of any type, so long as it decides in its own allegedly unreviewable judgment it is "necessary to prevent" the spread of diseases between states. Defs. Resp. at 28, 33. It then argues that the regulation at issue, 42 C.F.R. § 70.2, imposes no further limitations, and should be read to allow CDC to take any action "that medical experts may deem necessary to protect the public health." Defs. Resp. at 32.

First, CDC is wrong when it asserts that the statute and regulation merely set out "examples Congress gave of specific measures the Secretary may take to control

---

[6] The reason CDC does not ask for deference is that it would not be entitled to any. Deference only applies when a statute or regulation "is genuinely ambiguous," and "before concluding that a rule is genuinely ambiguous, a court must exhaust all the traditional tools of construction." *Id.* (citation omitted). CDC argues however that there is no "'grievous ambiguity or uncertainty' as to what the statute authorizes," and, instead, the statutory text sets out clear, albeit broad, limits on authority. Defs. Resp. at 36. Plaintiffs agree to the extent that the text is sufficiently clear for this Court to construe it on its own. Deference would also be improper because the CDC Order construes a provision that does not depend on CDC's technical expertise, CDC has no longstanding or consistent interpretation on which this Court can rely, and the Order was issued abruptly and without the benefit of notice-and-comment procedures. *See United States v. Mead Corp.*, 533 U.S. 218, 228 (2001) (recognizing that "[t]he fair measure of deference to an agency administering its own statute has been understood to vary with circumstances, and courts have looked to the degree of the agency's care, its consistency, formality, and relative expertness, and to the persuasiveness of the agency's position") (citations omitted).

infectious disease—which are illustrative, not exhaustive" and [which] "underscore the breadth of this authority, showing that it may infringe on personal liberties or property rights where needed to protect the public health." Defs. Resp. at 28. Aside from CDC's truly terrifying invocation of unlimited authority, its reading of the text cannot be right. The canon of *ejusdem generis* "ensures that a general word will not render specific words meaningless," as "Congress would have had no reason to refer specifically" to an enumerated act but then allowed "dissimilar" acts to come along for the ride. *Yates v. United States*, 574 U.S. 528, 546 (2015) (plurality op.). "Had Congress intended [an] all-encompassing meaning" "it is hard to see why it would have needed to include the examples at all." *Id*. (citation omitted). While the text speaks in term of "fumigation," "pest extermination," and "destruction of animals … found to be so infected," 42 U.S.C. § 264(a), rewriting property laws nationwide bears no relationship with the disease control measures envisioned in the text.[7]

---

[7] CDC also points to another provision, 42 U.S.C. §§ 264(b), (c), to show that it has "authority to impose limitations on individuals' freedom of movement, including the 'apprehension, detention, or conditional release of individuals." Defs. Resp. at 28. Those sections are irrelevant because CDC did not rely on them in promulgating the Order, and the regulation, which formed the basis of the Order discusses only inspection, fumigations, and the like. *See CDC Order*, 85 Fed. Reg. at 55297; 42 C.F.R. § 70.2. Regardless, they apply only when people are believed to be already infected by disease and empower temporary quarantines. 42 U.S.C. §§ 264(b),(c). Such quarantines bear no resemblance to stopping healthy people from using court procedures allowed by state law.

Without really challenging this principle, CDC audaciously argues that "the temporary eviction moratorium is not so different than the actions contemplated in the statute or regulation as to exceed CDC's authority." Defs. Resp. at 35. It then suggests that, actually, "inspection" and "fumigation" is merely a "comparable imposition on property"—in other words it is no greater an "intrusion" on liberty. Defs. Resp. at 34-35. That is neither true nor relevant. The statute's enumerated acts do intrude on liberty, but only for those already infected and then only to stop the spread of disease. CDC's unilateral revocation of state law for everyone—healthy or not—is a completely different scale and type of intrusion on liberty. But that is the wrong metric anyway. It is not a battle of which government action is *worse* for personal liberty—it should be a question of whether Congress allowed CDC to void state law when it set out specific powers to temporarily detain livestock. CDC's Order has no relation to the examples listed, and if this Court reads the statute to empower CDC's actions here, "it is hard to see why [Congress] would have needed to include the examples at all." *Yates*, 574 U.S. at 546.

While this alone would be sufficient to show the Order is invalid, CDC also ignored key limits in both the statute and regulation. First, even though the statute limits CDC to actions that are "necessary" to prevent the spread of disease into or between states, which the regulation parrots, CDC argues that this should mean whatever *it decides* is necessary. *See* Defs. Resp. at 32. If CDC's interpretation were

18

correct, then the term would be meaningless. This Court should not take CDC up on its invitation to write the word "necessary" out of the statute. *See United States v. Menasche*, 348 U.S. 528, 538-539 (1955) ("It is our duty to give effect, if possible, to every clause and word of a statute.") (citation omitted).

Under any rational limitation on what is "necessary," CDC's Order fails. Something is "necessary," of course, when it is "required." Merriam-Webster.com Dictionary, Merriam-Webster, "Necessary" (last visited Oct. 7, 2020). CDC never even tries to argue the Order is truly essential. It just insists "that eviction moratoria *may* help to curb the spread of COVID-19[.]" Defs. Resp. at 40 (emphasis added). Even that relies on a torturous path of inferences—"mass evictions" could lead to mass homelessness, which might lead to masses of people congregating in shelters where they "may have difficulty adhering to social distancing." Defs. Resp. at 29-30. None of that suggests, however, that the Order is actually "necessary" for any public health purpose. If that is all "necessity" means, then CDC can take any action it can conceive of as long as it theoretically might benefit public health.

CDC also all but ignores the regulation's critical requirement that its actions are only permitted once "measures taken by health authorities of any State … are insufficient to prevent the spread of any of the communicable diseases[.]" 42 C.F.R. § 70.2. While defending the evidentiary basis of its conclusion that state action was insufficient, CDC just says that it declared insufficiency in the Order because "many

States and jurisdictions do not provide protections against evictions during the pandemic." Defs. Resp. at 40. It never engages with what that textual requirement means legally. The text is clear—state action must be "insufficient to prevent the spread," not that CDC's action "may" reduce certain risks. The best CDC can say is that "eviction moratoria may help to curb the spread of COVID-19." Defs. Resp. at 40. CDC's actions do not meet the legal threshold of insufficient state action.

Finally, because the Order comes with the threat of *criminal prosecution* for those who attempt to use state law, if this Court concludes that the text ambiguously empowers CDC's actions, it must apply the rule of lenity and invalidate the Order. While CDC argues the statute is not ambiguous, if this Court deems otherwise, then it must strike down CDC's attempt to expand the scope of federal criminal law far beyond what Congress could have envisioned. *See Yates*, 574 U.S. at 548. Just as in *Yates*, where the Court concluded that an unlawfully caught fish was not any other "tangible object" under the Sarbanes-Oxley Act, "if our recourse to traditional tools of statutory construction leaves any doubt about the meaning of 'tangible object,' as that term is used in [the statute], we would invoke the rule that ambiguity concerning the ambit of criminal statutes should be resolved in favor of lenity." *Id*. (citation omitted).[8]

---

[8] Even if this Court sought to defer to CDC's legal interpretation based on a statutory ambiguity, such legal "deference does not apply in criminal cases, and instead, we

**B. The CDC Order Has No Evidentiary Support and Is Thus Arbitrary and Capricious**

Plaintiffs are likely to prevail on the merits for the additional reason that CDC has provided no substantial evidence that a national eviction moratorium will address the COVID-19 pandemic. Rather than support its findings or its reasoning with such evidence, CDC just claims that this Court must give its factual determinations the "most deferential" review and uphold its Order merely because it is not "irrational." Defs. Resp. at 39, 41 (quoting *Balt. Gas & Elec. Co. v. NRDC*, 462 U.S. 87, 103 (1983)). This Court should not accept CDC's invitation to be nothing more than a rubber stamp.

While arbitrary and capricious review is "narrow," it is hardly meaningless, and any "clear error of judgment" must be vacated. *DHS v. Univ. of California*, 140 S. Ct. 1891, 1905 (2020). It is arbitrary and capricious for an agency to "offer[ ] an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Miccosukee Tribe of Indians of Fla. v. United States*, 566 F.3d 1257, 1269 (11th Cir. 2009) (citation omitted). Courts owe no factual deference to an agency's technical expertise when the question at issue is not uniquely within the

---

must look solely to the language of the regulatory provision at issue to determine whether it unambiguously prohibits the act charged." *United States v. Phifer*, 909 F.3d 372, 385 (11th Cir. 2018).

agency's expertise. *See WildEarth Guardians v. BLM*, 870 F.3d 1222, 1236 (10th Cir. 2017). A court should not "rely blindly" "on [] purported expertise." *U.S. Lines, Inc. v. FMC*, 584 F.2d 519, 535 (D.C. Cir. 1978).

CDC's factual "findings" cannot justify the Order. CDC relies on a string of inferences, but almost no hard data. Indeed, CDC cites only to the "evidence presented in the Order," which it claims proves that "evictions contribute to the spread of disease" and that "eviction moratoria may help curb the spread of COVID-19." Defs. Resp. at 40. But CDC's Order does not prove even that minimal claim. CDC only points to a single study suggesting that 15% of residents at a single homeless shelter subjectively believed eviction was the primary cause of their homelessness. *Id*. Its claim that "[e]xtensive outbreaks of COVID-19 have been identified in homeless shelters" comes from reports from Seattle, Washington and Boston, Massachusetts, from May and April, respectively. *Id*. Of course, both localities *had eviction moratoria* in place at both times. *See* Gov. Jay Inslee, *Proclamation 20-19.3, Evictions and Related Housing Practices* (July 24, 2020); *COVID-19 Emergency Regulations*, 400 CMR 5.0 (Apr. 24, 2020). And CDC has no citations and no authority for its essential claim that "[i]n the context of the current pandemic, large increases in evictions could have at least two potential negative consequences. One is if homeless shelters increase occupancy in ways that increase the exposure risk to COVID-19. The other is if homeless shelters turn away

the recently homeless, who could become unsheltered, and further contribute to the spread of COVID-19." *CDC Order*, 85 Fed. Reg. at 55295. Nor does CDC even attempt to argue that the data supports yet another leap in imagination—that the moratorium on evictions will *reduce* infections. *See id*. In short, CDC has no evidence at all to justify its actions.

Relatedly, CDC makes almost no effort to justify its conclusory assertion that its actions are "reasonably necessary" and local actions are "inadequate." *See* Defs. Resp. at 40. As mentioned, CDC never even tries to go that far, saying only that "evictions contribute to the spread of disease" and moratoria "may help to curb the spread." Defs. Resp. at 40. Even if that were true, that does not answer the question of why local actions are inadequate. Why is CDC focused on evictions, and not *anything* else that creates appreciable and serious impacts on the spread of disease? And why, if evictions should be the focus of CDC's efforts, does the Order exempt tenants with high incomes, mortgage foreclosures, and evictions for reasons other than nonpayment? Surely CDC must explain itself better than this before it can single-handedly wipe out the property laws of all 50 states.

**C. The CDC Order Denies Plaintiffs Access to the Courts Because They Cannot Retake Possession of the Property**

CDC's argument against Plaintiffs' access-to-courts claims rests on an untrue factual assertion and a legal argument without support. Factually, CDC says, "[T]he

Order does not prevent a landlord from filing an eviction action in state court." Defs. Resp. at 42. But that is neither true of what happened to Plaintiffs, nor is it justified by the language of the CDC Order. The Order says only that anyone with a legal right to retake possession of their property "shall not evict any covered person from any residential property[.]" 85 Fed. Reg. at 55292. Textually that seems to encompass any action taken to further an eviction, even merely filing paperwork with a court. Regardless, Plaintiffs were all forbidden from using their court systems because of the Order. Ms. Jones was not even allowed to proceed with existing eviction proceedings because of the broad language. *See* Jones Decl. ¶¶ 6-8.

CDC's newly-narrowed understanding of what it did does not matter for this claim. CDC says its Order does not "constitute a complete foreclosure of relief on any claim" because "[w]here tenants fail to pay rent, nothing in the Order precludes landlords from filing a breach of contract action seeking payment." Defs. Resp. at 43. As discussed, that is certainly not true now for Plaintiffs. But it yet again ignores what is at stake—it is not the lost damages for breach that matters, it is the inability for the property owners to retake possession of their property. The only way for Plaintiffs to retake possession of their property is with eviction proceedings that are now *criminalized*. *See* Pl. Mem. of Law, ECF No. 18-1, at 31-34.

Finally, CDC throws its hands in the air and says that because the "Order is [] temporary" Plaintiffs are facing "mere delay" in getting damages from their tenants.

Defs. Resp. at 43. But the delay *is* the harm, as Plaintiffs have been deprived of their property until 2021.

## V. THE PUBLIC INTEREST FAVORS THE INJUNCTION

CDC invokes the danger of the pandemic as an excuse to wildly exceed its statutory authority. *See* Defs. Resp. at 44. While no one disputes the harm caused by the pandemic, that is not a free pass for CDC to do as it pleases. CDC has no evidence, much less any convincing argument, that its Order has *any* effect on the pandemic or would prevent even a single infection. But it is always in the public interest to protect core limits on government power. *See* Pl. Mem. of Law at 38.

CDC also dismisses Plaintiffs as merely "acting in their individual economic interests." Defs. Resp. at 45. Plaintiffs do care about their ability to earn a living, and the use of their property. But they also care about the freedom to abide by only legitimate exercises of government power. Balanced against CDC's lawless and ineffective Order, the public interest strongly favors an injunction.

## VI. CONCLUSION

For the reasons set out above, the Court should enter a preliminary injunction against the CDC Order.[9]

---

[9] CDC also raises a misplaced concern over "[n]ationwide injunctions" in its response, Defs. Resp. at 47, as Plaintiffs never asked for one. Still, an injunction extending to CDC's conduct in the Northern District of Georgia would appropriately constrain CDC quite a bit since the agency's headquarters are here.

October 16, 2020

Respectfully,

*/s/ James W. Hawkins*
James W. Hawkins
Georgia State Bar No. 338767
JAMES W. HAWKINS, LLC
5470 Blair Valley Run
Cumming, GA 30040
V: 678-697-1278
F: 678-540-4515
jhawkins@jameswhawkinsllc.com

*/s/ Caleb Kruckenberg*
**Caleb Kruckenberg**
Litigation Counsel
New Civil Liberties Alliance
1225 19th St. NW, Suite 450
Washington, DC 20036
caleb.kruckenberg@ncla.legal
(202) 869-5210
*Appearing Pro Hac Vice*
*Counsel for Plaintiffs*

## CERTIFICATE OF COMPLIANCE

I hereby certify that the foregoing court filing has been prepared in 14-point

Times New Roman font and complies with LR 5.1, NDGa and LR 7.1(D), NDGa.

>*/s/ Caleb Kruckenberg*
>Caleb Kruckenberg
>*Counsel for Plaintiffs*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on October 16, 2020, I electronically filed the foregoing

with the Clerk of Court using the CM/ECF system which sent notification of such

filing to all counsel of record.

>*/s/ Caleb Kruckenberg*
>Caleb Kruckenberg
>*Counsel for Plaintiffs*